1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

8
9
10
11
12
13

**INTEGRATIVE HEALTH INSTITUTE PLLC d/b/a SOPHIA HEALTH INSITUTUTE, a Washington Professional Limited Liability Company, SOPHIA NUTRITION, LLC, a Washington Limited Liability Company; SOPHIA EDUCATION, LLC, a Washington Limited Liability Company; KS DISTRIBUTORS LLC, a Washington Limited Liability Company; DIETRICH KLINGHARDT, an individual,**

14

**Plaintiffs,**

15

**v.**

16
17
18
19
20
21
22

**CHRISTINE SCHAFFNER and DANIEL SCHAFFNER, as individuals and the marital community thereof; BELLA FIORE KLINIK, PLLC, a Washington Professional Limited Liability Company; BELLA FIORE ORGANIC SKIN CARE, LLC, a Washington Limited Liability Company; BELLA FIORE ORGANICS, LLC, a Washington Limited Liability Company; LUMVI SKINCARE, LLC, a Washington Limited Liability Company,**

23

**Defendants.**

**No.:  2:20-cv-01471-RAJ-MLP**

**SECOND AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF AND DECLARATORY RELIEF**

24
25

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health v. Schaffner* – 1

1   COME NOW Sophia Health Institute, Sophia Education, LLC, Sophia Nutrition, LLC, KS

2   Distributors, LLC and Dr. Dietrich Klinghardt on behalf of himself and for the benefit of and on behalf

3   of Sophia Health Institute, Sophia Education, LLC, Sophia Nutrition, LLC, KS Distributors, LLC

4   (collectively "Sophia Entities"), by and through the undersigned attorneys, and allege as follows:

### I. PARTIES

5       1.      Plaintiff INTEGRATIVE HEALTH INSTITUTE PLLC d/b/a SOPHIA HEALTH

6   INSITUTUTE ("Sophia"), is now, and at all times pertinent hereto has been a Washington professional

7   limited liability company transacting business in the state of Washington.

8       2.      Plaintiff SOPHIA NUTRITION, LLC, **is** now, and at all times pertinent hereto has been

9   a Washington limited liability company transacting business in the state of Washington.

10      3.      Plaintiff SOPHIA EDUCATION, LLC, is now, and at all times pertinent hereto has

11  been a Washington limited liability company transacting business in the state of Washington.

12      4.      Plaintiff KS DISTRIBUTORS, LLC, is now, and all times pertinent hereto has been a

13  Washington limited liability company transacting business in the state of Washington.

14      5.      Plaintiff DIETRICH KLINGHARDT, is now, and at all times pertinent hereto has been

15  a resident of the United Kingdom.

16      6.      Defendants CHRISTINE SCHAFFNER and DANIEL SCHAFFNER are now, and at

17  all times pertinent hereto have been, a married couple residing in the state of Washington. All actions

18  by the Defendants alleged herein were taken in the interest of, and said Defendants were acting on

19  behalf of, said marital community. If information later establishes that Defendants were unmarried

20  during any operative period pertaining to this lawsuit, Plaintiff reserves the right to amend the

21  Complaint accordingly.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner – 2*

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

7.    Defendant BELLA FIORE KLINIK, PLLC d/b/a IMMANENCE HEALTH, is now, and at all times pertinent hereto has been a Washington professional limited liability company transacting business in the state of Washington.

8.    Defendant BELLA FIORE ORGANIC SKIN CARE, LLC, is now, and at all times pertinent hereto has been a Washington limited liability company transacting business in the state of Washington.

9.    Defendant BELLA FIORE ORGANICS, LLC, is now, and at all times pertinent hereto has been a Washington limited liability company transacting business in the state of Washington. Based on information and belief, this company was administratively dissolved on June 3, 2020.

10.    Defendant LUMVI SKINCARE, LLC, is now, and at all times pertinent hereto has been a Washington limited liability company transacting business in the state of Washington.

## II.    JURISDICTION AND VENUE

10.    This court has subject matter jurisdiction over this suit, pursuant to RCW 2.08.010, as the amount in controversy exceeds three hundred dollars.

11.    This court has personal jurisdiction over the Defendants pursuant to RCW 4.12.020 as the causes of action complained of herein arose in King County, Washington.

12.    Venue is proper under RCW 4.12.025 as the Defendants conducted business in King County, and the agreement was made in King County, Washington.

## III.    BASIS OF CLAIMS

13.    On or about June 13, 2012, to expand his practice and passion for the arts of healing and neural therapy and biology, Dr. Dietrich Klinghardt formed Sophia. Dr. Klinghardt had previously studied medicine and psychology in Freiburg, Germany, completing his PhD on the involvement of the autonomic nervous system in autoimmune disorders. Dr. Dietrich Klinghardt created a model of

medicine addressing the true cause of disease that focuses on chronic infections, environmental toxicity, genetic susceptibilities, nutrition, and lifestyle, and he founded Sophia to use this model and his knowledge for the treatment of patients. Sophia provides in person patient treatment, and patient education through workshops, conferences, and online training. It also provides physician education through workshops, conferences and online training.

14.     In 2012, Dr. Klinghardt employed Christine Schaffner, a recent graduate of Bastyr University Naturopathic Medicine, and designated her as the manager of Sophia Health Institute with her agreement that she would adhere to the tenets of Sophia's operating agreement and Sophia's employee handbook. Dr. Schaffner brought no significant experience, professional recognition, or patient list to Sophia. Over the nine to ten years that she worked at Sophia, she only worked at the clinic two days a week. During that time, however, Dr. Schaffner was developing her own health network using resources and knowledge gained at Sophia.

15.     Section 5.1 of Sophia's Operating Agreement provides:

> Management of the business affairs of the company shall be vested in Christine Schaffner who is not a Member, but is a naturopathic physician licensed by the state of Washington. As the manager, she shall have the right and authority to manage the affairs of the company and to make all decisions with respect thereto, including but not limited to the authority to sign on behalf of the company. A copy of the Operating Agreement is attached hereto as **Exhibit 1.**

Section 6.4 of Sophia's Operating Agreement provides:

> Upon reasonable request, each Member shall have the right to inspect and copy at such Member's expense, during ordinary business hours the records required to be maintained by the company pursuant to section 11.5.

Section 8.3.1 of Sophia's Operating Agreement provides in part:

> A sperate Capital Account will be maintained for each Unit Holder throughout the term of the company in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv). Each Unit Holder's Capital Account will be increased by (1) the amount of money contributed by such Unit Holder to the Company;

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner – 4*

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

(2) the fair marker value of property contributed by such Unit Holder to the company; (3) allocations to such Unit Holder of Net Profits…

Section 11.5 of Sophia's Operating Agreement provides in part:

At the expense of the Company, the Members shall maintain records and accounts of all operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records…A copy of the certificate of formation and all amendments thereto; copies of this Agreement and all amendments hereto; copies of the Company's federal, state and local tax returns and reports, is any, for the three recent years; minutes of every meeting of the Members…, and copies of the Company's financial statements for the three (3) most recent years.

16.      In 2012, Daniel Schaffner (Christine Schaffner's husband) and Dietrich Klinghardt formed Sophia Nutrition, LLC to sell dietary supplements. Daniel Schaffner and Dietrich Klinghardt are equal (50%/50%) members of Sophia Nutrition, LLC. Daniel Schaffner was appointed as the manager of Sophia Nutrition, LLC. As part of the agreement, Daniel Schaffner agreed that he would use the funds of the company in furtherance of the company's business. Additionally, as the manager of the company, he agreed to borrow or raise money on behalf of the company for the benefit of the company. A copy of the Sophia Nutrition, LLC Operating Agreement is attached hereto as **Exhibit 2**.

17. Section 4.3 of the Sophia Nutrition, LLC's Operating Agreement provides in part:

Limitations on authority of the managers. Without first obtaining the approval of all the Members, the Manager will not have the authority to:

4.3.1 Enter into any sale of other disposition of the Company assets other than in the ordinary course of the company's business;
4.3.4 Dissolve the company;
4.3.5 Convert the company to another type of entity;
4.3.6. Merge the company with another entity;
4.3.7 Borrow funds from the company;
4.3.11 Admit new manager.

Section 7.2 of the Sophia Nutrition, LLC's Operating Agreement provides:

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 5

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

1

2    Accounting Reports. Within 120 days after the end of each taxable year of the Company,
     each Member will be furnished with the copies of the Company's internally prepared
3    financial statement.

4    Section 7.3 of the Sophia Nutrition, LLC's Operating Agreement provides in part:

5        …Within 105 days after the end of each taxable year, or such lesser time if prescribed by
         the Internal Revenue Service, each Member will be furnished with a statement which
6        may be used by the Member in the preparation of the Member's income tax returns,
         showing the amounts of any distributions, gains, profits, losses or credit allocated to or
7        against the Member during such taxable year.

8    In violation of Sophia Nutrition, LLC's Operating Agreement, Daniel Schaffner failed to provide Dr.

9    Klinghardt with the financials of Sophia Nutrition, LLC, and he also failed to provide Dr. Klinghardt

10   with access to the business or financial accounts of Sophia Nutrition, LLC. Upon information and

11   belief, the Schaffners have moved or sold inventory of Sophia Nutrition, LLC for personal gain, to

12   the detriment of Sophia Nutrition, LLC and Dr. Klinghardt, and without Dr. Klinghardt's knowledge.

13

14       18.    Upon information and belief, in November of 2012, Dr. Schaffner purchased a laser for

15   her company Bella Fiore Organic Skincare, LLC through Sophia and pledging Sophia's credit. This

16   was done without Dr. Klinghardt's authorization. Additionally, it took Schaffner seven years to return

17   this money to Sophia. Upon information and belief, Dr. Schaffner has been using Sophia's account for

18   her own personal use.

19       19.    On or about April 30, 2013, Dr. Schaffner formed Bella Fiore Klinik, PLLC which was

20   providing the same services as Sophia. Dr. Schaffner is the sole owner of that professional limited

21   liability company. In 2014, Dr. Schaffner formed Christine Schaffner ND, d/b/a Marine Naturopathic,

22   in California. Christine Schaffner is the sole owner of that entity.

23       20.    In the year 2015-2016, Dr. Schaffner added herself and her husband Daniel Schaffner

24   as the members of Sophia without Dr. Klinghardt's authorization. Accordingly, a Certificate of

25

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 6

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

Amendment was filed with the Washington Secretary of State in 2016 to remove the Schaffners as members of Sophia. A copy of the certificate is attached hereto as **Exhibit 3**. On or about May 31, 2016, the Schaffners purchased the property located at 1629 Queen Anne Avenue North, Suite 104, Seattle, WA 98109. This property was Bella Fiore Klinik, PLLC's principal office. The Schaffners used Sophia Nutrition, LLC to secure a loan for the purchase of the Bella Fiore Klinik, PLLC's principal office.

21.     On or about July 29, 2015, Sophia Education, LLC was formed. Dr. Klinghardt and Dr. Schaffner were named as equal (50%/50%) members of this limited liability company.

22.     On or about August 7, 2017, KS Distributors, LLC was formed. Dr. Klinghardt and Dr. Schaffner were named as equal (50%/50%) members of this limited liability company.

23.     On or about January 25, 2018, Dr. Schaffner formed Bella Fiore Organic, LLC. Dr. Schaffner is the sole owner of this limited liability company. It appears on the Washington Secretary of State's website that this limited liability company was administratively dissolved on June 3, 2020. Upon information and belief, in 2018, Bella Fiore Klinik, PLLC started its podcast called "Spectrum of Health" which is similar to Dr. Klinghardt's educational and training podcasts and seminars. In 2019, Dr. Schaffner got involved with Lumvi Skincare, LLC.  In 2020, Dr. Schaffner registered the tradename Immanence Health for Bella Fiore Klinik, PLLC.  In early 2020, Dr. Schaffner launched a new series called Luminary Talks under the Immanence Health domain. In 2020, Immanence Ipothecary, LLC was formed in which Dr. Schaffner is the sole owner of that entity.

24.     Sophia's Employee Handbook required that each employee of Sophia Health Institute to be entirely free from the influence of any personal consideration when dealing on behalf of Sophia Health Institute, making recommendations with respect to such dealings, or passing judgment on such

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 7

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

dealings. Sophia's Employee Handbook further required employees to avoid any situation which could affect their undivided loyalty and the fiduciary duty they owed to Sophia Health Institute.

25. On or about October 11, 2018, Daniel Schaffner registered Sophia Nutrition, LLC as a foreign corporation in Nevada. Based on the Nevada Secretary of State's website Christine Schaffner has been added as an "authorized signer" to this entity. Attached hereto as **Exhibit 4** is a copy of Sophia Nutrition, LLC registration retrieved from Nevada Secretary of State's website. Additionally, it appears that Gary Wilson has also been added as a managing member without Klinghardt's authorization. Section 10.1 of Sophia Nutrition, LLC Operating Agreement provides:

> Any Member may propose one or more amendments to this Agreement. A proposed amendment will be adopted and become effective as an amendment to this Agreement only upon the written approval or consent of all the Members. No amendment may be adopted that would alter the income of capital interests of a Member unless such Member voted for the amendment.

Section 8.1.1. of Sophia Nutrition, LLC operating Agreement provides in part:

> …no Member may directly or indirectly transfer, assign, pledge, hypothecate, or in any way alienate …any ownership interest…

26. In 2016, "The Sophia Method" which is Dr. Klinghardt's brand, was wrongfully trademarked and appropriated by Dr. Schaffner under the name of Sophia Nutrition, LLC and not in the name of Dr. Klinghardt' s name, despite the fact that Dr. Klinghardt created and owned the subject intellectual property. Additionally, in 2015, "The Sophia Health Institute" which is Dr. Klinghardt's brand, was trademarked under Sophia Nutrition, LLC instead of Dr. Klinghardt's name. These actions have been taken without Dr. Klinghardt's authorization. Attached hereto collectively as **Exhibit 5** are true and correct copies of the documents retrieved from the USPTO website.

27. On or about March 6, 2019, Dr. Klinghardt signed a document called "Resolution by Integrative Health Institute, PLLC". It appears from the document that Christine Schaffner was to

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 8

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

become a member of Sophia according to the following schedule: five percent (5%) as of the date of March 6, 2019; ten percent (10%) as of September 6, 2019; ten percent (10%) as of March 6, 2020; and nine percent (9%) as of October 20, 2020. This proposal was provided to Klinghardt by Schaffner. It was agreed that as part of this assignment of interest, additional documents had to be signed by both parties. Schaffner provided Klinghardt with a proposed Phantom Stock Agreement to assign interest to Schaffner. A copy of the Phantom Stock Agreement is attached hereto as **Exhibit 6**. Dr. Klinghardt did not agree with the terms, and the Phantom Stock Agreement was not executed. In fact, there was no meeting of the minds. Critically, and wrongfully, Schaffner used Sophia for the payment of her legal fees for the Phantom Stock Agreement.

28.     Subsequently, Dr. Schaffner blocked Dr. Klinghardt's access to Sophia's accounting information. Despite multiple attempts, Schaffner refused to provide Klinghardt with the company's financial documents or passwords to access accounts and emails of Sophia. In the meantime, Schaffner opened a line of credit for Sophia under Dr. Klinghardt's name without his authorization. Dr. Klinghardt has demanded and continues to demand access to all the financial and accounting records for Sophia Education, LLC, KS Distributors, LLC and Sophia Nutrition, LLC as well as any customer list or lists and mailing lists including access to QuickBooks. To date, Dr. Klinghardt does not have access to all the financial and accounting records for Sophia Education, LLC, KS Distributors, LLC and Sophia Nutrition, LLC.

29.     In January of 2020, Klinghardt provided Schaffner with an employment agreement attached hereto as **Exhibit 7** which she refused to sign. At this time, Schaffner instructed GPL Tax & Accounting Inc. ("GPL") who was the accounting firm of Sophia to not provide any information regarding the accountings to Klinghardt who was the majority owner of Sophia.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 9

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

As the manager of Sophia, Dr. Schaffner failed to file the 2019 annual report with the Washington Secretary of State which resulted in administrative dissolution of Sophia. Dr. Klinghardt had to engage legal counsel to reinstate the status of the company.

30.     In March of 2020, Klinghardt was informed by Sophia's former controller who was terminated by Schaffner about the accounting and invoicing irregularities. Klinghardt was informed about a very large number of family and non-family discounts. He was informed about significant discounting on charges in excess of the policy guidelines. This was done in violation of Sophia's policy and without Dr. Klinghardt's authorization.

31.     Dr. Schaffner has also used Dr. Klinghardt's name and likeness for purposes and websites that he did not authorize. She has used Sophia and Dr, Klinghardt's names on her personal and/or her company websites. Upon information and belief, she has used Dr. Klinghardt's recordings and handouts for her own use and promotion of her own business ventures, all without the approval or consent of Klinghardt. Upon information and belief, Dr. Schaffner has been creating educational seminars through Sophia; however, the income of those seminars is directed to Sophia Nutrition, LLC wherein Daniel Schaffner is a fifty percent (50%) equity ownership member. Additionally, Christine Schaffner has used Dr. Klinghardt's name and likeness for her own website and has added Sophia Nutrition, LLC as an addition to her own business in California, Marine Naturopathic Medicine: http://www.marinnaturopathicmedicine.com. A copy of the homepage is retrieved from the website and is attached hereto as **Exhibit 8**. Dr. Schaffner has posted Dr. Klinghardt's educational videos on the *Vimeo* account at https://vimeo.com/user56075531 and has refused to provide access to this account.  E-mails are sent on behalf of Sophia Nutrition, LLC, but with Dr. Schaffner's logo and address of Bella Fiore Klinik. To date, Defendants have refused to provide the login information

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 10

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

of Sophia's Instagram, Vimeo and YouTube accounts. A copy of the page is retrieved from the website and is attached hereto as **Exhibit 9**.

32. Dr. Schaffner is using the contact list of Sophia Health Institute, Sophia Nutrition, LLC, Sophia Education, LLC and KS Distributors, LLC for her own business ventures. Infusionsoft software is an e-mail marketing and sales platform for small businesses, including products to manage and optimize the customer lifecycle, customer relationship management, marketing automation, lead capture, and e-commerce. Infusionsoft software empowers small business owners to store contact information, such as name, address, phone number, and email of customers. This is the software that has been used for Sophia Education, LLC, Sophia Nutrition, LLC, KS distributors, LLC and Sophia Health Institute. However, to date the Schaffners have refused to provide Dr. Klinghardt with access to the Infusionsoft software. Upon information and belief, Dr. Schaffner has been sending promotional e-mails on behalf of Bella Fiore Klink, PLLC d/b/a Immanence Health to Sophia's mailing list and patient list indicating: "at Sophia Health, we truly believe our products are a valuable investment." These e-mails include Bella Fiore Klinik PLLC's address. Upon information and belief, Dr. Schaffner has been sending promotional e-mails to Sophia Education, LLC's mailing list without Dr. Klinghardt's authorization, discounting –also without Dr. Klinghardt's authorization-- Sophia Education, LLC's courses and seminars. These e-mails also include Dr. Schaffner and Bella Fiore Klink, PLLC's address.

33. The software used at Sophia, ChARM EHR which is paid by Sophia was used by Dr. Schaffner in all her clinics at no cost to her. Upon information and belief, Sophia Nutrition, LLC, Bella Fiore Klinik and Sophia's supplement sales were funneled through improper companies to the pecuniary detriment of, Dr. Klinghardt. Upon information and belief, Dr. Schaffner has been soliciting and seeing patients of Sophia at her own clinic Bella Fiore Klinik, PLLC so that Sophia would not

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health v. Schaffner* – 11

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

receive any income from those patient visits. Upon information and belief, in 2020, Dr. Schaffner was working with an employee of Sophia trying to migrate the patient lists and records to Dr. Schaffner's entity through ChARM EHR.

34.     Sophia Flow + CBD Cream is currently marketed and sold at Lumvi Skincare, LLC. Lumvi Skincare, LLC is not owned by Sophia Health Institute, Sophia Nutrition, LLC, KS Distributors, LLC, Sophia Education, LLC, or Dr. Klinghardt. The Sophia brand is Dr. Klinghardt's tradename and a product solely owned by Sophia Entities. Dr. Klinghardt did not authorize the use and selling of Sophia brand at Lumvi Skincare, LLC. Attached hereto as **Exhibit 10** is a copy of the page retrieved from https://offers.lumviskincare.com/shop/sophia-flow-plus/.

35.     Dr. Schaffner turned Dr. Klinghardt's passion for healing, education, and neural therapy and biology into a marketing tool for her own business and self-promotion, to the pecuniary and other detriment of Dr. Klinghardt

36.     On or about September 8, 2020, Dr. Klinghardt terminated Dr. Schaffner's managerial position. Subsequently, Dr. Schaffner resigned her position at Sophia as an employee and physician at Sophia abandoning Sophia's patients without adequate notice thereby harming Sophia and Dr. Klinghardt.

37.     To the extent that Plaintiffs' claims include causes of action brought on behalf of entities partially owned by Defendants Schaffner (or Defendant Schaffner), Plaintiff Klinghardt was not required to make demand for the same against Defendants Schaffner (or Defendant Schaffner) as such demand or demands would have been futile.

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION—BREACH OF CONTRACT
(Direct and Derivative Action Against the Schaffners)

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 12

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

38.     Plaintiffs re-allege each and every allegation as set forth above.

39.     In 2012, Dr. Klinghardt employed Christine Schaffner and appointed her as the manager of Sophia. As a manager of Sophia, she had agreed to act in good faith, to follow Sophia's operating agreement and Sophia's employee handbook and to promote the interest of the company. Dr. Schaffner breached Sophia's operating agreement and the employee handbook. She used Sophia Entities for her personal gain by: using Sophia Nutrition, LLC to secure loan for purchase of her own property, using Sophia Entities for her personal interest and expenses, using Sophia for her personal legal fees, soliciting patients away from Sophia, sending promotional emails and advertisement to the Sophia's patients list and Sophia Entities' mailing list advertising Bella Fiore Klinik, PLLC or her other business ventures, using Dr. Klinghardt's likeness, name, educational material for her own promotion and websites, blocking Dr. Klinghardt from accessing the company's account and financial documents in violation of Sections 6.4 and 11.5 of Sophia's Operating Agreement, and funneling money to different companies to receive the most profits. To date, Dr. Schaffner has refused providing access to Dr. Klinghardt to the financial and business accounts of Sophia Education, LLC and KS Distributors, LLC including but not limited to the access to QuickBooks, payment platforms, accounting platforms, PayPal, payroll and Infusionsoft software. This was done for her personal gain and or the benefit of her own businesses. Additionally, Dr. Schaffner trademarked Dr. Klinghart's trademark under Sophia Nutrition, LLC without his authorization.

40.     Daniel Schaffner, as a fifty percent (50%) owner of Sophia Nutrition, LLC breached the operating agreement by appointing his wife as the "authorized signer" of the company without Dr. Klinghardt's authorization and or amendment of the operating agreement. Daniel Schaffner has also added Wilson as a managing member of the company. Furthermore, money from different companies have been funneling through Sophia Nutrition, LLC without Dr. Klinghardt's authorization. In

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 13

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

violation of Sections 7.3 and 7.4 of the Sophia Nutrition, LLC's Operating Agreement, Daniel Schaffner failed to provide Dr. Klinghardt with the financials of Sophia Nutrition, LLC, and he has also refused to provide Dr. Klinghardt with access to the business or financial accounts of Sophia Nutrition, LLC including but not limited to the access to QuickBooks, payment platforms, accounting platforms, PayPal, payroll and Infusionsoft software. Schaffner wrongfully registered Dr. Klinghart's trademark under the business Sophia Nutrition, LLC without his authorization.

41.    As a result of Defendants' breach of the agreements, Plaintiffs have suffered damages, and continue to suffer ongoing damages, in an amount as to be proven at trial.

## SECOND CAUSE OF ACTION—BREACH OF FIDUCIARY DUTY
### (Direct and Derivative Action Against the Schaffners)

42.    Plaintiffs re-allege each and every allegation as set forth above.

43.    As the managers of Sophia Health Institute and Sophia Nutrition, LLC, Christine Schaffner and Daniel Schaffner owed fiduciary duties of loyalty and care to Sophia Nutrition, LLC, Sophia Health Institute, and Dietrich Klinghardt, to act at all times with the utmost care, honesty, and undivided loyalty. The Schaffners were required to act in a fair, just and equitable manner in managing the LLCs and refrain from abusing their position in control. Additionally, as a member of Sophia Education, LLC and KS, Distributors, LLC, Dr. Schaffner owed a fiduciary duty to these entities and Dr. Klinghardt.

44.    The wrongful actions here were not due to an honest error in judgment, but rather to the Schaffners' intentional mismanagement and reckless disregard of the rights and interests of Sophia Nutrition, LLC, Integrative Health Institute, PLLC, Sophia Education, LLC, KS Distributors, LLC, and Dietrich Klinghardt. The Schaffners took major actions without consulting with Klinghardt. Critically, Dr. Schaffner has failed to disclose information of the LLCs including financial statements

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 14

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

and accounting of the LLCs to Klinghardt. The Schaffners have acted without the reasonable and ordinary care which they owed to the LLCs and the members. As set forth above, the Schaffners intentionally took possession and/or used funds owned by Sophia Nutrition, LLC, Integrative Health Institute, PLLC, Sophia Education, LLC, KS Distributors, LLC, and Dietrich Klinghardt for their personal use and to the exclusion of Klinghardt. The Schaffners failed to provide Dr. Klinghardt with access to the Sophia Entities business and financial accounts in violation of the companies' operating agreements, RCW § 25.15.136 and RCW § 25.15.038. The Schaffners have used Sophia Entities and Dr. Klinghardt' s name, recordings, handouts and likeness for their own use and promotion of Dr. Schaffner's business ventures, all without the approval or consent of Dr. Klinghardt.

45.    As a result of the Schaffners' breach of fiduciary duty, Plaintiffs have been harmed as alleged herein in an amount to be proven at trial.

### THIRD CAUSE OF ACTION— BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Direct and Derivative Action Against the Schaffners)

46.    Plaintiffs re-allege each and every allegation as set forth above.

47.    The Schaffners' contract with Klinghardt to act as the manager of the LLCs contains within it the implied covenant of good faith and fair dealing at all times.

48.    By virtue of committing the breaches set forth in paragraph above. The Schaffners breached the implied covenant of good faith and fair dealing with the Plaintiffs.

49.    As a direct and proximate result of this breach and wrongful conduct. Plaintiffs have and will continue to suffer damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION— TRADEMARK INFRINGEMENT
(15 U.S.C. § 1114)
(Direct Action of Klinghardt Against the Schaffners)

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 15

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

50.     Plaintiffs re-allege each and every allegation as set forth above.

51.     The Schaffners have used in interstate commerce, without Klinghardt's authorization, Klinghartd's trademark by trademarking "The Sophia Method" and "Sophia Health Institute" under names other than Dietrich Klinghardt. These marks have been used in connection with the marketing, advertising, promotion, and sale of Sophia and Sophia Nutrition, LLC. The Schaffners have also trademarked the brand name "Sophia" under Sophia Nutrition, LLC instead of Klinghardt' s name

52.     The Schaffners' unauthorized use of the marks is likely to have caused confusion, to have caused mistake, and/or to have deceived patients and clients as to the source of Defendants' services or as to Defendants' affiliation, connection, approval, sponsorship, or association with Dietrich Klinghardt.

53.     The Schaffners'actions constitute infringement of Dr. Klinghardt's design and in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

54.     The Schaffners' infringing conduct has caused damages to Klinghardt's business, reputation, name, goodwill, and profits.

55.     The Schaffners' acts have caused, and unless enjoined, will continue to cause, irreparable harm and injury to Klinghardt's business reputation and goodwill for which there is no adequate remedy at law. Defendants' acts also have caused, and unless enjoined, will continue to cause, inevitable public confusion and substantial and irreparable harm to the public for which there is no adequate remedy at law. Klinghardt is therefore entitled to injunctive relief pursuant to 15 U.S.C. §1116.

56.     Pursuant to 15 U.S.C. § 1117, Klinghardt also entitled to recover damages in an amount to be determined at trial. Klinghardt is further entitled to recover additional treble damages and reasonable attorneys' fees pursuant to 15 U.S.C §1117.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 16

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

**FIFTH CAUSE OF ACTION— FALSE DESIGNATION OF ORIGIN, FALSE ADVERTISING, AND UNFAIR COMPETITION (15 U.S.C. § 1125)**
(Direct Action of Klinghardt Against the Schaffners)

57.     Plaintiffs re-allege each and every allegation as set forth above.

58.     By trademarking Klinghardt's trademarks under Sophia Nutrition, LLC, the Schaffners have made false and misleading representations and descriptions of fact in connection with the services, offering for sale and sale of Klinghardt's Products. The Schaffners' false and misleading representations and descriptions of fact misrepresent the nature, characteristics, qualities, or origin of their goods, services, and commercial activities.

59.     Defendants' promotion, marketing, services, offering for sale, and sale of Klinghardt's products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or the origin of Defendants' goods or services.

60.     Defendants' action and false representations and description of fact in interstate commerce has either deceived or has the capacity to deceive a substantial segment of patients, customers and potential consumers, and such deception is material, in that it is likely to influence the patients', consumers' and physicians' decisions.

61.     Defendants have used, and continue to use, Klinghardt's trademarks without his authorization to compete unfairly with Klinghardt and to deceive consumers.

62.     Defendants' wrongful conduct constitutes false designation of origin, false advertising, and unfair competition, all of which are willful violations of Section 43 of the Lanham Act, 15 U.S.C. § 1125. Defendants' wrongful conduct is likely to continue unless restrained and enjoined.

63.     As a result of Defendants' wrongful conduct, Klinghardt is entitled to recover his actual damages, Defendants' profits attributable to the infringement, and treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a) and (b). Alternatively, Klinghardt is entitled to statutory damages

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 17

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

under 15 U.S.C. § 1117(c). Additionally, Klinghardt is entitled to the re-assignment and transfer of the trademarks to his name.

64.     Klinghardt is further entitled to injunctive relief. Klinghardt has no adequate remedy at law for Defendants' wrongful conduct because, inter alia: (a) Defendants' conduct constitutes harm to Klinghardt such that Klinghardt could not be made whole by any monetary award; (b) if Defendants' wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of the Klinghardt's Products and services; and (c) Defendants' wrongful conduct, and the resulting harm to Klinghardt, is continuing.

## SIXTH CAUSE OF ACTION—TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (As Derivative Action)

65.     Plaintiffs re-allege each and every allegation as set forth above.

66.     There is a valid business expectancy between Sophia and its patients.

67.     The Schaffners and Bella Fiore Klinik, PLLC had knowledge of the contractual relationships and/or business expectancies between Sophia and its patients.

68.     The Schaffners and Bella Fiore Klinik, PLLC have intentionally interfered with said contractual relationships and/or business expectancies resulting in a breach and/or termination of the relationships and expectancies.

69.     As a direct result of Defendants' actions, Sophia has suffered damages, including direct damages and consequential damages, as more specifically set forth in the prayer for relief below.

## SEVENTH CAUSE OF ACTION –VIOLATION OF THE UNIFORM TRADE SECRETS ACT (RCW 19.108)
### (As Direct and Derivative Action)

70.     Plaintiffs re-allege each and every allegation as set forth above.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health v. Schaffner* – 18

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

71.     During her employment at Sophia, Christine Schaffner has had access to, and acquired certain of Sophia's trade secrets, including Sophia's patients' information, patient lists, educational material, and other valuable information which constitute trade secrets under RCW 19.108.010.

72.     Christine Schaffner used trade secret information for her own benefit, constituting misappropriation of trade secrets under RCW 19.108.010.

73.     Christine Schaffner misappropriated Sophia's assets, including use of Dietrich Klinghardt's name and likeness, for the purpose of diverting clients and patients away from Sophia. Christine Schaffner misappropriated Sophia's assets, including sending promotional emails and advertisement to the Sophia's patients list and Sophia Entities' mailing list for the promotion of her own business ventures, all without the approval or consent of Dr. Klinghardt.

74.     As a direct result of Christine Schaffner's violation of the Uniform Trade Secrets Act, Plaintiffs have suffered damages and continue to suffer ongoing damages, including direct damages and consequential damages, in an amount to be proven at trial.

75.     Klinghardt is further entitled to injunctive relief. Klinghardt has no adequate remedy at law for Defendants' wrongful conduct because, inter alia: (a) Defendants' conduct constitutes harm to Klinghardt such that Klinghardt could not be made whole by any monetary award; (b) if Defendants' wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of Klinghardt's products and services; and (c) Defendants' wrongful conduct, and the resulting harm to Klinghardt, is continuing.

### EIGHTH CAUSE OF ACTION –CONVERSION
(As Direct and Derivative Action)

76.     Plaintiffs re-allege each and every allegation as set forth above.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 19

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

77.     At all times relevant to this litigation, the Schaffners owed a duty to Plaintiffs to not convert Plaintiffs' property to Defendants' own use and benefit. As discussed, the Schaffners intentionally took possession and/or used funds, assets and trade secrets owned by Sophia Nutrition, LLC, Integrative Health Institute, PLLC, Sophia Education, LLC, KS Distributors, LLC, and Dietrich Klinghardt for their personal use and to the exclusion of Klinghardt.

78.     As a direct result of Defendants' conversion of Plaintiffs' money, Plaintiffs suffered damages, and continue to suffer ongoing damages, including direct damages and consequential damages, in an amount to be proven at trial.

### NINTH CAUSE OF ACTION—CONVERSION OF BUSINESS GOODWILL
(As Direct and Derivative Action)

79.     Plaintiffs re-allege each and every allegation as set forth above.

80.     Christine Schaffner solicited and directed away patients of and from Integrative Health Services, PLLC' and visited the patients at Bella Fiore Klinik, PLLC. Additionally, Christine Schaffner has used Dr. Klinghardt name and likeness for her own website and has added Sophia as an addition to her own business in California, Marine Naturopathic Medicine: http://www.marinnaturopathicmedicine.com. Christine Schaffner has been sending promotional emails and advertisement to the Sophia's patients list and Sophia Entities' mailing list for the promotion of her own business ventures and soliciting patients away from Sophia. To date the Schaffners have refused to provide Dr. Klinghardt with access to the Infusionsoft software which includes the customer list of Sophia Entities. Daniel Schaffner has added Christine Schaffner as the authorized signer for Sophia Nutrition, LLC without Dr. Klinghardt's authorization, and he has also added Wilson as the managing member of Sophia Nutrition, LLC without Dr. Klinghardt's

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 20

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

knowledge and authorization. Upon information and belief, Bella Fiore Klinik, PLLC and Sophia's dietary supplements sales were funneled through Sophia Nutrition, LLC.

81. The Schaffners intentionally interfere with a chattel that belongs to the Plaintiffs, and deprive Plaintiffs form their business goodwill and customers.

82. As a direct result of Defendants' actions, Plaintiffs suffered damages, and continue to suffer ongoing damages, as more specifically set forth in the prayer for relief below.

## TENTH CAUSE OF ACTION—ACCOUNTING

### (As Direct and Derivative Action)

83. Plaintiffs re-allege each and every allegation as set forth above.

84. Dietrich Klinghardt is a member of Sophia Nutrition, LLC, Integrative Health Institute, PLLC, Sophia Education, LLC, KS Distributors, LLC, and as such, is entitled to inspect and copy the records of the companies during regular business hours at the companies' principle office pursuant to RCW 25.15.136.

85. Klinghardt seeks to review the full and complete accounting records of the companies.

86. Christine Schaffner has refused to grant Klinghardt access to the full and complete accounting records of Sophia Entities.

87. Klinghardt's demands to see the records of Sophia Nutrition, LLC, Integrative Health Institute, PLLC, Sophia Education, LLC, KS Distributors, LLC was made in good faith and for a proper purpose. Klinghardt has described his purpose and the records sought with reasonable particularity and the records sought are directly connected to the entities' respective purposes.

88. Accordingly, Klinghardt seeks relief as set forth below.

## ELEVENTH CAUSE OF ACTION – JUDICIAL DISSOLUTION OF SOPHIA NUTRITION, LLC AND KS DISTRIBUTORS, LLC

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

89.     Plaintiffs re-allege each and every allegation as set forth above.

90.     Plaintiffs bring this action pursuant to RCW 25.15.274.

91.     The Superior Court may dissolve a limited liability company in a proceeding by a member if it is established that "it is not reasonably practicable to carry on the business in conformity with a limited liability company agreement" or "other circumstances render dissolution equitable."

92.     The Schaffners are the members in charge of the operations and accounting of Sophia Nutrition, LLC and KS Distributors, LLC and have acted in a manner that is oppressive by breaching their duties of loyalty, due care and/or good faith.

93.     It is no longer reasonably practicable to carry on Sophia Nutrition, LLC and KS Distributors, LLC's activities.

94.     Sophia Nutrition, LLC and KS Distributors, LLC should be judicially dissolved, and assets wound up pursuant to RCW 25.15.274.

**TWELFTH CAUSE OF ACTION –DECLARATORY JUDGMENT THAT KLINGHARDT OWNS THE TRADEMARKS**
**(RCW Ch. 7.24)**

95.     Plaintiffs re-allege each and every allegation as set forth above.

96.     An actual controversy has arisen between Klinghardt and the Schaffners, in that Plaintiffs contend—and believe that the Schaffners would deny—the following: (a) Defendants marketed, sold, and distributed Klinghardt's Products through the unauthorized entity names and websites including the trademark of "The Sophia Method" and "Sophia Health Institute" under the name of Sophia Nutrition, LLC instead of Dr. Klinghardt' s name, and the selling of Sophia products through the unauthorized entities or websites; (b) Defendants infringed upon and misused the intellectual property rights of Klinghardt; and (c) Defendants Schaffner personally participated in

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner – 22*

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

and/or had the right and ability to supervise, direct, and control the conduct alleged herein, and derived a direct financial benefit from that wrongful conduct.

97.    The parties have genuine and opposing interests, which are direct and substantial.

98.    Klinghardt has suffered, is suffering, and will continue to suffer invasion of his statutory, common law, and contractual rights due to Defendants' wrongful conduct.

99.    A judicial determination of the parties' controversy would provide or assist in final and conclusive relief.

100.   For these and other reasons, Klinghardt is entitled to a declaration that conclusively determines those controversies listed above.

**THIRTEENTH CAUSE OF ACTION –DECLARATORY JUDGMENT**
**THAT KLINGHARDT OWNS 100% OF INTERGRATIVE HEALTH INSTITUTE, PLLC**
**(RCW Ch. 7.24)**

101.   Plaintiffs re-allege each and every allegation as set forth above.

102.   An actual controversy has arisen between Klinghardt and Christine Schaffner, in that Plaintiffs contend—and believe that the Schaffners would deny—that Christine Schaffner is not a shareholder in Integrative Health Institute, PLLC.

103.   The parties have genuine and opposing interests, which are direct and substantial.

104.   Klinghardt has suffered, is suffering, and will continue to suffer invasion of his rights and property and pecuniary interests due to Schaffner's wrongful conduct.

105.   A judicial determination of the parties' controversy would provide final and conclusive relief.

106.   For these and other reasons, Plaintiff is entitled to a declaration that conclusively determines the controversies listed above.

**FOURTEENTH CAUSE OF ACTION –UNJUST ENRICHMENT**

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 23

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

(Direct Action of Klinghardt Against the Schaffners)

107.   Plaintiffs re-allege each and every allegation as set forth above.

108.   As a result of the improper conduct of Defendants described herein, the Schaffners have been unjustly enriched at the expense and to the detriment of Klinghardt.

109.   Supplement and other product sales only authorized through Sophia have been funneled through Sophia Nutrition, LLC where Daniel Schaffner is a fifty percent (50%) owner. Educational and other proprietary materials of Klinghardt have been used and distributed through a different company to the pecuniary detriment of Klinghardt resulting in the unjust enrichment of Defendants Schaffner.

110.   Accordingly, the Schaffners should be required to distribute the profits they have obtained wrongfully to Klinghardt.

**FIFTEENTH CAUSE OF ACTION- VIOLATION OF KLINGHARDT'S RIGHTS UNDER RCW 63.60 et.seq**

111.   Plaintiffs re-allege each and every allegation as set forth above.

112.   Defendants jointly and severally used or authorized the use of and wrongfully appropriated to their own use and benefit the name of the Plaintiff Klinghardt for commercial advertising purposes in violation of RCW 63.60 et seq. "[e]very individual or personality has a property right in the use of his or her name, voice, signature, photograph, or likeness." RCW 63.60.010.

113.   Under RCW § 63.60.050,

Any person who uses or authorizes the use of a living or deceased individual's or personality's name, voice, signature, photograph, or likeness, on or in goods, merchandise, or products entered into commerce in this state, or for purposes of advertising products, merchandise, goods, or services, or for purposes of fundraising or solicitation of donations, or if any person disseminates or publishes such advertisements in this state, without written or oral, express or

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 24

MDK | LAW
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

implied consent of the owner of the right, has infringed such right. An infringement may occur under this section without regard to whether the use or activity is for profit or not for profit.

114.     Defendants' appropriation of Klinghardt's name was without his consent, express or implied.

115.     As a direct and proximate result of the conduct of the Defendants, Plaintiff Klinghardt sustained loss of property rights and lost income. Klinghardt is further entitled to an order enjoining the conduct of Defendants complained of herein and such further equitable relief as the Court may deem proper.

### SIXTEENTH CAUSE OF ACTION— FALSE DESIGNATION OF ORIGIN, FALSE ADVERTISING, AND UNFAIR COMPETITION (15 U.S.C. § 1125)
(Against Lumvi Skincare, LLC and the Schaffners)

116.     Plaintiffs re-allege each and every allegation as set forth above.

117.     By marketing and selling Sophia Flow + CBD, Lumvi Skincare, LLC has made false and misleading representations and statements of fact in connection with the goods, commercial activity and sale of Klinghardt's and Sophia Entities' Products. Lumvi Skicare, LLC's false and misleading representations and descriptions of fact misrepresent the nature, characteristics, qualities, or origin of its goods, services, and commercial activities. Sophia is trademarked under Sophia Nutrition, LLC with the serial number 85919418 at United States Patent and Trademark Office. Sophia Flow is a product of Sophia Nutrition, LLC.

118.     Lumvi Skincare, LLC's promotion, marketing, services, offering for sale, and sale of Klinghardt's products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or the origin of Defendants' goods or services.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 25

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

119.     Lumvi Skincare, LLC's action and false representations and statements of fact in interstate commerce have either deceived or has the capacity to deceive a substantial segment of patients, customers and potential consumers, and such deception is material, in that it is likely to influence the patients', consumers' and physicians' decisions.

120.     Lumvi Skincare, LLC has used, and continues to use, Klinghardt's trademarks without his authorization to compete unfairly with Klinghardt and to deceive consumers.

121.     Lumvi Skincare, LLC's wrongful conduct constitutes false designation of origin, false advertising, and unfair competition, all of which are willful violations of Section 43 of the Lanham Act, 15 U.S.C. § 1125. Defendants' wrongful conduct is likely to continue unless restrained and enjoined.

122.     As a result of Defendants' wrongful conduct, Klinghardt is entitled to recover his actual damages, Lumvi Skincare, LLC's profits attributable to the infringement, and treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(a) and (b). Alternatively, Klinghardt is entitled to statutory damages under 15 U.S.C. § 1117(c).

123.     Klinghardt is further entitled to injunctive relief. Klinghardt has no adequate remedy at law for Lumvi Skincare, LLC's wrongful conduct because, inter alia: (a) Lumvi Skincare, LLC's conduct constitutes harm to Klinghardt such that Klinghardt could not be made whole by any monetary award; (b) if Lumvi Skincare, LLC's wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of Klinghardt's Products and services; and (c) Lumvi Skincare, LLC's wrongful conduct, and the resulting harm to Klinghardt, is continuing.

## SEVENTEENTH CAUSE OF ACTION— TRADEMARK INFRINGEMENT
### (15 U.S.C. § 1114)
(Against Lumvi Skincare, LLC and the Schaffners)

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 26

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

124.    Plaintiffs re-allege each and every allegation as set forth above.

125.    Defendant Lumvi Skincare, LLC has used in interstate commerce, without Klinghardt's authorization, Klinghartd's and Sophia Entities' trademark by selling Sophia Flow with an added variation "Sophia Flow + CBD" Cream. Sophia's mark and product have been used in connection with the marketing, advertising, promotion, and sale of their products at Lumvi Skincare, LLC.

126.    Lumvi Skincare, LLC's unauthorized use of the marks is likely to have caused confusion, to have caused mistake, and/or to have deceived patients and clients as to the source of Defendants' services or as to Defendants' affiliation, connection, approval, sponsorship, or association with Dietrich Klinghardt and Sophia Entities.

127.    Lumvi Skincare, LLC's actions constitute infringement of Dr. Klinghardt's and Sophia Entities' design and in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

128.    Lumvi Skincare, LLC's infringing conduct has caused damages to Klinghardt's business, reputation, name, goodwill, and profits.

129.    Lumvi Skincare, LLC's acts have caused, and unless enjoined, will continue to cause, irreparable harm and injury to Plaintiffs' business reputation and goodwill for which there is no adequate remedy at law. Defendants' acts also have caused, and unless enjoined, will continue to cause, inevitable public confusion and substantial and irreparable harm to the public for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief pursuant to 15 U.S.C. §1116.

130.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are also entitled to recover damages in an amount to be determined at trial, including, but not limited to, profits made by Lumvi Skincare, LLC on the sale of Sophia's product and the costs of this action.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 27

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

131.     Plaintiffs are further entitled to recover additional treble damages and reasonable attorneys' fees pursuant to 15 U.S.C §1117, since Lumvi Skincare, LLC's actions were undertaken willfully and with the intention of causing confusion, mistake and deception on the part of the public.

### EIGHTEENTH CAUSE OF ACTION- VIOLATION OF THE CONSUMER PROTECTION ACT, RCW § 19.86 *et seq*
(Against All Defendants)

132.     Plaintiffs re-allege each and every allegation as set forth above.

133.     Defendants engaged, and continue to engage, in unfair or deceptive acts in the conduct of trade or commerce, by infringing Klinghardt's and Sophia Entities' mark, by selling Sophia Entities' product on unauthorized website and entities, by using Dr. Klinghardt's name and likeness, by using the patient list, trade secret and customer list of Sophia Entities for the promotion of their own business entities and by violating the Uniform Trade Secret Act.

134.     The public interest has been, and continues to be, affected by the Defendants' unfair or deceptive acts.

135.     Defendants' unfair or deceptive acts are susceptible of repetition.

136.     Plaintiffs have been harmed by the unfair or deceptive acts of Defendants.

137.     As a direct result of Defendants' violation(s) of the Washington Consumer Protection Act, Plaintiffs have suffered damages – and further requests recovery of applicable treble damages and attorneys' fees pursuant to RCW § 19.86 *et seq.* – as more specifically set forth below.

138.     Pursuant to RCW 19.86.090, Plaintiffs are further entitled to an order enjoining the conduct of Defendants complained of herein and such further equitable relief as the Court may deem proper.

### NINTEENTH CAUSE OF ACTION –VIOLATION OF THE UNIFORM TRADE SECRETS ACT (RCW 19.108)
(Against Lumvi Skincare, LLC and the Schaffners)

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health v. Schaffner* – 28

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

139.     Plaintiffs re-allege each and every allegation as set forth above.

140.     During her employment at Sophia, Christine Schaffner has had access to, and acquired certain of Sophia's trade secrets, including Sophia Entities' products and other valuable information which constitute trade secrets under RCW 19.108.010.

141.     Lumvi Skincare, LLC through Christine Schaffner used Plaintiffs' trade secret information for its own benefit which continuities misappropriation of trade secrets under RCW 19.108.010. Christine Schaffner and Lumvi Skincare, LLC misappropriated Dr. Klinghardt's and Sophia Entities' assets.

142.     As a direct result of Christine Schaffner's and Lumvi Skincare, LLC's violation of the Uniform Trade Secrets Act, Plaintiffs have suffered damages and continue to suffer ongoing damages, including direct damages and consequential damages, in an amount to be proven at trial.

143.     Plaintiffs are further entitled to injunctive relief. Plaintiffs have no adequate remedy at law for Defendants' wrongful conduct because, inter alia: (a) Defendants' conduct constitutes harm to Plaintiffs such that Plaintiffs could not be made whole by any monetary award; (b) if Defendants' wrongful conduct is allowed to continue, the public is likely to become further confused, mistaken, or deceived as to the source, origin, or authenticity of the Sophia Entities' Products and services; and (c) Defendants' wrongful conduct, and the resulting harm to Klinghardt, is continuing.

**TWENTIETH CAUSE OF ACTION-INJUNCTIVE RELIEF**

144.     Plaintiffs re-allege each and every allegation as set forth above

145.     As a direct result of Defendants' violations of RCW § 63.60.050, Washington's Consumer Protection Act, conversion, trademark infringement, false designation of origin, false advertisement and unfair competition, Plaintiffs have suffered irreparable harm in which remedies

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 29

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

at law are inadequate. Accordingly, Plaintiffs request an injunction permanently enjoining Defendants as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

A. For entry of judgment against Defendants for all damages claimed in this Complaint;

B. For all direct, foreseeable, and consequential damages that resulted from Defendants' breach of any and all applicable agreements;

C. For all direct, foreseeable, and consequential damages that resulted from Defendants' breach of good faith and fair dealing;

D. For all direct, foreseeable, and consequential damages that resulted from Defendants' breach of fiduciary duties;

E. For damages in the amount of the funds that Defendants converted from the Plaintiffs in an amount to be determined at trial;

F. For entry of judgment against the Defendants for unjust enrichment, in an amount to be determined at trial;

G. For entry of a judgment ordering the Schaffners to provide accountings of the books and records of Sophia Nutrition, LLC, Integrative Health Institute, PLLC, Sophia Education, LLC, and KS Distributors, LLC accounting records.

H. For declaratory judgment that the Schaffners have infringed Klinghardt's trademarks and other intellectual property;

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 30

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

I.   For declaratory judgment that Klinghardt is the 100% owner of Integrative Health Institute, PLLC ;

J.   For judicial dissolution and winding up of Sophia Nutrition, LLC and KS Distributors, LLC and winding up of assets.

K.   For entry of judgment that Defendants be required to pay all profits realized by Defendants by reason of their unlawful or other acts alleged herein, along with all general, special, actual, and statutory damages which Klinghardt has sustained, or will sustain, as a consequence of Defendants' unlawful acts, and that such damages be enhanced, doubled, or trebled as provided for by 17 U.S.C. § 504(c) and 15 U.S.C. § 1117(b);

L.   For entry of judgment for reassignment of the trademarks to Klinghardt.

M.   For treble damages pursuant to RCW 19.86.090;

N.   For a permanent injunction permanently barring defendants and their representatives, agents, employees, attorneys, independent contractors, and those persons in active concert or participation with defendants and their representatives, agents, employees, attorneys, and independent contractors from use of Klinghardt's name and likeness; use of Plaintiffs' trade secret and trademark; use of Sophia Entities' patient list and mailing list for any entities outside Sophia Entities; selling of Sophia Entities' product on any unauthorized websites or entities.

O.   For an award of attorneys' fees and costs pursuant the contract, RCW § 4.84 *et seq.,* and any other applicable statutory, equitable, or contractual authority;

P.   For post judgment interest accruing at a rate of 12% per annum or highest permitted by law, whichever is higher, pursuant to RCW § 4.56.110; and

Q.   For such other and further relief as the Court deems just.

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 31

**MDK | LAW**
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

1

2      DATED this 27th   day of May, 2021.

3                                                      MDK LAW

4                                                      */s/ Mark D. Kimball*

5                                                      */s/ Farnoosh Faryabi*

6      ─────────────────────────────────
       MARK D. KIMBALL, WSBA NO. 13146
7      FARNOOSH FARYABI, WSBA No. 49706
       MDK Law
8      777 108th Ave NE, Suite 2000
       Bellevue, WA 98004
9      Telephone: (425) 455-9610
       Fax: (425) 455-1170
10     E-mail: mkimball@mdklaw.com
       E-mail: ffaryabi@mdklaw.com
11     Attorneys for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health  v. Schaffner* – 32

## DECLARATION OF DIETRICH KLINGHARDT

DIETRICH KLINGHARDT, pursuant to RCW 9A.72.085, declares as follows:

1.    I am over the age of eighteen years, competent to testify in this matter, and make this declaration on personal knowledge of the facts stated herein. I am a Plaintiff in this case.

2.    I have read the Complaint and fully verify the content.

3.    I am and have been a shareholder of Integrative Health Institute PLLC d/b/a Sophia Health Institute, Sophia Nutrition, LLC, Sophia Education, LLC, and KS Distributors, LLC at all times pertinent to the subject matter of this complaint.

4.    This action is not a collusive one to confer jurisdiction on a court of this state which it would not otherwise have.

5.    To the extent that Plaintiffs' claims include causes of action brought on behalf of entities partially owned by Defendants Schaffner (or Defendant Schaffner), I was not required to make a demand for the same against Defendants Schaffner (or Defendant Schaffner) as such demand or demands would have been futile. Additionally, I made efforts toward Christine Schaffner to protect the entities' interests, but those efforts were unsuccessful.


I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.


Dated this _2_ day of April, 2021 at __12:09 pm_____..
In Woodinville, Washington.


DIETRICH KLINGHARDT

SECOND AMENDED COMPLAINT
(2:20-cv-01471-RAJ-MLP)-
*Sophia Health v. Schaffner* – 33

MDK | LAW
777 108th Avenue Northeast, Suite 2000
Bellevue, Washington 98004
(425) 455-9610

# EXHIBIT 1

**PROFESSIONAL LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

**OF**

**INTEGRATIVE HEALTH INSTITUTE, PLLC**

**(a Washington Professional Limited Liability Company)**

**Dated and Effective**

**as of**

**June 13, 2012**

# TABLE OF CONTENTS

PAGE

ARTICLE 1 ---     DEFINITIONS ......................................................................... 1

ARTICLE 2 ---     FORMATION OF COMPANY ................................................. 4
2.1       Formation................................................................................. 4
2.2       Name....................................................................................... 4
2.3       Principal Place of Business...................................................... 4
2.4       Registered Office and Registered Agent................................... 4
2.5       Term....................................................................................... 5

ARTICLE 3 ---     BUSINESS OF COMPANY ..................................................... 5

ARTICLE 4 ---     NAMES AND ADDRESSES OF MEMBERS ........................... 5

ARTICLE 5 ---     MANAGEMENT ..................................................................... 5
5.1       Management............................................................................. 5
5.2       Voting ..................................................................................... 5

ARTICLE 6 ---     RIGHTS AND OBLIGATIONS OF MEMBERS ...................... 5
6.1       Limitation of Liability.............................................................. 5
6.2       Liability for Company Obligations ........................................... 5
6.3       Approval of Sale of All Assets ................................................ 6
6.4       Inspection of Records .............................................................. 6
6.5       No Priority and Return of Capital............................................. 6
6.6       Withdrawal of Member............................................................ 6

ARTICLE 7 ---     MEETINGS OF MEMBERS..................................................... 6
7.1       Annual Meetings...................................................................... 6
7.2       Special Meetings...................................................................... 6
7.3       Place of Meetings.................................................................... 6
7.4       Notice of Meetings.................................................................. 7
7.5       Record Date ........................................................................... 7
7.6       Quorum................................................................................... 7
7.7       Manner of Acting.................................................................... 7
7.8       Proxies ................................................................................... 7
7.9       Action by Members Without a Meeting .................................... 8
7.10      Waiver of Notice..................................................................... 8

ARTICLE 8 ---     CONTRIBUTIONS TO THE COMPANY AND
                    CAPITAL ACCOUNTS ......................................................... 8
8.1       Members' Capital Contributions .............................................. 8
8.2       Additional Contributions ......................................................... 8
8.3       Capital Accounts..................................................................... 9

i

8.3.1 Establishment and Maintenance ........................................................ 9
8.3.2 Compliance with Regulations ........................................................... 9
8.4   Withdrawal or Reduction of Members'
     Contributions to Capital .............................................................. 10

ARTICLE 9 ---  ALLOCATIONS OF NET PROFITS AND LOSSES ............................. 10
9.1   Allocation of Net Profit and Loss in General ............................................ 10
9.1.1 Allocation of Net Profit or Loss ..................................................... 10
9.1.2 Limitation ............................................................................... 10
9.2   Special Allocations ....................................................................... 10
9.2.1 Minimum Gain Chargeback ............................................................. 10
9.2.2 Member Minimum Gain Chargeback .................................................. 11
9.2.3 Qualified Income Offset ................................................................ 11
9.2.4 Nonrecourse Deductions ................................................................ 11
9.2.5 Member Nonrecourse Deductions .................................................... 11
9.3   Corrective Allocations .................................................................... 11
9.3.1 Allocations to Achieve Economic
     Agreement .......................................................................... 11
9.3.2 Waiver of Application of Minimum Gain
     Chargeback ......................................................................... 12
9.4   Other Allocation Rules ................................................................... 12
9.4.1 General ................................................................................... 12
9.4.2 Allocation of Recapture Items ....................................................... 12
9.4.3 Allocation of Excess Nonrecourse
     Liabilities ........................................................................... 12
9.4.4 Allocations in Connection with Varying
     Interests ............................................................................. 12
9.5   Determination of Net Profit or Loss ..................................................... 13
9.5.1 Computation of Net Profit or Loss .................................................. 13
9.5.2 Adjustments to Net Profit or Loss .................................................. 13
9.5.3 Items specially Allocated .............................................................. 14
9.6   Mandatory Tax Allocations Under Code Section
     704(c) ............................................................................... 14

ARTICLE 10 ---  DISTRIBUTIONS ......................................................................... 14
10.1   Cash Contributions ....................................................................... 14
10.1.1 Nonliquidating Distributions ......................................................... 14
10.1.2 Distributions in Liquidation .......................................................... 15
10.2   Distributions in Kind .................................................................... 15
10.3   Withholding; Amounts Withheld Treated as
     Distributions ......................................................................... 15
10.4   Limitation Upon Distributions .......................................................... 15

ARTICLE 11 ---  ACCOUNTING, BOOKS AND RECORDS ......................................... 15
11.1   Accounting Principles .................................................................... 15

|       | 11.2 | Interest On and Return of Capital Contributions ................................................... 15 |
|       | 11.3 | Loans to Company .................................................................................................... 15 |
|       | 11.4 | Accounting Period ................................................................................................... 15 |
|       | 11.5 | Records, Audits and Reports ................................................................................... 16 |
|       | 11.6 | Returns and Other Elections ................................................................................... 16 |

ARTICLE 12 ---     TRANSFERABILITY ........................................................................... 16
|       | 12.1 | General .................................................................................................................... 16 |
|       | 12.2 | Repurchase Rights .................................................................................................. 17 |

ARTICLE 13 ---     ADDITIONAL MEMBERS ................................................................... 17
|       | 13.1 | New Members .......................................................................................................... 17 |
ARTICLE 14 ---     DISSOLUTION AND TERMINATION ............................................... 17
|       | 14.1 | Dissolution .............................................................................................................. 17 |
|       | 14.2 | Allocation of Net Profit and Loss in Liquidation ................................................... 18 |
|       | 14.3 | Winding Up, Liquidation and Distribution of Assets ............................................. 18 |
|       | 14.4 | No Obligation to Restore Negative Capital Account Balance on Liquidation ........ 18 |
|       | 14.5 | Termination ............................................................................................................. 19 |
|       | 14.6 | Certificate of Cancellation ..................................................................................... 19 |
|       | 14.7 | Return to Contribution Nonrecourse to Other Members ......................................... 19 |

ARTICLE 15 ---     INDEPENDENT ACTIVITIES OF MEMBERS ................................... 19

ARTICLE 16 --- LIMITATION OF LIABILITY AND INDEMNIFICATION PROVISION ................................................................................................................. 19
|       | 16.1 | Limitation of Members Liability ............................................................................. 19 |
|       | 16.2 | Indemnification ....................................................................................................... 20 |
|       |      | 16.2.1 Power to Indemnify ....................................................................................... 20 |
|       |      | 16.2.2 Power to Pay Expenses and Advance Disposition ........................................ 20 |
|       |      | 16.2.3 Power to Enter Into Contracts ...................................................................... 21 |
|       |      | 16.2.4 Limitation on Powers .................................................................................... 21 |
|       |      | 16.2.5 Insurance ....................................................................................................... 21 |
|       |      | 16.2.6 Applicable Law ............................................................................................. 21 |

ARTICLE 17 ---     MISCELLANEOUS PROVISIONS ..................................................... 22
|       | 17.1 | Notices .................................................................................................................... 22 |
|       | 17.2 | Governing Law ....................................................................................................... 22 |

17.3        Amendments ................................................................................ 22
17.4        Construction................................................................................. 22
17.5        Headings ..................................................................................... 22
17.6        Waivers ....................................................................................... 22
17.7        Rights and Remedies Cumulative................................................. 22
17.8        Severability ................................................................................. 23
17.9        Heirs, Successors and Assigns...................................................... 23
17.10       Creditors ..................................................................................... 23
17.11       Counterparts................................................................................ 23
17.12       Investment Representations ......................................................... 23

iv

# PROFESSIONAL LIMITED LIABILITY COMPANY

## OPERATING AGREEMENT

### OF

### INTEGRATIVE HEALTH INSTITUTE, PLLC

THIS PROFESSIONAL LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement") is made and entered into effective as of June 13, 2012, by and among the Persons whose signatures appear on the signature page hereof.

## ARTICLE 1 -- DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

"**Act**" means the Washington Limited Liability Company Act (RCW Ch. 25.15 et seq.).

"**Affiliate**" means, with respect to any Person, (i) any other Person directly or indirectly controlling, controlled by, or under common control with such Person, (ii) any Person owning or controlling twenty-five percent (25%) or more of the outstanding voting interests of such Person, (iii) any officer, director, or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee, or holder of twenty-five percent (25%) or more of the voting interests of any Person described in clauses (i) through (iii). For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the Power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Capital Account**" means the capital account determined and maintained for each Unit Holder pursuant to Section 8.3.

"**Capital Contribution**" means any contribution to the capital of the Company in cash or property by a Member whenever made.

"**Certificate of Formation**" means the Certificate of Formation pursuant to which the Company was formed, as originally filed with the office of the Secretary of State on June 13, 2012, and as amended from time to time.

"**Code**" means the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent superseding federal revenue laws.

"**Company**" means **INTEGRATIVE HEALTH INSTITUTE, PLLC**.

1

"**Company Minimum Gain**" has the same meaning as the term "partnership minimum gain" in Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

"**Deficit Capital Account**" means with respect to any Unit Holder, the deficit balance, if any, in such Unit Holder's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

       (i)     credit to such Capital Account any amount that such Unit Holder is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentences of Regulation Sections 1.704-2(g)(1) and (i)(5); and

       (ii)    debit to such Capital Account the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

This definition is intended to comply with the provisions of Regulation Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

"**Distributable Cash**" means all cash received by the Company, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and other sums paid or payable to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business; and (iii) Reserves.

"**Economic Interest**" means a Unit Holder's share of Net Profits, Net Losses, and other tax items of the Company and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members.

"**Economic Interest Owner**" means the owner of an Economic Interest who is not a Member.

"**Entity**" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any other organization that is not a natural person.

"**Majority Interest**" means, at any time, more than fifty percent (50%) of the then outstanding Units held by Members.

"**Member**" means each Person who executes a counterpart of this Agreement as a Member and each Person who may hereafter become a Member. To the extent a Manager has purchased a Membership Interest in the Company, it will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent it has purchased a Membership Interest in the Company. If a Person is a Member immediately prior to the acquisition by such Person of an Economic Interest, such Person shall have all the rights of a

2

Member with respect to such Economic Interest.

"**Membership Interest**" means all of a Member's share in the Net Profits, Net Losses, and other tax items of the Company and distributions of the Company's assets pursuant to this Agreement and the Act and all of a Member's rights to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members.

"**Member Minimum Gain**" has the same meaning as the term "partner nonrecourse debt minimum gain" in Regulation Section 1.704(2)(i).

"**Membership Nonrecourse Deductions**" has the same meaning as the term "partner nonrecourse deductions" in Regulation Sections 1.704(2)(i)(1) and (2). The amount of Member Nonrecourse Deductions for a Company fiscal year shall be determined in accordance with Regulation Section 1.704-2(i)(2).

"**Net Profits**" and "**Net Losses**" shall have the meaning ascribed to those terms in <u>Section 9.5</u>.

"**Nonrecourse Deductions**" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a Company fiscal year shall be determined pursuant to Regulation Section 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Regulation Section 1.704-2(b)(3).

"**Percentage Interest**" means with respect to any Unit Holder the percentage determined based upon the ratio that the number of Units held by such Unit Holder bears to the total number of outstanding Units.

"**Person**" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"**Regulations**" includes proposed, temporary and final Treasury regulations promulgated under the Code and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

"**Reserves**" means, with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"**Unit Holder**" means a Person who is a Member or who holds an Economic Interest but is not a Member.

"**Units**" means the Units issued to any Member under this Agreement as reflected in attached <u>Schedule 1</u>, as amended from time to time.

## ARTICLE 2 -- FORMATION OF COMPANY

**2.1**     **Formation**.  The Company was formed on June 13, 2012, when the Certificate of Formation was executed and filed with the Office of the Secretary of State in accordance with and pursuant to the Act.

**2.2**     **Name**.  The name of the Company is **INTEGRATIVE HEALTH INSTITUTE, PLLC.**

**2.3**     **Principal Place of Business**.  The principal place of business of the Company shall be 18106 140th Avenue NE, Ste. 102, Woodinville, WA 98072.  The Company may locate its places of business at any other place or places as the Members may from time to time deem advisable.

**2.4**     **Registered Office and Registered Agent**.  The Company's initial registered agent and the address of its initial registered office in the State of Washington are as follows:

| <u>Name</u> | <u>Address</u> |
| --- | --- |
| Christine Schaffner | 18106 140th Avenue NE, Ste. 102<br>Woodinville, WA 98072 |

The registered office and registered agent may be changed by the Members from time to time by filing an amendment to the Certificate of Formation.

**2.5**     **Term**.  The term of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with either Article 14 or the Act.

## ARTICLE 3 -- BUSINESS OF COMPANY

The business of the Company shall be:

     (a)     the sole member is a naturopathic physician licensed by the state of Washington under RCW 18.36A.030 and thus, the business of the company shall be to operate a naturopathic medical clinic in addition to all other lawful business or activity which may be conducted by a professional limited liability company organized under the Act; and

     (b)     to exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised by professional limited liability companies under the Act.

## ARTICLE 4 -- NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are set forth on attached Schedule 1, as amended or

4

restated from time to time.

### ARTICLE 5 -- MANAGEMENT

**5.1** **Management**. Management of the business affairs of the Company shall be vested in Christine Schaffner who is not a Member, but is a naturopathic physician licensed by the state of Washington. As the manager, she shall have the right and authority to manage the affairs of the Company and to make all decisions with respect thereto, including but not limited to the authority to sign on behalf of the Company.

**5.2** **Manager Removal**. The Manager can be removed by the affirmative vote, approval, or consent of Members holding more than one-half of the Membership Interests in the Company.

### ARTICLE 6 -- RIGHTS AND OBLIGATIONS OF MEMBERS

**6.1** **Limitation of Liability**. Each Member's liability shall be limited as set forth in this Agreement and the Act.

**6.2** **Liability for Company Obligations**. Members shall not be personally liable for any debts, obligations or liabilities of the Company beyond their respective Capital Contributions and any obligation of the Members under Section 8.1 or 8.2 to make Capital Contributions, except as otherwise provided by law.

**6.3** **Approval of Sale of All Assets**. The Company shall not sell, exchange or otherwise dispose of all, or substantially all, of its assets without the affirmative vote of the holders of a majority interest.

**6.4** **Inspection of Records**. Upon reasonable request, each Member shall have the right to inspect and copy at such Member's expense, during ordinary business hours the records required to be maintained by the Company pursuant to Section 11.5.

**6.5** **No Priority and Return of Capital**. Except as expressly provided in Article 9 or 10, no Unit Holder shall have priority over any other Unit Holder, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided, that this Section 6.5 shall not apply to loans made by a Member to the Company.

**6.6** **Withdrawal of Member**. Except as expressly permitted in this Agreement, no Member shall voluntarily resign or otherwise withdraw as a Member. Unless otherwise approved by Members holding a Majority Interest, a Member who resigns or withdraws shall be entitled to receive only those distributions to which such Person would have been entitled had such Person remained a Member (and only at such times as such distribution would have been made had such Person remained a Member). Except as otherwise expressly provided herein, a resigning or withdrawing Member shall become an Economic Interest Owner. The remedy for breach of this Section 6.6 shall be monetary damages (and not specific performance), which may be offset against distributions by the Company to which such Person would otherwise be entitled.

5

## ARTICLE 7 -- MEETINGS OF MEMBERS

**7.1     Annual Meeting.**  The annual meeting of the Members shall be held on June 13 of each and every year, or at such other time as shall be determined by the Members, for the purpose of the transaction of such business as may come before the meeting.

**7.2     Special Meetings.**  Special meetings of the Members, for any purpose or purposes, may be called by the Members holding at least ten percent (10%) of the Units held by Members.

**7.3     Place of Meetings.**  The Members may designate any place, either within or outside the State of Washington, as the place of meeting for any meeting of the Members.  If no designation is made, or if a special meeting is called, the place of meeting shall be the principal office of the Company specified in Section 2.3.

**7.4     Notice of Meetings.**  Written notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Members calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States Mail, addressed to the Member as specified in Section 17.1, with postage thereon prepaid.

**7.5     Record Date.**  For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.  When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**7.6     Quorum.**  A Majority Interest represented in person or by proxy shall constitute a quorum at any meeting of Members.  In the absence of a quorum at any such meeting, a majority of Units held by Members so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice.  However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.  At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed.  The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Units whose absence would cause less than a quorum.

**7.7     Manner of Acting.**  If a quorum is present, the affirmative vote of Members holding

6

more than fifty percent (50%) of the Units represented at the meeting in person or by proxy shall be the act of the Members, unless the vote of a greater or lesser percentage is required by this Agreement or the Act.

**7.8     Proxies**. At all meetings of Members a Member may vote in person or by proxy executed in writing by the Member. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

**7.9     Action by Members Without a Meeting**. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, executed by Members entitled to vote thereon and included in the Company's minutes. Action taken under this Section 7.9 is effective when the Members holding a majority interest in the Company and entitled to vote thereon have signed such consents, unless such consents specify a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a consent.

**7.10     Waiver of Notice**. When any notice is required to be given to a Member, a waiver thereof in writing signed by the Member entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

## ARTICLE 8 -- CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

**8.1     Members' Capital Contributions**. Each Member shall contribute such amount as set forth in attached Schedule 1 as such Member's share of the Members Initial Capital Contribution.

**8.2     Additional Contributions**. Each Member shall be required to make such additional Capital Contributions as shall be determined by the Members from time to time to be reasonably necessary to meet the expenses of the Company.

The Members shall give written notice to each Member of the amount of any required additional Capital Contribution, and each Member shall pay to the Company such additional Capital Contribution no later than thirty (30) days following the date such notice is given. Nothing contained in this Section 8.2 is or shall be deemed to be for the benefit of any Person other than the Members and the Company, and no such Person shall under any circumstances have any right to compel any actions or payments by the Members.

If any Member fails to make such additional Capital Contribution said Member's proportionate interest in the limited liability company shall be reduced by the same percentage that the required additional Capital Contribution bears to the value of that Member's proportionate interest.

7

**8.3     Capital Accounts.**

      **8.3.1  Establishment and Maintenance.**  A separate Capital Account will be maintained for each Unit Holder throughout the term of the Company in accordance with the rules of Regulation Section 1.704-1(b)(2)(iv). Each Unit Holder's Capital Account will be increased by (1) the amount of money contributed by such Unit Holder to the Company; (2) the fair market value of property contributed by such Unit Holder to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take the property subject to under Code Section 752); (3) allocations to such Unit Holder of Net Profits; (4) any items in the nature of income and gain that are specially allocated to the Unit Holder pursuant to <u>Sections 9.2 and 9.3</u>; and (5) allocations to such Unit Holder of income and gain exempt from federal income tax. Each Unit Holder's Capital Account will be decreased by (1) the amount of money distributed to such Unit Holder by the Company; (2) the fair market value of property distributed to such Unit Holder by the Company (net of liabilities secured by such distributed property that such Unit Holder is considered to assume or take the property subject to Code Section 752); (3) allocations to such Unit Holder of expenditures described in Code Section 705(a)(2)(B); (4) any items in the nature of deduction and loss that are specially allocated to the Unit Holder pursuant to <u>Sections 9.2</u> and <u>9.3</u>; and (5) allocations to such Unit Holder of Net Losses. In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest.

      **8.3.2  Compliance with Regulations.**  The manner in which Capital Accounts are to be maintained pursuant to this <u>Section 8.3</u> is intended to comply with the requirements of Code Section 704(b) and the Regulations promulgated thereunder. If in the opinion of the Company's legal counsel or accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this <u>Section 8.3</u> should be modified in order to comply with Code Section 704(b) and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this <u>Section 8.3</u>, the method in which Capital Accounts are maintained shall be so modified; provided however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

**8.4     Withdrawal or Reduction of Members' Contributions to Capital.**  A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

## ARTICLE 9 -- ALLOCATIONS OF NET PROFITS AND LOSSES

**9.1     Allocation of Net Profit and Loss - In General.**

      **9.1.1  Allocation of Net Profit or Loss.**  After giving effect to the special allocations set forth in <u>Sections 9.2</u> and <u>9.3</u>, the Net Profit or Net Loss for any fiscal year of the

Company shall be allocated among the Unit Holders in accordance with their respective Percentage Interests.

**9.1.2  Limitation**. The Net Loss allocated to each Member for any Company fiscal year pursuant to Section 9.1.1 shall not exceed the maximum amount of Net Loss that can be so allocated without causing such Member to have a Deficit Capital Account at the end of the fiscal year. All Net Losses in excess of the limitation set forth in this Section 9.1.2 shall be allocated to the other Unit Holders who do not have Deficit Capital Accounts in proportion to their respective Percentage Interests.

**9.2    Special Allocations**. The following special allocations shall be made for any fiscal year of the Company in the following order:

**9.2.1  Minimum Gain Chargeback**. If there is a net decrease in Company Minimum Gain during any Company fiscal year, each Unit Holder shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Unit Holder's share of the net decrease in Company Minimum Gain, determined in accordance with Regulation Sections 1.704-2(f) and 1.704-2(g)(2). The items to be so allocated, and the manner in which those items are to be allocated among the Unit Holders, shall be determined in accordance with Regulation Section 1.704-2(f) and 1.704-2(j)(2). This Section 9.2.1 is intended to satisfy the minimum gain chargeback requirement in Regulation Section 1.704-2(f) and shall be interpreted and applied accordingly.

**9.2.2  Member Minimum Gain Chargeback**. If there is a net decrease in Member Minimum Gain during any Company fiscal year, each Unit Holder who has a share of that Member Minimum Gain, determined in accordance with Regulation Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Unit Holder's share of the net decrease in Member Minimum Gain, determined in accordance with Regulation Sections 1.704-2(i)(4) and 1.704-2(i)(5). The items to be so allocated, and the manner in which those items are to be allocated among the Unit Holders, shall be determined in accordance with Regulation Sections 1.704-2(h)(4) and 1.704-2(j)(2). This Section 9.2.2 is intended to satisfy the minimum gain chargeback requirement in Regulation Section 1.704-2(i)(4) and shall be interpreted and applied accordingly.

**9.2.3  Qualified Income Offset**. In the event that any Unit Holder unexpectedly receives any adjustments, allocations, or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d) (4), (5) or (6), items of Company income and gain shall be specially allocated to such Unit Holder in an amount and in a manner sufficient to eliminate as quickly as possible, to the extent required by Regulation Section 1.704-1(b)(2)(ii)(d), the Deficit Capital Account of the Unit Holder (which Deficit Capital Account shall be determined as if all other allocations provided for in this Article 9 have been tentatively made as if this Section 9.2.3 were not in this Agreement).

**9.2.4  Nonrecourse Deductions**. Nonrecourse Deductions shall be allocated among the Unit Holders in accordance with their respective Percentage Interests.

9

**9.2.5 Member Nonrecourse Deductions**. Any member Nonrecourse Deductions shall be specially allocated among the Unit Holders in accordance with Regulation Section 1.704-2(i).

**9.3     Corrective Allocations**.

**9.3.1 Allocations to Achieve Economic Agreement**. The allocations set forth in the last sentence of Section 9.1.2 and in Section 9.2 are intended to comply with certain regulatory requirements under Code Section 704(b). The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Section 9.2 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 9.3.1. Accordingly, the Members are hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 9.3.1 in whatever manner the Members determine is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Unit Holders are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Section 9.2 were not contained in this Agreement and all income, gain, loss and deduction of the Company were instead allocated pursuant to Section 9.1.1.

**9.3.2   Waiver of Application of Minimum Gain Chargeback**. The Members shall request from the Commissioner of the Internal Revenue Service a waiver, pursuant to Regulation Section 1.704-2(f)(4), of the minimum gain chargeback requirements of Regulation Section 1.704-2(f) if the application of such minimum gain Chargeback requirement would cause a permanent distortion of the economic arrangement of the Partners, as reflected in Section 9.1.

**9.4     Other Allocation Rules**.

**9.4.1   General**. Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided among Unit Holders in the same proportions as they share Net Profits or Net Losses, as the case may be, for the year.

**9.4.2   Allocation of Recapture Items**. In making any allocation among the Unit Holders of income or gain from the sale or other disposition of a Company asset, the ordinary income portion, if any, of such income and gain resulting from the recapture of cost recovery or other deductions shall be allocated among those Unit Holders who were previously allocated (or whose predecessors-in-interest were previously allocated) the cost recovery deductions or other deductions resulting in the recapture items, in proportion to the amount of such cost recovery deductions or other deductions previously allocated to them.

**9.4.3   Allocation of Excess Nonrecourse Liabilities**. Solely for purposes of determining a Unit Holder's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Regulation Section 1.752-3(a)(3), the Unit Holders' interests in the

Company's profits shall be in the same ratio as the allocation of profits and losses.

**9.4.4 Allocations in Connection with Varying Interests**. If, during a Company fiscal year, there is (i) a permitted transfer of a Membership Interest or Economic Interest under this Agreement during a Company fiscal year or (ii) the admission of a Member or additional Members, Net Profit, Net Loss, each item thereof, and all other tax items of the Company for such period shall be divided and allocated among the Unit Holders by taking into account their varying interests during such fiscal year in accordance with Code Section 706(d) and using any conventions permitted by law and selected by the Members.

**9.5     Determination of Net Profit or Loss**.

**9.5.1   Computation of Net Profit or Loss**.  The Net Profit or Net Loss of the Company, for each fiscal year or other period, shall be an amount equal to the Company's taxable income or loss for such period, determined in accordance with Code Section 703(a) (and, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1), including income and gain exempt from federal income tax, shall be included in taxable income or loss).

**9.5.2   Adjustments to Net Profit or Loss**.  For purposes of computing taxable income or loss on the disposition of an item of Company property or for purposes of determining the cost recovery, depreciation, or amortization deduction with respect to any property, the Company shall use such property's book value determined in accordance with Regulation Section 1.704-1(b). Consequently, each property's book value shall be equal to its adjusted basis for federal income tax purposes, except as follows:

a.     The initial book value of any property contributed by a Member to the Company shall be the gross fair market value of such property at the time of contribution;

b.     In the sole discretion of the Members holding Fifty-One Percent (51%) of book value of all Company properties may be adjusted to equal their respective gross fair market values, as determined by the Members as of the following times: (1) in connection with the acquisition of an interest in the Company by a new or existing Member for more than a de minimis capital contribution, (2) in connection with the liquidation of the Company as defined in Regulation Section 1.704-(1)(b)(2)(ii)(g), or (3) in connection with more than de minimis distribution to a retiring or a continuing Unit Holder as consideration for all or a portion of his or its interest in the Company.  In the event of a revaluation of any Company assets hereunder, the Capital Accounts of the Unit Holders shall be adjusted, including continuing adjustments for depreciation, to the extent provided in Regulation Section 1.704-(1)(b)(2)(iv)(f);

c.     If the book value of an item of Company property has been determined pursuant to this Section 9.5.2, such book value shall thereafter be used, and shall thereafter be adjusted by depreciation or amortization, if any, taken into account with respect to such property, for purposes of computing taxable income or loss.

11

**9.5.3  Items Specially allocated**.  Notwithstanding any other provision of this Section 9.5, any items that are specially allocated pursuant to Sections 9.2 or 9.3 shall not be taken into account in computing Net Profit or Net Loss.

**9.6**     **Mandatory Tax Allocations Under Code Section 704(c)**.  In accordance with Code Section 704(c) and Regulation Section 1.704-3, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Unit Holders so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial book value computed in accordance with Paragraph (a) of Section 9.5.2. Prior to the contribution of any property to the Company that has a fair market value that differs from its adjusted tax basis in the hands of the contributing Member on the date of contribution, the contributing Member (and a Majority Interest of the non-contributing Members) shall agree upon the allocation method to be applied with respect to that property under Regulation Section 1.704-3.

If the book value of any Company property is adjusted pursuant to Paragraph (b) of Section 9.5.2, subsequent allocations of income, gain, loss and deduction with respect to such property shall take account of any variation between the adjusted basis of such property for federal income tax purposes and its book value in the same manner as under Code Section 704(c).  The choice of allocation methods under Regulation Section 1.704-3 with respect to such revalued property shall be made by a majority of the Members.

Allocations pursuant to this Section 9.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Unit Holder's Capital Account or share of Net Profit, Net Loss or other items as computed for book purposes, or distributions pursuant to any provision of this Agreement.

### ARTICLE 10 -- DISTRIBUTIONS

**10.1**     **Cash Distributions**.

**10.1.1 Nonliquidating Distributions**.  Distributions of Distributable Cash, or other distributions in liquidation pursuant to Section 10.1.2, shall be made to the Unit Holders monthly.

**10.1.2     Distributions in Liquidation**.  Notwithstanding Section 10.1.1, distributions in liquidation of the Company shall be made to each Unit Holder in the manner set forth in Section 14.3(c).

**10.2**     **Distribution in Kind**.  Non-cash assets, if any, shall be distributed in a manner that reflects how cash proceeds from the sale of such assets for fair market value would have been distributed (after any unrealized gain or loss attributable to such non-cash assets has been allocated among the Unit Holders in accordance with Article 9).

**10.3**     **Withholding; Amounts Withheld Treated as Distributions.**  The Members are authorized to withhold from distributions, or with respect to allocations or payments, to Unit Holders and to pay over to the appropriate federal, state or local governmental authority any amounts required to be withheld pursuant to the Code or provisions of applicable state or local law.  All amounts withheld pursuant to the preceding sentence in connection with any payment, distribution or allocation to any Unit Holder shall be treated as amounts distributed to such Unit Holder pursuant to this Article 10 for all purposes of this Agreement.

**10.4**     **Limitation Upon Distributions.**  No distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

## ARTICLE 11 -- ACCOUNTING, BOOKS AND RECORDS

**11.1**     **Accounting Principles.**  The Company's books and records shall be kept, and its income tax returns prepared, under such permissible method of accounting, consistently applied, as the Members determine is in the best interest of the Company and its Members.

**11.2**     **Interest On and Return of Capital Contributions.**  No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution, except as otherwise specifically provided for herein.

**11.3**     **Loans to Company.**  Nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company.

**11.4**     **Accounting Period.**  The Company's accounting period shall be the calendar year.

**11.5**     **Records, Audits and Reports.**  At the expense of the Company, the Members shall maintain records and accounts of all operations and expenditures of the Company.  At a minimum the Company shall keep at its principal place of business the following records:

(a)     A current list and past list, setting forth the full name and last known mailing address of each Member, Economic Interest Owner;

(b)     A copy of the Certificate of Formation and all amendments thereto;

(c)     Copies of this Agreement and all amendments hereto;

(d)     Copies of the Company's federal, state and local tax returns and reports, if any, for the three most recent years;

(e)     Minutes of every meeting of the Members and any written consents obtained from Members for actions taken by Members without a meeting; and

(f)     Copies of the Company's financial statements for the three (3) most recent years.

**11.6     Returns and Other Elections.** The Members shall cause the preparation and timely filing of all tax and information returns required to be filed by the Company pursuant to the code and all other tax and information returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Unit Holders within a reasonable time after the end of the Company's fiscal year.

Except as otherwise expressly provided to the contrary in this Agreement, all elections permitted to be made by the Company under federal and state laws shall be made by the Members in their sole discretion.

## ARTICLE 12 -- TRANSFERABILITY

**12.1     General.**  Except as otherwise expressly provided in this Agreement, neither a Member nor an Economic Interest Owner shall have the right to:

(a)     sell, assign, transfer, exchange or otherwise transfer for consideration, (collectively, "sell" or "sale").

(b)     gift, bequeath or otherwise transfer for no consideration whether or not by operation of law, except in the case of bankruptcy (collectively "gift") all or any part of its Membership Interest or Economic Interest.  Each Member and Economic Interest Owner hereby acknowledges the reasonableness of the restrictions on sale and gift of Membership Interests and Economic Interests imposed by this Agreement in view of the Company's purposes and the relationship of the Members and Economic Interest owners.  Accordingly, the restrictions on sale and gift contained herein shall be specifically enforceable.  In the event that any Unit Holder pledges or otherwise encumbers any of its Membership Interest or Economic Interest as security for repayment of a liability, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all the terms and conditions of this Article 12.

(c)     Notwithstanding anything herein to the contrary, the Member(s) may transfer Membership Interests or portions thereof for estate planning purposes.

Any attempted transfer shall be null and void.

**12.2     Repurchase Rights**

At any Unit Holder's option, any Unit Holder may require the Company to repurchase all of its Economic Interest or Membership Interest at a price equal to eighty percent (80%) of the value of the Unit Holder's interest as determined by the Company's Accountant.

## ARTICLE 13 -- ADDITIONAL MEMBERS

**13.1     New Members.**     No new Members, other than transferees, can become

14

Members after execution of this Agreement.

## ARTICLE 14 – DISSOLUTION AND TERMINATION

**14.1      Dissolution**.  The Company shall be dissolved upon the occurrence of any of the following events:

(a)      upon expiration of the term specified in Section 2.5;

(b)      by the written agreement of all Members; or

(c)      a Person ceases to be a Member upon the occurrence of any of the events specified in RCW 25.15.130 of the Act, unless the business of the Company is continued with the consent of all of the remaining Members within ninety (90) days following the occurrence of such event.

**14.2      Allocation of Net Profit and Loss in Liquidation**.  The allocation of Net Profit, Net Loss and other items of the Company following the date of dissolution, including but not limited to gain or loss upon the sale of all or substantially all of the Company's assets, shall be determined in accordance with the provisions of Article 9 and 10 and shall be credited or charged to the Capital Accounts of the Unit Holders in the same manner as Net Profit, Net Loss, and other items of the Company would have been credited or charged if there were no dissolution and liquidation.

**14.3      Winding Up, Liquidation and Distribution of Assets**.  Upon dissolution, the Members shall immediately proceed to wind up the affairs of the Company, unless the business of the Company is continued as provided in Paragraph (c) of Section 14.1.  The Members shall sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Unit Holders in kind) and shall apply the proceeds to such sale and the remaining Company assets in the following order of priority:

(a)      Payment of creditors, including Members who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company, other than liabilities for distributions to Members;

(b)      To establish any reserves that the Members deem reasonably necessary for contingent or unforeseen obligations of the Company and, at the expiration of such period as the Members shall deem advisable, the balance then remaining in the manner provided in Paragraph (c) below;

(c)      By the end of the taxable year in which the liquidation occurs (or, if later, within ninety (90) days after  the date of such liquidation), to the Unit Holders in proportion to the positive balances of their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs (other than those made pursuant to this Paragraph (c)).

15

**14.4     No Obligation to Restore Negative Capital Account Balance on Liquidation.** Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g), if any Unit Holder has a negative Capital Account balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Unit Holder shall have no obligation to any Capital Contribution to the Company, and the negative balance of such Unit Holder's Capital Account shall not be considered a debt owed by such Unit Holder to the Company or to any other Person for any purpose whatsoever.

**14.5     Termination.** The Members shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets. Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

**14.6     Certificate of Cancellation.** When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets have been distributed to the Unit Holders, the Members shall file a certificate of cancellation as required by RCW 25.15.080 of the Act. Upon filing the certificate of cancellation, the existence of the Company shall cease, except as otherwise provided in the Act.

**14.7     Return of Contribution Nonrecourse to Other Members.** Except as provided by law or as expressly provided in this Agreement, upon dissolution each Unit Holder shall look solely to the Assets of the Company for the return of its Capital Contribution. If the property remaining after the payment or discharge of liabilities of the Company is insufficient to return the contributions of Members, no Unit Holder shall have recourse against any other Unit Holder.

## ARTICLE 15 -- INDEPENDENT ACTIVITIES OF MEMBERS

Any Member may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including but not limited to, the ownership, financing, management, employment by, lending to or otherwise participating in businesses which are similar to the business of the Company, and neither the Company nor any of the Unit Holders shall have any right by virtue of this Agreement in and to such independent ventures or to the income or profits therefrom.

## ARTICLE 16 -- LIMITATION OF LIABILITY
## AND INDEMNIFICATION PROVISION

**16.1     Limitation of Members Liability.**  No Member will be personally liable, merely as a Member, for any debts or losses, or liabilities of the Company beyond the Member's respective contributions and any obligation of the Member under Section 8 to make contributions, except as otherwise specifically provided by law.  No Member shall have liability to the Company or its Members for monetary damages for conduct merely as a Member, except for acts or omissions that involve intentional misconduct, a knowing violation of the law, conduct violating RCW 25.15.235, or for any transaction from which the Member has personally received a benefit in money, property or services to which the Member was not legally entitled.  If the Washington Limited Liability Company Act is hereafter amended to authorize Company action further eliminating or limiting the personal liability of Members, then the liability of a Member shall be eliminated or limited to the full extent permitted by the Washington Limited Liability Company Act, as so amended.  Any repeal or modification of this section shall not adversely affect any right or protection of a member of the Company existing at the time of such repeal or modification for or with respect to any act or omission of such member occurring prior to such repeal or modification.

**16.2     Indemnification.**

**16.2.1  Power to Indemnify.**  The company may indemnify and hold harmless to the full extent permitted by applicable law each person who was or is made a party to or is threatened to be made a party to or is involved (including, without limitation, as a witness) in any actual or threatened action, suit or other proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he, she, or it, is or was a Member, officer, employee, or agent of the Company or, being or having been such a Member, officer, employee or agent, he, she or it, is or was serving at the request of the Company as a Member, officer, employee, agent, trustee, or in any other capacity of another limited liability company or of a corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action or omission in an official capacity or in any other capacity while serving as a Member, officer, employee, agent, trustee or in any other capacity, against all expenses, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts to be paid in settlement) actually or reasonably incurred or suffered by such person in connection therewith.  Such indemnification may continue as to a person who has ceased to be a Member, officer, employee or agent of the Company and shall inure to the benefit of his or her heirs and personal representatives.

**16.2.2  Power to Pay Expenses and Advance Final Disposition.**  The Company may pay expenses incurred in defending any such proceeding in advance of the final disposition of any such proceeding; provided, however, that the payment of such expenses in advance of the final disposition of a proceeding shall be made to or on behalf of a Member, officer, employee or agent only upon delivery to the Company of an undertaking, by or on behalf of such Member, officer, employee or agent, to repay all amounts so advanced if it shall ultimately be determined that such Member, officer, employee or agent is not entitled to be indemnified under this Article or otherwise, which undertaking may be unsecured and may be accepted without reference to financial ability to make repayment.

**16.2.3  Power to Enter Into Contracts.**  The Company may enter into contracts

17

with any person who is or was a Member, officer, employee and agent of the Company in furtherance of the provisions of this Article and may create a trust fund, grant a security interest in property of the Company or use other means (including, without limitation, a letter of credit) to ensure the payment of such amounts as may be necessary to effect indemnification as provided in this Article.

**16.2.4  Limitation on Powers.**  No indemnification shall be provided under this Article to any such person if the Company is prohibited by the nonexclusive provisions of the Washington Limited Liability Company Act or other applicable law as then in effect from paying such indemnification. For example, no indemnification shall be provided to any Member in respect of any proceeding, whether or not involving action in his, her, or its official capacity, in which he or she shall have been finally adjudged to be liable on the basis of intentional misconduct or knowing violation of law by the Member, or from conduct of the Member in violation of RCW 25.15.235, or that the Member personally received a benefit in money, property or services to which the Member was not legally entitled.

**16.2.5  Insurance**.  The Company may purchase and maintain insurance, at its expense, to protect itself and any Member, manager, officer, employee, agent or trustee of the Company or another company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Washington Limited Liability Company Act.

**16.2.6  Applicable Law**.  For purposes of this Article, "applicable law" shall at all times be construed as the applicable law in effect at the date indemnification may be sought, or the law in effect at the date of the action, omission or other event giving rise to the situation for which indemnification may be sought, whichever is selected by the person seeking indemnification. As of the date hereof, applicable law shall include the Washington Limited Liability Company Act, RCW 25.15.005 through RCW 25.15.902, as amended.

## ARTICLE 17 -- MISCELLANEOUS PROVISIONS

**17.1     Notices.**  Any notice, demand, or communication required or permitted under this Agreement shall be deemed to have been duly given if delivered personally to the party to whom directed or, if mailed by registered or certified mail, postage and charges prepaid, addressed (a) if to a Member, to the Member's address specified on attached Schedule 1, (b) if to the Company, to the address specified in Section 2.3, and (c) if to the Manager, to the address specified in Section 2.3. Except as otherwise provided herein, any such notice shall be deemed to be given when personally delivered or, if mailed, three (3) business days after the date of mailing. A Member or the Company may change its address for the purposes of notices hereunder by giving notice to the others specifying such changed address in the manner specified in this Section 17.1.

**17.2     Governing Law**.  This Agreement shall be construed and enforced in accordance with the internal laws of the State of Washington.

18

**17.3    Amendments.**  This Agreement may not be amended except by the unanimous written agreement of all of the Members.

**17.4    Construction.**  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**17.5    Headings.**  The headings in this Agreement are inserted for convenience only and shall not affect the interpretations of this Agreement.

**17.6    Waivers.**  The failure of any Person to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

**17.7    Rights and Remedies Cumulative.**  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy shall not preclude or waive the right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

**17.8    Severability.**  If any provision of this Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**17.9    Heirs, Successors and Assigns.**  Each of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

**17.10    Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**17.11    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

**17.12    Investment Representations.**  The Units have not been registered under the Securities Act of 1933, the Securities Act of Washington or any other state securities law (collectively, the "Securities Acts") because the Company is issuing the Units in reliance upon the exemptions from the registration requirements of the Securities Acts, and the Company is relying upon the fact that the Units are to be held by each Unit Holder for investment.

Accordingly, each Unit Holder hereby confirms the Units have been acquired for such Unit Holder's own account, for investment and not with a view to the resale or distribution thereof and

19

may not be offered or sold to anyone unless there is an effective registration or other qualification relating thereto under all applicable Securities Acts or unless such Unit Holder delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification is not required. The Unit Holders understand that the Company is under no obligation to register the Units or to assist any Unit Holder in complying with any exemption from registration under the Securities Acts.

**17.13    Subchapter S Tax Election.** The Company will elect to be treated as a Subchapter S corporation for tax purposes only.  Thus, to the extent that such election conflicts with any provision in this Operating Agreement, this Company will continue to be treated as a Subchapter S for tax purposes and any conflicting provision herein shall be unenforceable.

Executed by the undersigned Members and Managers effective as of the date first written above.

**INTEGRATIVE HEALTH INSTITUTE, PLLC**

By: Dietrich Klinghardt
Its: Member

20

# EXHIBIT 2

# AMENDED AND RESTATED OPERATING AGREEMENT

# SOPHIA NUTRITION LLC

# A WASHINGTON LIMITED LIABILITY COMPANY

# TABLE OF CONTENTS

**Page**

1.  THE LIMITED LIABILITY COMPANY ................................................................ 1
    1.1  Formation ................................................................................................. 1
    1.2  Name ....................................................................................................... 1
    1.3  Purpose .................................................................................................... 1
    1.4  Offices ..................................................................................................... 1
    1.5  Registered Agent ..................................................................................... 1
    1.6  Term ........................................................................................................ 1
    1.7  Names and Addresses of Members ......................................................... 1
    1.8  Admission of Additional Members ......................................................... 1
2.  CAPITAL CONTRIBUTIONS AND OWNERSHIP PERCENTAGES ........... 2
    2.1  Ownership Interest .................................................................................. 2
    2.2  Initial Capital Contributions .................................................................. 2
    2.3  Additional Capital Contributions ........................................................... 2
    2.4  No Interest on Capital Contributions ..................................................... 2
    2.5  Contribution Obligation for Guaranteed Indebtedness ........................... 2
3.  ALLOCATIONS OF INCOME AND LOSS AND PROVISIONS FOR
    DISTRIBUTIONS ............................................................................................... 2
    3.1  Determination of Profits and Losses ...................................................... 2
    3.2  Allocation of Profits and Losses ............................................................ 2
    3.3  Distribution of Net Cash Flow ............................................................... 3
    3.4  No Right to Demand Return of Capital ................................................... 3
    3.5  Revaluation of Company Property .......................................................... 3
    3.6  Limitations on Distributions .................................................................. 4
    3.7  Transfer of Ownership Interest by Member During Fiscal Year ........... 4
4.  POWERS AND DUTIES OF MANAGER ......................................................... 4
    4.1  Management of Company Business ......................................................... 4
    4.2  More Than One Manager ......................................................................... 5
    4.3  Limitations on Authority of the Manager .............................................. 5
    4.4  Duties of the Manager ............................................................................ 6
    4.5  Dealing With the Company ..................................................................... 6
    4.6  Limitation on Liability of the Manager ................................................. 6

SEADOCS:449723.2

**TABLE OF CONTENTS**
(continued)

<u>Page</u>

| | | | |
|---|---|---|---|
| | 4.7 | Indemnification of the Manager | 6 |
| | 4.8 | Restrictions | 7 |
| | 4.9 | Other Business | 7 |
| | 4.10 | Removal of Manager | 7 |
| | 4.11 | Resignation of Manager | 7 |
| | 4.12 | Successor Manager | 7 |
| 5. | | PROVISIONS APPLICABLE TO ALL MEMBERS | 7 |
| | 5.1 | Limitations on Powers of the Members | 7 |
| | 5.2 | Limitation on Liability of the Members | 7 |
| | 5.3 | Withdrawal of a Member | 8 |
| | 5.4 | Loans | 8 |
| 6. | | SALARIES AND DEALING WITH THE COMPANY | 8 |
| | 6.1 | Organizational Expenses | 8 |
| | 6.2 | Other Company Expenses | 8 |
| | 6.3 | Dealing With the Company | 8 |
| 7. | | BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS, FISCAL YEAR, BANKING | 8 |
| | 7.1 | Books of Account | 8 |
| | 7.2 | Accounting Reports | 9 |
| | 7.3 | Tax Returns | 9 |
| | 7.4 | Method of Accounting | 9 |
| | 7.5 | Fiscal Year; Taxable Year | 9 |
| | 7.6 | Capital Accounts | 9 |
| | 7.7 | Banking | 10 |
| | 7.8 | Management of Funds | 10 |
| 8. | | TRANSFER OF OWNERSHIP INTEREST | 10 |
| | 8.1 | Transfers in General | 10 |
| | 8.2 | Right of First Refusal; Gift Transfers | 11 |
| | 8.3 | Option to Buy Member's Ownership Interest | 11 |
| | 8.4 | Purchase Price | 12 |
| | 8.5 | Payment Terms | 12 |

SEADOCS:449723.2

# TABLE OF CONTENTS
### (continued)

**Page**

| | | |
|---|---|---|
| 8.6 | Life Insurance | 13 |
| 8.7 | Tag-Along Rights | 13 |
| 8.8 | Drag-Along Right | 14 |
| 8.9 | Miscellaneous Transfer Provisions | 14 |
| 9. | DISSOLUTION AND WINDING UP OF THE COMPANY | 15 |
| 9.1 | Dissolution | 15 |
| 9.2 | Disposing of Known Claims | 16 |
| 9.3 | Winding Up | 16 |
| 10. | GENERAL PROVISIONS | 16 |
| 10.1 | Amendments | 16 |
| 10.2 | Governing Law | 16 |
| 10.3 | Counterparts | 16 |
| 10.4 | Parties in Interest | 16 |
| 10.5 | Member Approval | 17 |
| 10.6 | Entire Agreement | 17 |
| 10.7 | Attorney Fees | 17 |
| 10.8 | Representation | 17 |
| 10.9 | Further Effect | 17 |
| 10.10 | Severability | 17 |
| 10.11 | Captions | 17 |
| 10.12 | Notices | 17 |
| EXHIBIT A | | |
| EXHIBIT B | | |

SEADOCS:449723.2

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## SOPHIA NUTRITION LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT, whose date for reference purposes is September _____, 2012, is entered into by and among SOPHIA NUTRITION LLC, a Washington limited liability company (the "Company") and the parties identified on Exhibit A to this Agreement (the "Members").

1.    THE LIMITED LIABILITY COMPANY

1.1    Formation. Effective as of the date the Certification of Formation was filed with the Washington Secretary of State (the "Formation Date"), the Members agree to form a Washington limited liability company under the name Sophia Nutrition LLC, upon the terms and conditions set forth in this Operating Agreement (the "Agreement") and pursuant to the Washington Limited Liability Company Act (the "Act"). The rights and obligations of the parties will be as provided in the Act except as otherwise expressly provided in this Agreement.

1.2    Name. The business of the Company will be conducted under the name Sophia Nutrition LLC.

1.3    Purpose. The purpose of the Company will be to distribute and sell dietary supplements and to engage in any other activities that may be carried on by a limited liability company under the Act.

1.4    Offices. The Company will maintain its principal business office within Washington at 3417 Evanston Ave N Fremont, Seattle, WA 98103

1.5    Registered Agent. United States Corporation Agents, Inc., a California corporation, will be the Company's initial registered agent in Washington and the registered office will be 11820 Northup Way, Suite E200, Bellevue, Washington, 98005. The registered agent or registered office may be changed from time to time by the Manager.

1.6    Term. The term of the Company commenced or will commence on the Formation Date and will continue until terminated as provided in this Agreement.

1.7    Names and Addresses of Members. The names and addresses of the Members are as set forth on Exhibit A attached to this Agreement. Exhibit A may be updated from time to time by the Manager to reflect any changes necessary to reflect matters that do not by the terms of this Agreement require Member approval.

1.8    Admission of Additional Members. Except as otherwise expressly provided in this Agreement, no additional Members may be admitted to the Company without the prior consent of all the Members. If such approval is provided, the Manager will determine the capital contribution and Ownership Interest of the new Member. Each new Member will agree in writing to be bound by this Agreement.

SEADOCS:449723.2

2.    CAPITAL CONTRIBUTIONS AND OWNERSHIP PERCENTAGES

2.1    Ownership Interest.  Except as otherwise provided in this Agreement, the interest of each Member in the capital and profits of the Company will be referred to as the Member's "Ownership Interest" in the Company.  The initial Membership Percentage of each Member is set forth in Exhibit A to this Agreement.  The voting interest of each Member shall be referred to as the Member's "Voting Interest".  The initial Voting Interest of each Member is set forth in Exhibit A to this Agreement.

2.2    Initial Capital Contributions.  The value, nature, and timing of each Member's initial capital contribution to the Company are as set forth on Exhibit B to this Agreement.

2.3    Additional Capital Contributions.  Additional capital contributions will be made only upon the prior consent of the Manager.  No Member will, without the consent of that Member, be required to make any capital contribution beyond the Member's capital contribution as described in Exhibit B.

2.4    No Interest on Capital Contributions.  Members will not be entitled to interest or other compensation for their capital contributions except as expressly provided in this Agreement.

2.5    Contribution Obligation for Guaranteed Indebtedness.  One or more Members may become a joint obligor or guarantor with respect to the indebtedness of the Company ("Company Indebtedness").  To the extent that any Member is subsequently required to personally pay any amount of such Company Indebtedness, then the other Members will be personally required to contribute to any such required payment an amount equal to the Member's Membership Percentage multiplied by the total amount paid by all Members on such Company Indebtedness.  If one Member has paid more than that Member's proportionate amount of any such Company Indebtedness, then the other Members will reimburse the paying Member such amounts as may be necessary to reduce the payment made by the paying Member to the Member's proportionate percentage interest in the obligation paid.  Until such reimbursement obligation has been paid in full, any such unpaid balances due under this provision will bear interest at a rate equal to 4 percent above the publicly announced prime rate or similar reference rate announced from time to time by The Wall Street Journal, fully floating.

3.    ALLOCATIONS OF INCOME AND LOSS AND PROVISIONS FOR DISTRIBUTIONS

3.1    Determination of Profits and Losses.  The Company's profits and losses for each fiscal year will be determined as of the end of that fiscal year by the Company's accountants in accordance with federal income tax accounting principles, consistently applied, utilizing that method of accounting employed in the federal income tax informational return filed by the Company for that fiscal year.

3.2    Allocation of Profits and Losses.  The profits and losses of the Company for each fiscal year will be allocated among the Members pro rata in proportion to their respective Membership Percentages.

SEADOCS:449723.2

3.3    Distribution of Net Cash Flow.

3.3.1    Net Cash Flow Defined. "Net Cash Flow" means for any given fiscal period of the Company, the amount by which (a) the gross cash receipts received by the Company during the fiscal period (excluding capital contributions and loan proceeds) exceeds (b) the sum, without duplication, of (i) all cash operating expenses of the Company during that fiscal period, (ii) debt service payments made during that fiscal period on all indebtedness of the Company, (iii) payments made during that fiscal period on account of the maintenance, leasing, repair, replacement, or improvement of property of the Company, and (iv) all amounts allocated during that fiscal period, in the reasonable judgment of the Manager, to reserves established to meet the reasonable needs of the business, including working capital and capital improvement requirements and for reserves for unknown of unfixed liabilities or contingencies of the Company.

3.3.2    Capital Events Proceeds Defined. "Capital Events Proceeds" means for any given fiscal period of the Company, the amount by which (a) the gross cash receipts from any capital event (sale of a capital asset or borrowing funds) occurring during the fiscal period exceed (b) the sum, without duplication, of (i) the expenses and costs, including but not limited to sales and broker commissions, retirement of debt, prepayment fees and penalties, associated with such capital event, and (ii) all proceeds from a capital event allocated during that fiscal period, in the reasonable judgment of the Manager, to reserves for unknown or unfixed liabilities or contingencies of the Company related to the capital event.

3.3.3    Distributions. The Net Cash Flow and Capital Events Proceeds of the Company, if any, will be distributed to the Members on a monthly basis and will be allocated among the Members pro rata in proportion to their respective Membership Percentages. Any distribution to a Member will be subject to any applicable tax withholding. All tax withholdings with respect to distributions to a Member will be treated as an amount distributed to that Member.

3.4    No Right to Demand Return of Capital. No Member will have any right to any distribution except as expressly provided in this Agreement. No Member will have any drawing account in the Company except as expressly provided in this Agreement.

3.5    Revaluation of Company Property. Upon the occurrence of (a) a subsequent contribution of money or property to the Company by a Member (b) the admission of a new Member, or (c) a distribution of money or property by the Company to a Member, or otherwise as provided in this Agreement, the Company will increase or decrease the respective Capital Accounts (as defined in Section 7) of all Members to reflect a revaluation of all Company property on the books of the Company, but:

3.5.1    such adjustments must be based on the fair market value of the property on the date of adjustment;

3.5.2    the adjustments must reflect the manner in which the unrealized income, gain, loss, or deduction inherent in such property (that has not been reflected in the Capital Accounts of the Members previously) would be allocated among the Members under this

- 3 -

Section 3 if there were taxable disposition of the property for the fair market value on the adjustment date;

3.5.3   thereafter, the Capital Accounts of the Members must be adjusted in accordance with Treasury Regulation § 1.704-1(b)(2)(iv)(g) for allocations to them of depreciation, depletion, amortization, and gain or loss, as computed for book purposes, with respect to the property; and

3.5.4   thereafter, the Members' distributive shares of depreciation, depletion, amortization, and gain or loss, as computed for tax purposes, with respect to the property will be determined so as to take account of the variation between the adjusted tax basis and the book value of the property in the same manner as under Internal Revenue Code § 704(c) and Treasury Regulation § 1.704-1(b)(4)(i).

3.6   <u>Limitations on Distributions</u>.  Notwithstanding any other provisions of this Agreement, no distribution will be declared and paid unless, as reasonably determined by the Manager (a) after the distribution is made, the assets of the Company will be in excess of all liabilities of the Company, except liabilities to Members on account of their contributions, and (b) the Company is able to pay its debts as they become due in the ordinary course of business.

3.7   <u>Transfer of Ownership Interest by Member During Fiscal Year</u>.  If, after compliance with the requirements of Section 10, any Member who transfers any Ownership Interest during any fiscal year of the Company, the income, gain, loss or expense of the Company allocable to the Transferred Ownership Interest will be prorated between the transferor and the transferee by closing the books of the Company on the date of the Transfer of the Ownership Interest.

4.   POWERS AND DUTIES OF MANAGER

4.1   <u>Management of Company Business</u>.  The management and control of the Company and its business and affairs will be vested exclusively in Daniel Schaffner as the manager of the Company (the "Manager").  The Manager does not need to be a Member.  The Manager will have all the rights and powers which may be possessed by a manager in a limited liability company with managers pursuant to the Act and such rights and powers as are otherwise conferred by law or are necessary, advisable, or convenient to the discharge of the Manager's duties under this Agreement and to the management of the business and affairs of the Company. Without limiting the generality of the foregoing but subject to the limitations of Section 4.3, the Manager will have the following rights and powers (which the Manager may exercise at the cost, expense, and risk of the Company):

4.1.1   To expend the funds of the Company in furtherance of the Company's business.

4.1.2   To perform all acts necessary to manage and operate the Company's business and properties, including engaging such persons as the Manager will deem advisable for such purposes.

- 4 -

SEADOCS:449723.2

4.1.3   To execute, deliver, and perform on behalf of and in the name of the Company any and all agreements and documents deemed necessary or desirable by the Manager to carry out the business of the Company, including any lease, deed, easement, bill of sale, mortgage, trust deed, security agreement, contract of sale, or other document conveying, leasing, or granting a security interest in the interest of the Company in any of its assets, or any part thereof, whether held in the Company's name, the name of the Manager, or otherwise. No other signature or signatures will be required.

4.1.4   To borrow or raise moneys on behalf of the Company in the Company's name or in the name of the Manager for the benefit of the Company, and, from time to time, to draw, make, accept, endorse, execute, and issue promissory notes, drafts, checks, and other negotiable or nonnegotiable instruments and evidences of indebtedness, and to secure the payment thereof by mortgage, security agreement, pledge, or conveyance or assignment in trust of the whole or any part of the assets of the Company, including contract rights.

4.2   <u>More Than One Manager</u>.   At any time there are two or more Managers, (a) references in this Agreement to the Manager will include all of the Managers, and (b) an action or decision of the Managers will require the consent or approval of a majority of the Managers, and (c) any single Manager individually may execute on behalf of the Company any document, instrument or agreement authorized to be executed by the Manager. Upon the resignation, withdrawal, death, or disability of a Manager, the remaining Managers will continue to act as the Manager.

4.2.1   <u>Actions by Consent</u>.   Any action which could be taken at a meeting of the Managers may be taken without a meeting if a written consent setting forth the action so taken is signed by at least the number of Managers required to take or approve such action under this Agreement. Action taken by written consent will be effective when the last signature is placed on the consent, unless the consent specifies an earlier or later date. Such written consent will have the same effect as a vote of the Managers.

4.2.2   <u>Managers as Agents</u>.   The Managers, to the extent of the powers set forth in this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of any one Manager (or such other number of Managers as may be required elsewhere in this Agreement for specific actions) taken in accordance with such powers will bind the Company.

4.3   <u>Limitations on Authority of the Manager</u>.   Without first obtaining the approval of all the Members, the Manager will not have the authority to:

4.3.1   Enter into any sale or other disposition of the Company assets other than in the ordinary course of the Company's business;

4.3.2   Borrow money or otherwise incur indebtedness in the name of or on behalf of the Company if such borrowing or indebtedness either is not in the ordinary course of the Company's business or is in excess of $10,000 in a single transaction or a series of related transactions;

4.3.3   File a voluntary petition in bankruptcy on behalf of the Company;

- 5 -

4.3.4   Dissolve the Company;

4.3.5   Convert the Company to another type of entity;

4.3.6   Merge the Company with another entity;

4.3.7   Borrow funds from the Company;

4.3.8   Do any act that makes it impossible to carry on the business of the Company;

4.3.9   Do any act in contravention of this Agreement;

4.3.10   Amend this Agreement or the Company's Certificate of Formation;

4.3.11   Admit a new Manager;

    4.4   <u>Duties of the Manager</u>.  The Manager will manage and control the Company's business and affairs to the best of the Manager's ability and will use the Manager's best efforts to carry out the business of the Company.  The Manager will devote such time to the business and affairs of the Company as is reasonable, necessary or appropriate.  Whenever reasonably requested by any Member, the Manager will render a full and complete accounting of all dealings and transactions relating to the business of the Company.  The Manager will have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Company, whether or not in the Manager's immediate possession or control, and the Manager will not employ or permit another to employ such funds or assets in any manner except for the exclusive benefit of the Company.

    4.5   <u>Dealing With the Company</u>.  Any Manager may deal with the Company by providing or receiving property and services to or from it, and may receive from others or from the Company normal profits, salary, compensation, commissions or other income incident to such dealings; provided, however, in each such case, the dealing or transaction, and the profit or compensation, is approved in advance by the Members.

    4.6   <u>Limitation on Liability of the Manager</u>.  Subject to the restrictions of Section 4.8, the Manager will not have any liability to the Company or to any Member for any loss suffered by the Company or any Member which arises out of any action or inaction of the Manager if the Manager, in good faith, determined that such course of conduct was in the best interest of the Company and such course of conduct did not constitute gross negligence, willful misconduct, or knowing violation of the law of the Manager.

    4.7   <u>Indemnification of the Manager</u>.  Subject to the restrictions of Section 4.8, the Manager will be indemnified by the Company against any losses, judgments, liabilities, expenses, and amounts paid in settlement of any claims sustained against the Company or against the Manager in connection with the Company, provided that the same were not the result of gross negligence or willful misconduct on the part of the Manager.  The satisfaction of any indemnification and any saving harmless will be from, and limited to, Company assets, and the Members will not have any personal liability on account thereof.

- 6 -

4.8     Restrictions.  No Manager will be relieved of liability pursuant to Section 4.6 and will not be entitled to indemnification pursuant to Section 4.7 for:

4.8.1   Any breach of the Manager's duty of loyalty to the Company or its Members;

4.8.2   Any act or omission not in good faith that involves intentional misconduct or a knowing violation of law;

4.8.3   Any unlawful distribution to Members in violation of RCW 25.15.235; or

4.8.4   Any transaction from which the Manager derives an improper personal benefit in violation of RCW 25.15.155(2).

4.9     Other Business.  Nothing in this Agreement will be deemed to restrict in any way the freedom of the Manager or any Member to conduct any other business or activity whatsoever without any accountability to the Company or any Member, even if such investments or activities compete with the business of the Company.

4.10    Removal of Manager.  The Manager may be removed upon the unanimous consent of all Members without cause at any time and for any reason or for no reason.

4.11    Resignation of Manager.  A Manager may resign from the position of Manager at any time upon not less than 10 days' prior written notice to the Members.

4.12    Successor Manager.  In the event that a Manager dies or otherwise ceases to serve as Manager, the Members may select a successor Manager.

5.      PROVISIONS APPLICABLE TO ALL MEMBERS

5.1     Limitations on Powers of the Members.  Except for voting and approval rights provided in this Agreement, and except as otherwise expressly stated in this Agreement, no Member who is not also a Manager, will:

5.1.1   Be permitted to take part in the control of the business or affairs of the Company;

5.1.2   Have any direct voice in the management or operation of the Company; or

5.1.3   Have any authority or power in the capacity of a Member to act as agent for or on behalf of the Company, to do any act which would be binding on the Company or to incur any expenditures with respect to the Company or its property.

5.2     Limitation on Liability of the Members.  Except to the limited extent provided in the Act and this Agreement, no Member, including the Manager, will have any personal liability for any Company obligation, expense, or liability.  Notwithstanding anything in this Agreement to the contrary, the Members will only be liable to make their capital contributions.

- 7 -

SEADOCS:449723.2

5.3   <u>Withdrawal of a Member</u>. Any Member may voluntarily withdraw as a Member upon six months prior written notice to the Manager. Upon the effectiveness of a withdrawal by a Member (the "Withdrawing Member"), the Company will treat the Withdrawing Member as an assignee of the economic rights and benefits of the Ownership Interest of the Withdrawing member, but the Withdrawing Member will cease to have any voting or other rights under this Agreement with respect to such Ownership Interest. A Withdrawing Member will have no right to receive any distribution in liquidation of the Withdrawing Member's Ownership Interest prior to the dissolution of the Company pursuant to Section 9.

5.4   <u>Loans</u>. Any Member may, but will not be obligated to, make loans to the Company to cover the Company's cash requirements. Any such loans will bear interest at a reasonable rate to be determined by the Manager.

6.   SALARIES AND DEALING WITH THE COMPANY

6.1   <u>Organizational Expenses</u>. All expenses incurred in connection with the organization of the Company will be paid by the Company.

6.2   <u>Other Company Expenses</u>. The Manager will charge the Company for the Manager's actual out-of-pocket expenses incurred in connection with the Company's business. Any amounts paid by the Manager to satisfy obligations of the Company will be treated as loans to the Company under Section 5.4.

6.3   <u>Dealing With the Company</u>. Any Member may deal with the Company by providing or receiving property and services to or from it, and may receive from others or from the Company normal profits, salary, compensation, commissions or other income incident to such dealings; provided, however, in each such case, the dealing or transaction, and the profit or compensation, is approved in advance by the Manager.

7.   BOOKS OF ACCOUNT, ACCOUNTING REPORTS, TAX RETURNS, FISCAL YEAR, BANKING

7.1   <u>Books of Account</u>. The Company shall keep at its principal place of business the following.

7.1.1   A current and a past list, setting forth the full name and last known mailing address of each Member and Manager, if any;

7.1.2   The Company's books and records;

7.1.3   The Certificate of Formation and any amendments thereto;

7.1.4   This Agreement and any amendments thereto, in addition to any prior operating agreements no longer in effect;

7.1.5   The Company's federal, state, and local tax returns for the three most recent years; and

- 8 -

7.1.6    The Company's financial statements for the three most recent years.

The Manager will keep and maintain books and records of the operations of the Company that are appropriate and adequate for the Company's business and for carrying out of this Agreement.

7.2    Accounting Reports.  Within 120 days after the end of each taxable year of the Company, each Member will be furnished with copies of the Company's internally prepared financial statements.

7.3    Tax Returns.  The Manager will cause to be prepared and timely filed with the appropriate authorities as necessary all federal and state income tax returns for the Company. Within 105 days after the end of each taxable year, or such lesser time if prescribed by the Internal Revenue Service, each Member will be furnished with a statement which may be used by the Member in the preparation of the Member's income tax returns, showing the amounts of any distributions, gains, profits, losses or credits allocated to or against the Member during such taxable year.

7.4    Method of Accounting.  The Company will utilize the method or methods of accounting for financial reporting and tax purposes selected by the Manager after consulting with the Company's accountants.

7.5    Fiscal Year; Taxable Year.  The fiscal year and the taxable year of the Company will be the calendar year.

7.6    Capital Accounts.  The Company will maintain a Capital Account for each Member on a cumulative basis in accordance with federal income tax accounting principles as set forth in Treasury Regulation § 1.704-1(b)(2)(iv). Each Member's Capital Account will be equal to:

7.6.1    the amount of cash and the fair market value of the property contributed to the capital of the Company by the Member (net of any liabilities secured by such contributed property assumed by the Company or to which such contributed property is subject), but excluding any loans to the Company; plus

7.6.2    the Member's allocable share under Section 3 of any income and gain, or items thereof, of the Company (including any income and gain exempt from federal income tax and including any items of gain, as computed for book purposes, under Treasury Regulation § 1.704-1(b)(2)(iv)(g), with respect to property properly reflected on the books of the Company at a value that differs from the adjusted tax basis of such property, but excluding items of income or gain, as computed for tax purposes, as described in Treasury Regulation § 1.704-1(b)(4)(i)); less

7.6.3    the Member's allocable share under Section 3 of any loss or deduction, or any items thereof of the Company (including any items of depreciation, depletion, amortization, and loss, as computed for book purposes under Treasury Regulation § 1.704-1(b)(2)(iv)(g), with respect to property properly reflected on the books of the Company at a value that differs from the adjusted tax basis of the property, but excluding items of depreciation, depletion,

- 9 -

SEADOCS:449723.2

amortization, and loss, as computed for tax purposes as described in Treasury Regulation § 1.704-1(b)(4)(i)); less

7.6.4   the amount of cash and the fair market value of property distributed to the Member (net of any liabilities secured by the distributed property assumed by the Member or to which such distributed property is subject); less

7.6.5   the Member's allocable share under Section 3 of any Company expenditures described in Internal Revenue Code § 705(a)(2)(B), including items treated as § 705(a)(2)(b) expenditures by Treasury Regulation § 1.704-1(b)(2)(i); and

7.6.6   otherwise adjusted as required pursuant to Treasury Regulation § 1.704-1(b)(2)(iv).

7.6.7   Except as otherwise expressly required in the Act or this Agreement, no Member will have any liability to restore all or any portion of a deficit balance in such Members' Capital Account.

7.6.8   <u>No Deficit Restoration Obligation</u>.  Except as otherwise expressly required in the Act or this Agreement, no Member will have any liability to restore all or any portion of a deficit balance in such Members' Capital Account.

7.7   <u>Banking</u>.  All funds of the Company will either (a) be deposited in a separate account, or (b) in a master account with one or more other legal entities affiliated with the Company, provided that both the Company and each affiliated entity maintain separate accounting and records of the separate funds of the Company.  The accounts may be a bank account or in an account or accounts of a savings and loan association as determined by the Manager.  Such funds will be invested or deposited with an institution, the accounts or deposits of which are insured or guaranteed by an agency of the United States Government.  Such funds may be withdrawn from such account or accounts upon the signature of such person or persons as are designated by the Manager.

7.8   <u>Management of Funds</u>.  The Manager must hold and disburse all funds of the Company in accordance with the terms of this Agreement and must account for all funds as a fiduciary.  Except as provided in Section 7.7, all funds of the Company held by a Member must (a) be held in trust for the benefit of the Company and must not be commingled with other funds of a Member, (b) not be the personal property of a Member, and, (c) to the maximum extent permitted by law, not be vulnerable to inclusion in the bankruptcy estate of a Member.

8.   TRANSFER OF OWNERSHIP INTEREST

8.1   <u>Transfers in General</u>.

8.1.1   <u>General Restriction</u>.  Except as expressly set forth in this Agreement, no Member may directly or indirectly transfer, assign, pledge, hypothecate, or in any way alienate ("Transfer" which may be used as a verb or a noun) any Ownership Interest.  An indirect Transfer of an Ownership Interest shall include a shift in the voting control of, or a transfer of more than a 50 percent interest in the capital or profit percentage in, a Member.  An indirect

- 10 -

Transfer of an Ownership Interest shall also include a transfer from a trust to a subsequent trust or to a beneficiary of a trust. Any transfer that is not permitted under this Section 8 is void ab initio and shall have no force or effect on the Company.

      8.1.2  Permitted Transfers.  A Member shall have the right, without complying with the provisions of Section 8.2, to Transfer a Member's Ownership Interest to another Member, a Member's spouse and children, or a revocable living trust in which the Member is the sole trustor or the Member and the Member's spouse are the sole trustors.

      8.1.3  Pledge.  A Member may pledge the Member's Ownership Interest if the pledge is to (a) secure the sale of an Ownership Interest which is otherwise approved by this Agreement, or (b) secure a loan to the Company.

      8.1.4  Consent.  A Member shall have the right, without complying with the provisions of Section 8.2 to complete a Transfer if the Members unanimously consent to the Transfer.

    8.2  Right of First Refusal; Gift Transfers.  A Member desiring to Transfer all or any part of the Member's Ownership Interest shall first offer such Ownership Interest to the Company. The offer notice shall also describe the terms of the proposed Transfer including the name of the transferee and the price and other terms. The Company shall have a period of 60 days to accept the offer. The price and terms shall be those as set forth in the offer; however, if the Transfer is for no consideration or if a portion of the consideration for the Transfer is not in the form of cash or promises to pay cash, the price and terms shall be as set forth in Sections 8.4 and 8.5. If the Company does not accept the offer within the 60-day period, the other Members shall have the option to purchase the Ownership Interest at the price and terms set forth above for a period of 60 days. If the Company and/or one or more of its Members does not purchase the entire Ownership Interest that the Member desired to Transfer, the Member for a period of 60 days may Transfer the Membership Interest based only on the previously proposed Transfer terms.

    8.3  Option to Buy Member's Ownership Interest.

      8.3.1  Involuntary Transfers.  In the event any Member shall be adjudged bankrupt, or if a Member's Ownership Interest shall be levied upon or attached by a creditor, or there is Transfer ordered in a dissolution of a marriage or other involuntary transfer of a Member's Ownership Interest (collectively "Involuntary Transfer"), the Company for a period of one year shall have the option to purchase the Member's Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5. If the Company does not exercise its option during the one-year period, the other Members shall have the option to purchase the Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5 for a period of 60 days. If a transferee acquires a Member's Ownership Interest as a result of an Involuntary Transfer, the Ownership Interest shall be considered an economic interest only and the transferee shall not have a vote in the Company unless the Member's vote to allow the transferee to have a full voting Ownership Interest.

- 11 -

8.3.2  Death.  In the event of a death of a Member, the Company for a period of 90 days shall have the option to purchase the Member's Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5. If the Company does not exercise its option during the 90 day period, the other Members shall have the option to purchase the Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5 for a period of 60 days.

8.3.3  Disability.  In the event that a Member is disabled and the Company in a writing sent to the disabled Member declares that the Member is a disabled, the Company for a period of 90 days shall have the option to purchase the Member's Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5. If the Company does not exercise its option, the other Members shall have the option to purchase the disabled Member's Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5 for a period of 60 days.

8.3.4  Material Breach.  In the event a Member materially breaches the Member's obligations under this Agreement and the Company declares in a writing sent to the Member that the Member has materially breached the Member's obligations under this Agreement, the Company for a period of 90 days shall have the option to purchase the Member's Ownership Interest at the price and terms set forth in Sections 8.4 and 5. If the Company does not exercise its option during the one-year period, the other Members shall have the option to purchase the Ownership Interest at the price and terms set forth in Sections 8.4 and 8.5 for a period of 60 days.

8.4     Purchase Price.  The purchase price for the Ownership Interest being purchased will be the fair market value of the Ownership Interests (the "fair market value"). Fair market value will be determined by valuing the Ownership Interest owned by the Member based solely on a determination of the total value of the Company's assets on a going-concern basis and the amount the Member would have received had all the assets of the Company been sold at that time for an amount equal to their fair market value and the proceeds (after payment of all Company obligations) were distributed in the manner contemplated in Section 9. Fair market value may not consider any discount for the sale of a minority interest in the Company or the lack of marketability of such interest. The fair market value shall not include the cash proceeds of any Company owned life insurance policy on the life of a Member whose interest is being acquired, but shall include the cash value. The fair market value of the Ownership Interests to be purchased will be determined by agreement between the Company and the Member (or the Member's representative). If the Company and the Member (or the Member's representative) cannot agree upon the fair market value within 30 days, the fair market value will be determined by a third-party appraiser acceptable to both the Company and the Member (or the Member's representative). That appraisal amount will be final and binding on all parties and their respective successors, assigns, and representatives. The costs and expenses of the appraiser will be shared by the buyers and the selling Member.

8.5     Payment Terms.  The payment obligation will be documented in a promissory note. Interest shall be set at the publicly announced prime or similar reference rate of The Wall Street Journal on the date the Company or a Member exercised the option. Except as otherwise provided below, there will be no down payment. The purchase price will be paid in equal monthly payments of principal and interest based on a ten year amortization from the closing date and the balance will be due five years from the closing date. Closing will take place 60 days

- 12 -

SEADOCS:449723.2

after the purchase price is determined. The purchaser will have the right, but not the obligation, to prepay the purchase price in whole or in part at any time. Any prepayment of the promissory note will not reduce the amount of the monthly payments. If the purchaser is the Company, the promissory note will be **unsecured**. If the purchaser is another Member, the promissory note will be secured by a pledge of the Ownership Interest being acquired. The promissory note will provide for attorney fees to enforce its provisions. The promissory note will require 15 days' prior written notice to declare it in default. The promissory note will also provide that a payment not paid within 15 days of the due date will result in a 5 percent late payment penalty.

     8.6   <u>Life Insurance</u>. The Company, in order to help fund a purchase under this Agreement, may procure insurance on the lives of =any of the Members in such amount as the Manager deems appropriate. The Company shall be the applicant, owner and beneficiary of such insurance. The Company agrees to pay premiums on the insurance policies taken out pursuant to this Agreement and shall give proof of payment of premiums to the Members whenever requested. If the premium is not paid within thirty (30) days after its due date, the insured shall have the right to pay such premium and be promptly reimbursed by the Company. Upon the joint agreement of the Members, other policies may be substituted for any policies made subject to this Agreement or any policies subject hereto may be withdrawn. Each Member agrees to submit to such physical examination and otherwise take such steps and complete and deliver such applications, questionnaires or other documents as may be necessary or appropriate in order to apply for and obtain life insurance as described above. If any insured Member ceases to be a Member during the Member's lifetime as the result of the sale of the Member's Ownership Interest and the purchase price for the Ownership Interest is fully paid, or if this Agreement terminates before the death of an insured Member, such Member shall have the right to purchase any policy or policies on the Member's life owned by the Company by paying an amount equal to the cash surrender value as of the date of transfer, less any existing indebtedness against the policy or policies. This right shall lapse if not exercised within thirty (30) days after sale or termination.

     8.7   <u>Tag-Along Rights</u>. If Members who hold more than a 50 percent of the Membership Percentage ("Majority Group") receives a bona fide written offer to Ownership Interests having Membership Percentage equal to or greater than 50 percent (the "Offered Membership Interests"), and Majority Group wants to accept such offer, and Majority Group has or will prior to a sale otherwise comply with the requirements of Section 8.2, Majority Group shall advise the other Members ("Minority Group") of the price and terms of such offer within 15 days following receipt thereof (the "Tag Along Notice"). Minority Group may, in a writing delivered to Majority Group and the Company no later than ten days after receipt of the Tag Along Notice, offer all or any portion of Minority Group's Membership Interests to the proposed third party purchaser (the "Tag Along Right") at the same price and on the same terms as stated for the Offered Membership Interests in the Tag Along Notice. Majority Group will in good faith seek the agreement of the proposed purchaser(s) to purchase the Membership Interests offered for sale by Minority Group; provided that if the proposed purchaser(s) desire to purchase, in the aggregate, less than all Membership Interests offered by Majority Group and the Minority Group, each Member of the Minority Group may either rescind the Member's offer of co sale in its entirety or agree to participate in the sale, with Majority Group and Minority Group, of the number of Membership Interests the proposed purchaser(s) are willing to purchase, to be allocated on a pro rata basis based on Ownership Percentage among the Majority Group and

- 13 -

those Members of the Minority Group that had agreed to participate in the sale. The Tag Along Rights shall be conditioned upon the express written waiver of the Drag Along Rights and Majority Group shall not be required to deliver the Tag Along Notice unless such Majority Member has determined not to exercise such Drag Along Rights.

      8.8    <u>Drag-Along Right</u>. Provided that the Majority Group will sell not less than a majority of Membership Percentage of the Ownership Interests in the Company, Majority Group shall have the right (the "Drag-Along Right"), subject to applicable law, and compliance prior to closing with the requirements of Section 8.2, to enter into a bona fide arm's length Transfer of all of the Membership Interests then owned by Minority Group (the "Dragged Along Ownership Interest") to a proposed transferee, on the same terms and conditions as applicable to Majority Group. To exercise a Drag Along Right, Majority Group shall give Minority Group written notice (the "Drag Along Notice") at least 15 days prior to the proposed Transfer. The Drag Along Notice shall contain (a) the name and address of the proposed transferee, (b) the proposed purchase price per Membership Percentage, (c) the terms of payment, and (d) other material terms and conditions of the proposed transferee's offer. Minority Group shall thereafter be obligated to sell the Dragged Along Ownership Interest to the proposed transferee and shall enter into a purchase agreement with the proposed transferee in form and substance as approved by Majority Group, provided such agreement does not allocate potential liability under the agreement in a manner that disproportionately allocates liability to the Minority Group. Without limiting the generality of the rest of this Section 8.8, if the Company approves a sale of the entire Company (the "Approved Sale") structured as a merger or a consolidation or a sale of substantially all of the Company's assets, then Minority Group shall, if requested by the Company (a) vote for, consent to and/or not raise objections against such Approved Sale, (b) waive (to the extent applicable) any dissenters, appraisal rights or similar rights in connection with a merger or consolidation, and (c) take all necessary and desirable actions in connection with the consummation of the Approved Sale as reasonably requested by the Company. The obligation of Minority Group with respect to an Approved Sale is subject to the satisfaction to the following conditions:  (a) that Minority Group shall receive the same form and amount of consideration per Membership Percentage as Members of the Majority Group, and (b) if any Member is given an option as to the amount and form of consideration to be received, Minority Group shall be given the same option. The Members hereby agree to execute and deliver any and all documents, agreements or instruments and take all actions as may be necessary or desirable to effect the transactions contemplated by this Section 8.8.

      8.9    Miscellaneous Transfer Provisions

      8.9.1    <u>Member Acquisition</u>. This provision shall apply if the Members shall have an option to purchase a selling Member's Ownership Interest. Each buying Member shall be entitled to purchase the Ownership Interest equal a fraction the numerator of which is each buying Member's Ownership Percentage divided by the total of all buying Member's Ownership Percentage. If any buying Member fails to purchase the Member's pro rata share of the selling Member's Ownership Interest, then the other remaining buying Members may purchase such Ownership Interest pro rata, as above, in relation to the Ownership Percentage of all remaining buying Member's desiring to purchase the Ownership Percentage not otherwise purchased or in such other manner as the remaining buying Member's shall agree.

SEADOCS:449723.2

8.9.2   Adoption of Agreement.  Notwithstanding any other provision of Section 8, a person who acquires an Ownership Interest who is not already a Member must sign a document which meets the reasonable approval of the Company agreeing to be bound by the terms of this Agreement.  Until such person executes such an adoption agreement, the person shall be treated an owning only an economic interest and shall not have the right to vote. Notwithstanding the foregoing, a person who acquired an Ownership Interest as a result of an Involuntary Transfer will own only owning an economic interest; shall not be required to adopt the agreement; and may become a full voting Member only if Section 1.8 is complied with.

8.9.3   Exercise of Option.  Any exercise of an option must be in writing and notice must be provided as to all affected parties.

8.9.4   Decision Making by Manager/Member.  If the Company must make a decision regarding whether to exercise an option, set or negotiate the price of the Membership Interest, or make any other material decision, any Manager or Member may not vote or otherwise participate in making the decision if it involves the purchase of an Ownership Interest owned by the Member, the Member's spouse, children, or an entity in which the same have a 50 percent or greater ownership or beneficial interest.  If a Manager cannot participate in the decision and there are no other Managers, the decision shall be made by the Members who are not otherwise disqualified by this provision.

8.9.5   Death or Disability Additional Provisions.  A Member is "Disabled" for the purposes of Section 8 when 1) he or she is unable to perform the majority of his or her usual duties for the Company for 12 consecutive months because of an accident or illness, and 2) he or she meets the definition of "permanent disability" under the terms of the disability insurance policy, if any.  In the event that a Member who is a natural person Transfers the Member's Ownership Interest to a corporation, partnership, trust or other artificial entity, and thereafter dies or becomes disabled, the transferee artificial entity Member shall be treated as if it was disabled or had died.

8.9.6   HIPAA Waiver.  Each Member hereby consents to the release by any health care provider of medical information to the extent necessary to determine whether the Member is incapacitated or financially incapable.  This release includes any information governed by the Health Insurance Portability and Accountability Act of 1996 (also known as "HIPAA").

8.9.7   Securities Law.  If the Company reasonably believes that a Transfer may violate federal or state securities law, the Transfer will not be effective until such time that the Company at the expense of the Member desiring to complete a Transfer obtains a legal opinion from counsel of the Company's choosing that the Transfer does not violate federal or state securities law.

9.   DISSOLUTION AND WINDING UP OF THE COMPANY

9.1   Dissolution.  The Company will be dissolved upon the happening of any of the following events:

- 15 -

       9.1.1   The determination of all the Members to dissolve the Company voluntarily; or

       9.1.2   Otherwise by operation of law.

    9.2   <u>Disposing of Known Claims</u>.  After the Company's certificate of dissolution is filed with the Secretary of State as described in Section 13.3, the Manager may seek to dispose of known claims, as the term is defined in RCW 25.15.298(4), against the Company in accordance with RCW 25.25.298.

    9.3   <u>Winding Up</u>.  Upon the dissolution of the Company, the Manger will file a certificate of dissolution with the Secretary of State.  In addition, the Manager will take full account of the Company's assets and liabilities, and the assets will be liquidated as promptly as is consistent with obtaining the fair market value of the assets, and the proceeds, to the extent sufficient to pay the Company's obligations with respect to such liquidation, will be applied and distributed in the following order:

       9.3.1   To payment and discharge of the expenses of liquidation and of all the Company's debts and liabilities to creditors including Members and former Members; and

       9.3.2   To Members in the amount of their respective adjusted positive Capital Account balances on the date of distribution (notwithstanding any provision regarding the distribution of Capital Events Proceeds).

10.   GENERAL PROVISIONS

    10.1   <u>Amendments</u>.  Any Member may propose one or more amendments to this Agreement.  A proposed amendment will be adopted and become effective as an amendment to this Agreement only upon the written approval or consent of all the Members.  No amendment may be adopted that would alter the income or capital interests of a Member unless such Member voted for the amendment.

    10.2   <u>Governing Law</u>.  This Agreement and the rights of the parties pursuant to this Agreement will be governed by, interpreted, and enforced in accordance with the laws of the state of Washington (without regard to principles of conflicts of law).

    10.3   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same counterpart.  All counterparts will be construed together and will constitute one Agreement.  A single counterpart may be introduced as evidence of the Agreement.  Execution of this Agreement by fax, PDF file, or similar electronic transmission will have the same effect as an original.

    10.4   <u>Parties in Interest</u>.  Subject to the limitations on Transfers of Ownership Interests set forth in Section 8 of this Agreement, each and every covenant, term, provision and agreement contained in this Agreement will be binding upon and inure to the benefit of the parties and the parties' respective heirs, successors, assigns and legal representatives.

- 16 -

10.5   <u>Member Approval</u>. Except as otherwise provided in this Agreement, any provision requiring the decision, consent, approval, judgment, or act of the Members requires the approval of Members holding a majority of the Membership Percentages in the Company.

10.6   <u>Entire Agreement</u>. This Agreement constitutes the entire understanding and agreement among the Company and the Members with respect to the subject matter of this Agreement, and there are no agreements, understandings, restrictions, representations or warranties between the Members other than those set forth, referred to, or provided for in this Agreement.

10.7   <u>Attorney Fees</u>. In the event of any suit or action or arbitration proceeding to enforce or interpret any provision of this Agreement (or which is based on this Agreement), including without limitation any proceeding under the U.S. Bankruptcy Code, the prevailing party will be entitled to recover, in addition to other costs, reasonable attorney fees in connection with such suit, action, arbitration, and in any appeal. The determination of who is the prevailing party and the amount of reasonable attorney fees to be paid to the prevailing party will be decided by the arbitrator or arbitrators (with respect to attorney fees incurred prior to and during the arbitration proceedings) and by the court or courts, including any appellate courts, in which the matter is tried, heard, or decided, including the court which hears any exceptions made to an arbitration award submitted to it for confirmation as a judgment (with respect to attorney fees incurred in such confirmation proceedings).

10.8   <u>Representation</u>. This Agreement was prepared by Miller Nash LLP who represented Daniel Schaffner. Each other party to this Agreement acknowledges and represents that the other party had an opportunity to consult with separate legal counsel prior to executing this Agreement.

10.9   <u>Further Effect</u>. The parties agree to execute other documents reasonably necessary to further effect and evidence the terms of this Agreement, as long as the terms and provisions of the other documents are fully consistent with the terms of this Agreement.

10.10   <u>Severability</u>. If any term or provision of this Agreement is held to be void or unenforceable, that term or provision will be severed from this Agreement, the balance of the Agreement will survive, and the balance of this Agreement will be reasonably construed to carry out the intent of the parties as evidenced by the terms of this Agreement.

10.11   <u>Captions</u>. The captions used in this Agreement are for the convenience of the parties only and will not be interpreted to enlarge, contract, or alter the terms and provisions of this Agreement.

10.12   <u>Notices</u>. All notices required to be given by this Agreement will be in writing and will be effective when actually delivered. For notices sent by the various methods detailed below, the notice must be sent to the address, fax or email address shown on Exhibit A or to any other updated Exhibit A information that a party to this Agreement may specify by notice given in conformance with these provisions to the other parties to this Agreement: (a) if mailed, five days after being deposited as mail, postage prepaid, (b) if sent by nationally recognized overnight courier, one business day after being sent, or (c) if sent by facsimile or email, when sent, but only

- 17 -

if promptly confirmed by mail, postage prepaid.  Notices to the Manager are to be addressed to the last address for the Manager appearing in the Company's records (including notices from the Manager to the Company of a change in address).

**MEMBERS:**

Daniel Schaffner

Dietrich Klinghardt, M.D.

**COMPANY:**

Sophia Nutrition, LLC

By:  Daniel Schaffner, Manager

- 18 -

**EXHIBIT A**

| MEMBER (Name, Address, Phone Number, Fax Number, E-mail Address) | MEMBERSHIP PERCENTAGE | VOTING INTEREST |
|---|---|---|
| Daniel Schaffner<br>6015 Phinney Avenue N. #303<br>Seattle, Washington 98103<br>Phone: (571) 228-1956<br>E-mail: dan.schaffner@gmail.com | 50 | 51 |
| Dietrich Klinghardt, M.D., PhD<br>839   171ˢᵗ  Pl  NE<br>Bellevue   98008<br>Phone:  425. 495. 9891<br>Fax:<br>E-mail: | 50 | 49 |

A-1

SEADOCS:449723.2

**EXHIBIT B**

| MEMBER | CAPITAL CONTRIBUTION<br>(value, nature, and timing) |
| --- | --- |
| Daniel Schaffner | Services performed and services to be performed |
| Dietrich Klinghardt | Cashier's check with limit of $40,000 |

SEADOCS:449723.2

**REGISTRY NUMBER:**

_____

# CERTIFICATE OF FORMATION

## OF

## SOPHIA NUTRITION LLC

### A Washington Limited Liability Company



PORTLAND, OREGON
SEATTLE, WASHINGTON
VANCOUVER, WASHINGTON
CENTRAL OREGON
WWW.MILLERNASH.COM

*Remit payments to:*
Post Office Box 3585
Portland, OR 97208-3585
(503) 224-5858

December 16, 2013

Mr. Daniel Schaffner
6015 Phinney Avenue N. #303
Seattle, WA 98103

Invoice: 577609
Account: 556270.0003  The Goods, LLC

## Summary of Account

|  | Fees | Disbursements | Total |
|---|---|---|---|
| CURRENT CHARGES – see attached | $2,000.00 | $0.00 | $2,000.00 |
| TOTAL AMOUNT DUE |  |  | $2,000.00 |

## Current Invoice Detail

| | |
|---|---|
| **Total fees:** | $2,592.00 |
| **Less reduction in fees:** | $-592.00 |
| **Total adjusted fees:** | $2,000.00 |
| **Total amount due:** | $2,000.00 |

**ACH AND WIRE PAYMENT INSTRUCTIONS:**

U. S. Bank National Association
ABA No. 123000220
Miller Nash LLP
Account No. 1536-0646-7352

Please include invoice number with remittance.

**SEND CHECK PAYMENTS TO:**

Miller Nash LLP
Post Office Box 3585
Portland, Oregon  97208-3585
(503) 224-5858

# EXHIBIT 3

Page 1 of 1



**Office of the Secretary of State**
Corporations & Charities Division

**Limited Liability Company**
*See attached detailed instructions*

*FILED*
*SECRETARY OF STATE*

*MAY 25, 2016*

*STATE OF WASHINGTON*

This Box For Office Use Only

05/25/16 3185331-001
$80.00 K
tid: 3252503

☐ **Filing Fee $30.00**

☒ **Filing Fee with Expedited Service $80.00**

UBI Number: 603215040

# CERTIFICATE OF AMENDMENT
Chapter 23.95 RCW

## SECTION 1

**NAME OF LIMITED LIABILITY COMPANY (LLC):** *(as currently recorded with the Office of the Secretary of State)*

Integrative Heatlh Institute, PLLC

## SECTION 2

**AMENDMENTS TO CERTIFICATE:** *(if necessary, attach additional information. If changing the name it must contain one of the following designations: Limited Liability Company, Limited Liability Co or one of these abbreviations: L.L.C. or LLC. If the designation is omitted, it will default to LLC when processed)*

Remove Christine Schaffner as Member #1

Remove Daniel Schaffner as Member #3

Dietrich Klinghardt is sole member

## SECTION 3

**EFFECTIVE DATE OF AMENDMENTS TO CERTIFICATE:** *(please check one of the following)*

☒  Upon filing by the Secretary of State

☐  Specific Date: _____ *(Specified effective date must be within 90 days AFTER the Amended Certificate has been filed by the Office of the Secretary of State)*

## SECTION 4

**EXECUTOR INFORMATION** *(see instructions page)*

This document is hereby executed under penalties of perjury, and is, to the best of my knowledge, true and correct.

X _____  Dietrich Klinghardt  5/17/16  425-402-9401
**Signature**  Printed Name/Title  Date  Phone

# EXHIBIT 4

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

SOPHIA NUTRITION LLC

**Entity Number:**

E0480472018-9

**Entity Type:**

Foreign Limited-Liability Company

**Entity Status:**

Active

**Formation Date:**

10/11/2018

**NV Business ID:**

NV20181740679

**Termination Date:**

Perpetual

**Annual Report Due Date:**

10/31/2021

**Series LLC:**

☐

**Domicile Name:**

**Jurisdiction:**

Washington

## REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

TINA MARIE SANFORD

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Non-Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

**Street Address:**

1709 BUCKTHORN COURT, MINDEN, NV, 89423, USA

**Mailing Address:**

**Individual with Authority to Act:**

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ VIEW HISTORICAL DATA

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Authorized Signer | Christine Schaffner | 309 Hayes ST, Seattle, WA, 98109, USA | 12/19/2019 | Active |
| Manager | TINA MARIE SANFORD | 1709 BUCKTHORN COURT, MINDEN, NV, 89423, USA | 10/15/2018 | Active |
| Managing Member | GARY WILSON | 1709 BUCKTHORN COURT, MINDEN, NV, 89423, USA | 10/15/2018 | Active |

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Managing Member | DIETRICH KLINGHARDT | 309 HAYES ST, SEATTLE, WA, 98109, USA | 10/15/2018 | Active |
| Managing Member | DANIEL SCHAFFNER | 309 HAYES ST, SEATTLE, WA, 98109, USA | 10/15/2018 | Active |

**Page 1 of 1, records 1 to 5 of 5**

Filing History      Name History      Mergers/Conversions

Return to Search      Return to Results

# EXHIBIT 5

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

# Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

**Serial Number: 86208044**
**Filing Date: 02/28/2014**

*NOTE: Data fields with the * are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

---

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| **\*MARK** | [SOPHIA HEALTH INSTITUTE](#) |
| **\*STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | SOPHIA HEALTH INSTITUTE |
| **\*MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| **\*OWNER OF MARK** | Sophia Nutrition LLC |
| **\*STREET** | 3417 Evanston Ave N. - #429 |
| **\*CITY** | Seattle |
| **\*STATE** (Required for U.S. applicants) | Washington |
| **\*COUNTRY** | United States |
| **\*ZIP/POSTAL CODE** (Required for U.S. applicants only) | 98103 |
| **LEGAL ENTITY INFORMATION** | |
| **\*TYPE** | LIMITED LIABILITY COMPANY |
| **\* STATE/COUNTRY WHERE LEGALLY ORGANIZED** | Washington |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **\*INTERNATIONAL CLASS** | 044 |
| **\*IDENTIFICATION** | Alternative medicine services |
| **\*FILING BASIS** | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 09/00/2012 |
| FIRST USE IN COMMERCE DATE | At least as early as 09/00/2012 |

| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT16\IMAGEOUT 16\862\080\86208044\xml1\ FTK0003.JPG |
|---|---|
| SPECIMEN DESCRIPTION | Screen shot of Applicant's web page affixed with Applicant's mark advertising its services |

## ADDITIONAL STATEMENTS INFORMATION

| | |
|---|---|
| *TRANSLATION (if applicable) | |
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |

## ATTORNEY INFORMATION

| | |
|---|---|
| NAME | Richard Alaniz |
| ATTORNEY DOCKET NUMBER | SAHI-2-0001 |
| FIRM NAME | Lowe Graham Jones PLLC |
| STREET | 701 Fifth Ave - #4800 |
| CITY | Seattle |
| STATE | Washington |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 98104 |
| PHONE | 206.381.3300 |
| FAX | 206.381.3301 |
| EMAIL ADDRESS | alaniz@lowegrahamjones.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | David Lowe; Lawrence Graham; Darren Jones; Mark Lorbiecki |

## CORRESPONDENCE INFORMATION

| | |
|---|---|
| *NAME | Richard Alaniz |
| FIRM NAME | Lowe Graham Jones PLLC |
| *STREET | 701 Fifth Ave - #4800 |
| *CITY | Seattle |
| *STATE (Required for U.S. applicants) | Washington |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 98104 |
| PHONE | 206.381.3300 |
| FAX | 206.381.3301 |
| *EMAIL ADDRESS | alaniz@lowegrahamjones.com |

| | |
|---|---|
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 275 |
| *TOTAL FEE PAID | 275 |
| **SIGNATURE INFORMATION** | |
| * SIGNATURE | /Richard Alaniz/ |
| * SIGNATORY'S NAME | Richard Alaniz |
| * SIGNATORY'S POSITION | Attorney of record, Washington state bar member |
| SIGNATORY'S PHONE NUMBER | 206.381.3300 |
| * DATE SIGNED | 02/28/2014 |

PTO Form 1478 (Rev 9/2006)
OMB No. 0651-0009 (Exp 12/31/2014)

## Trademark/Service Mark Application, Principal Register

## TEAS Plus Application

### Serial Number: 86208044
### Filing Date: 02/28/2014

## To the Commissioner for Trademarks:

**MARK:** SOPHIA HEALTH INSTITUTE (Standard Characters, see mark)
The literal element of the mark consists of SOPHIA HEALTH INSTITUTE.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Sophia Nutrition LLC, a limited liability company legally organized under the laws of Washington, having an address of
   3417 Evanston Ave N. - #429
   Seattle, Washington 98103
   United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
   International Class 044:  Alternative medicine services

In International Class 044, the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 09/00/2012, and first used in commerce at least as early as 09/00/2012, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods and/or services, consisting of a(n) Screen shot of Applicant's web page affixed with Applicant's mark advertising its services.
Specimen File1

The applicant's current Attorney Information:
   Richard Alaniz and David Lowe; Lawrence Graham; Darren Jones; Mark Lorbiecki of Lowe Graham Jones PLLC
   701 Fifth Ave - #4800
   Seattle, Washington 98104
   United States
The attorney docket/reference number is SAHI-2-0001.
The applicant's current Correspondence Information:
   Richard Alaniz
   Lowe Graham Jones PLLC
   701 Fifth Ave - #4800
   Seattle, Washington 98104
   206.381.3300(phone)
   206.381.3301(fax)
   alaniz@lowegrahamjones.com (authorized)

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

### Declaration

The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting

registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, if the application is being filed under 15 U.S.C. Section 1051(b), he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true.


Signature: /Richard Alaniz/   Date Signed: 02/28/2014
Signatory's Name: Richard Alaniz
Signatory's Position: Attorney of record, Washington state bar member


RAM Sale Number: 86208044
RAM Accounting Date: 03/03/2014

Serial Number: 86208044
Internet Transmission Date: Fri Feb 28 17:33:29 EST 2014
TEAS Stamp: USPTO/FTK-XX.XX.XXX.XXX-2014022817332970
0736-86208044-500ff3f3fcbd1cf3c43a641fc3
dd1ae9684e5a6b94ee0ab7d3696eeec131795676
-ET-5582-20140228172353912078

# SOPHIA HEALTH INSTITUTE



## Meet the Team

At the Sophia Health Institute, our philosophy and methods are rooted in the core teachings of Dietrich Klinghardt, M.D., Ph.D. These include the 5 Levels of Healing, Autonomic Response Testing, and Neural Therapy.

## Meet our Team

 Learn more about Dietrich Klinghardt MD, PhD

 Learn more about Katie Dahlgren, ND

 Learn more about Michele Grindstaff, ND

 Learn more about Christine Schaffner, ND



### Sign-Up for Our Newsletter

Receive important health related news to your inbox.

First Name: *

Last Name: *

Email *

Phone

☑ Sign up for our Newsletter

Comments/Questions

Submit



**SOPHIA**NUTRITION

Visit Sophia Nutrition for all your supplement needs at www.SophiaNutrition.com

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

# Trademark/Service Mark Application, Principal Register

**Serial Number: 86945443**
**Filing Date: 03/18/2016**

## The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 86945443 |
| **MARK INFORMATION** | |
| *MARK | THE SOPHIA METHOD |
| **STANDARD CHARACTERS** | YES |
| **USPTO-GENERATED IMAGE** | YES |
| **LITERAL ELEMENT** | THE SOPHIA METHOD |
| **MARK STATEMENT** | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | Sophia Nutrition LLC |
| *STREET | 3417 Evanston Ave N. #429 |
| *CITY | Seattle |
| *STATE (Required for U.S. applicants) | Washington |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 98103 |
| **LEGAL ENTITY INFORMATION** | |
| **TYPE** | limited liability company |
| **STATE/COUNTRY WHERE LEGALLY ORGANIZED** | Washington |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| **INTERNATIONAL CLASS** | 035 |
| *IDENTIFICATION | providing information in the field of alternative medicine services |
| **FILING BASIS** | SECTION 1(b) |
| **ADDITIONAL STATEMENTS SECTION** | |
| **ACTIVE PRIOR REGISTRATION(S)** | The applicant claims ownership of active prior U.S. Registration Number(s) 4769198 and 4730142. |
| **ATTORNEY INFORMATION** | |
| **NAME** | Richard Alaniz |
| **ATTORNEY DOCKET NUMBER** | SAHI-2-0002 |

| FIRM NAME | Lowe Graham Jones, PLLC |
|---|---|
| STREET | 701 Fifth Ave. Suite 4800 |
| CITY | Seattle |
| STATE | Washington |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 98104 |
| PHONE | 206.381.3300 |
| EMAIL ADDRESS | alaniz@lowegrahamjones.com |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| OTHER APPOINTED ATTORNEY | David Lowe; Lawrence Graham; Darren Jones; Mark Lorbiecki; Mark Walters |
| **CORRESPONDENCE INFORMATION** | |
| NAME | Richard Alaniz |
| FIRM NAME | Lowe Graham Jones, PLLC |
| STREET | 701 Fifth Ave. Suite 4800 |
| CITY | Seattle |
| STATE | Washington |
| COUNTRY | United States |
| ZIP/POSTAL CODE | 98104 |
| PHONE | 206.381.3300 |
| *EMAIL ADDRESS | alaniz@lowegrahamjones.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| **FEE INFORMATION** | |
| APPLICATION FILING OPTION | TEAS RF |
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 275 |
| *TOTAL FEE DUE | 275 |
| *TOTAL FEE PAID | 275 |
| **SIGNATURE INFORMATION** | |
| SIGNATURE | /Richard Alaniz/ |
| SIGNATORY'S NAME | Richard Alaniz |
| SIGNATORY'S POSITION | Attorney of record, Washington state bar member |
| SIGNATORY'S PHONE NUMBER | 206.381.3300 |
| DATE SIGNED | 03/18/2016 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.
PTO Form 1478 (Rev 09/2006)
OMB No. 0651-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

**Serial Number: 86945443**
**Filing Date: 03/18/2016**

## To the Commissioner for Trademarks:

**MARK:** THE SOPHIA METHOD (Standard Characters, see mark)
The literal element of the mark consists of THE SOPHIA METHOD.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, Sophia Nutrition LLC, a limited liability company legally organized under the laws of Washington, having an address of
    3417 Evanston Ave N. #429
    Seattle, Washington 98103
    United States

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

    International Class 035:  providing information in the field of alternative medicine services
Intent to Use: The applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the identified goods/services.


**Claim of Active Prior Registration(s)**
The applicant claims ownership of active prior U.S. Registration Number(s) 4769198 and 4730142.

The applicant's current Attorney Information:
    Richard Alaniz and David Lowe; Lawrence Graham; Darren Jones; Mark Lorbiecki; Mark Walters of Lowe Graham Jones, PLLC     701 Fifth Ave. Suite 4800
    Seattle, Washington 98104
    United States
    206.381.3300(phone)
    alaniz@lowegrahamjones.com (authorized)
The attorney docket/reference number is SAHI-2-0002.

The applicant's current Correspondence Information:
    Richard Alaniz
    Lowe Graham Jones, PLLC
    701 Fifth Ave. Suite 4800
    Seattle, Washington 98104
    206.381.3300(phone)
    alaniz@lowegrahamjones.com (authorized)
**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant or applicant's attorney at the e-mail address provided above. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in an additional processing fee of $50 per international class of goods/services.

A fee payment in the amount of $275 has been submitted with the application, representing payment for 1 class(es).

### Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed

an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant is entitled to use the mark in commerce; the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

**Declaration Signature**

Signature: /Richard Alaniz/   Date: 03/18/2016
Signatory's Name: Richard Alaniz
Signatory's Position: Attorney of record, Washington state bar member
RAM Sale Number: 86945443
RAM Accounting Date: 03/21/2016

Serial Number: 86945443
Internet Transmission Date: Fri Mar 18 14:31:00 EDT 2016
TEAS Stamp: USPTO/BAS-XX.XX.XXX.XXX-2016031814310020
3362-86945443-550cdaee6a29639bb73d7bb617
486baca06bda7c326372c4bcde17e97cc18f9994
-ET-808-20160318142246747770

# THE SOPHIA METHOD



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Mon Sep 7 03:32:23 EDT 2020*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

# SOPHIA HEALTH INSTITUTE

| | |
|---|---|
| **Word Mark** | SOPHIA HEALTH INSTITUTE |
| **Goods and Services** | IC 044. US 100 101. G & S: Alternative medicine services. FIRST USE: 20120900. FIRST USE IN COMMERCE: 20120900 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 86208044 |
| **Filing Date** | February 28, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | February 17, 2015 |
| **Registration Number** | 4730142 |
| **International Registration Number** | 1315819 |
| **Registration Date** | May 5, 2015 |
| **Owner** | (REGISTRANT) Sophia Nutrition LLC LIMITED LIABILITY COMPANY WASHINGTON 309 Hayes Street Seattle WASHINGTON 98109 |
| **Attorney of Record** | Richard Alaniz |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "HEALTH INSTITUTE" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

| .HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Mon Sep 7 03:32:23 EDT 2020*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# THE SOPHIA METHOD

| | |
|---|---|
| **Word Mark** | THE SOPHIA METHOD |
| **Goods and Services** | IC 044. US 100 101. G & S: providing information in the field of alternative medicine services. FIRST USE: 20170100. FIRST USE IN COMMERCE: 20170100 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 86945443 |
| **Filing Date** | March 18, 2016 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | August 16, 2016 |
| **Registration Number** | 5224230 |
| **International Registration Number** | 1326430 |
| **Registration Date** | June 13, 2017 |
| **Owner** | (REGISTRANT) Sophia Nutrition LLC LIMITED LIABILITY COMPANY WASHINGTON 3417 Evanston Ave N. #429 Seattle WASHINGTON 98103 |
| **Attorney of Record** | Richard Alaniz |
| **Prior Registrations** | 4730142;4769198 |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "METHOD" APART FROM THE MARK AS SHOWN |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

# EXHIBIT 6

# PHANTOM LLC UNIT AGREEMENT

This Phantom LLC Unit Agreement (the "Agreement"), effective January 1, 2020 (hereinafter the "Effective Date"), is by and between INTEGRATIVE HEALTH INSTITUTE, PLLC, a Washington professional limited liability company doing business as Sophia Health Institute (the "Company"), and CHRISTINE SCHAFFNER ("Employee").

**WHEREAS,** Employee is employed by the Company, and the Company wants to recognize Employee and to allow Employee to participate in its success by sharing in the value of Company units of ownership interest ("Company Units") by means of Phantom LLC Units;

**NOW THEREFORE,** in consideration of the promises and of the covenants and agreements herein set forth, the parties hereby mutually covenant and agree as follows:

1.    **Phantom LLC Units.**  Subject to the terms and conditions of this Agreement, Employee is hereby granted Phantom Units equivalent to thirty four percent (34%) of the outstanding equity in the Company, subject to the vesting schedule provided in Section 2.

2.    **Vesting.**  Except as otherwise provided herein, the Phantom LLC Units granted hereunder shall first vest and become non-forfeitable if the Employee is employed by the Company as of the following dates:

        a.    Fifteen percent (15%) on the effective date of this Agreement;
        b.    Ten percent (10%) on March 6, 2020; and
        c.    Nine percent (9%) on October 20, 2020.

3.    **Right to Payment at Time of Sale or Merger.**  The Employee will receive payment for Employee's Phantom LLC Units upon the following occurrences:

(a)    <u>Sale of Assets</u>.  If all or substantially all of the assets of the Company (without taking into account any real property owned by it, and not considering sales of product in the ordinary course of business) are sold to an unrelated third party in the aggregate in a single transaction or in a series of related or unrelated transactions extending over not more than twelve (12) months, then notwithstanding Section 2, Employee's Phantom LLC Units shall fully vest even if they have not already fully vested at the end of the date on which the sale is closed, and the Company will convert Employee's Phantom LLC Units to a cash payment within ninety (90) days thereafter.  The Company's obligation to convert the Phantom LLC Units and pay that amount to Employee is contingent upon the closing of the sale of assets.  The amount payable by the Company will be determined at the time of sale, as follows:

Upon a sale of assets, Employee will be entitled to receive for each Phantom LLC Unit that is converted an amount equal to the fair market value of each Company Unit. In that event, the fair market value of one Company Unit will be the net amount of consideration that the holder of one Company Unit would be entitled to receive with regard to that Company Unit if the Company liquidates (or would have liquidated) after the asset sale, reduced by all company liabilities, obligations, and expenses of the Company (except the obligation to

1

make payment hereunder), at the time of liquidation, and further reduced by the amount of such consideration attributable to the sale of any real property owned by the Company, and by the amount of any federal, state and local taxes payable by the Company (as versus its members), including, but not limited to, any applicable built in gains tax or similar tax.

(b)   Merger. If the Company merges with an unrelated entity (e.g. a corporation, another limited liability company, or a partnership) and a substantial portion of the consideration received by the Company or its members is cash and/or equity interests of a company that is a publicly traded company (stock that has a readily ascertainable value and/or stock that is registered under federal securities laws and registered under, or exempt from, state securities laws), then notwithstanding Section 2, Employee's Phantom LLC Units shall fully vest at the end of the date on which the merger is closed even if they have not already fully vested, and the Company will convert the Phantom LLC Units to a cash payment within ninety (90) days thereafter.  The Company's obligation to convert the Phantom LLC Units and to pay that amount to Employee is contingent upon the closing of the merger. The amount payable by the Company will be determined at the time of merger, as follows:

Upon a merger satisfying the foregoing conditions, Employee will receive for each Phantom LLC Unit that is converted an amount equal to the fair market value of each Company Unit. The fair market value of one Company Unit in such an event will be the amount of cash and the value of the other consideration that the holder of that Unit would be entitled to receive with regard to that Company Unit if he or she participated in the merger, without taking into consideration the payment to be made hereunder, but reducing such amount by the value of any real property owned by the Company, and by the amount of any federal, state and local taxes payable by the Company (as versus its members), including, but not limited to, any applicable built in gains tax or similar tax.

(c)   Sale of Company Units.  If greater than fifty percent (50%) of all the outstanding Company Units are acquired by an unrelated third party, then notwithstanding Section 2, Employee's Phantom LLC Units shall fully vest at the end of the date on which the Final Unit Sale, as defined below, is consummated even if they have not already fully vested, and the Company will convert Employee's Phantom LLC Units to a cash payment within ninety (90) days thereafter.  The Company's obligation to convert the Phantom LLC Units and to pay that amount to Employee is contingent upon the closing of the sale of Company Units.  For these purposes, "Final Unit Sale" means the single transaction or last transaction in a series of related or unrelated transactions over a period of not more than twelve (12) months, which results in greater than fifty percent (50%) of the Company Units being transferred.  The amount payable by the Company will be determined at the time of the Final Unit Sale, as follows:

Upon a sale of Company Units satisfying the foregoing conditions, Employee will receive for each Phantom LLC Unit that is converted an amount equal to the fair market value of each Company Unit.  The fair market value of one Company Unit in such an event will be the amount of cash and the value of the other consideration that the holder of one Unit received with regard to that Company Unit in the single transaction or the average, on a per Unit basis, of all transactions in the series of related or unrelated transactions that results in a

Final Unit Sale, less any taxes payable by the Company (as versus its members) due to the sale of Units, and less the value of any real property owned by the Company.

**4.      Right to Payment – Proportionate Distributions.**  If cash distributions are made by the Company pursuant to Article 10 of the Company's Operating Agreement, the Professional Limited Liability Company Operating Agreement of Integrated Health Institute, PLLC, dated June 13, 2012, then the Employee shall receive a proportionate share of any cash distribution made to other Members based on Employee's then vested Phantom LLC Units as if Employee were a Unit Holder (as defined in the Operating Agreement) of the Company eligible for such distribution. For purposes of clarification, if all of the Employee's 34% interest in PLLC Units have vested, and if the distribution is made to the Members of the Company in the amount of $6,600, then the Employee shall receive a distribution of $3,400. The distribution under this Section shall be paid to Employee at the same time paid to the Members, but in no case may the distribution be paid out more than 2 months after the close of the tax year end of the Company.

**5.      Miscellaneous.**

(a)      This Agreement is not a contract for services.  Nothing in this Agreement changes the character of Employee's at-will employment status with the Company.  Any payments made to Employee in connection with Phantom LLC Units will be taxable as ordinary compensation for services, subject to withholding of all applicable taxes by Company.

(b)      The Company is under no obligation whatsoever to purchase or maintain any contract, policy, or other asset, or to designate, set aside, or appropriate funds sufficient to provide for the payment of amounts that might become payable hereunder.

(c)      Employee has no unilateral authority to either accelerate or defer the payment of amounts coming due hereunder.

**6.      Non-Alienation of Benefits.**  No right or benefit or payment under this Agreement is subject to anticipation, sale, assignment, pledge, encumbrance, execution of judgment, garnishment or charge, and any attempt to anticipate, sell, assign, pledge, encumber, execute upon, garnish, or charge the same is void.  If Employee becomes bankrupt or attempts to anticipate, alienate, sell, assign, pledge, encumber, have executed upon or garnished, or charge any right or benefit or payment hereunder, then such right or benefit or payment shall terminate.  Employee may not transfer any of the Phantom LLC Units awarded hereunder other than by Last Will and Testament or by the laws of descent and distribution, and only to the extent they are not yet terminated.

**7.      No Member Rights.**  Employee is not entitled to receive, pro rata or otherwise, any cash or property distributions paid to holders of Company Units other than as expressly provided in this Agreement.  Employee's Phantom LLC Units will not be credited with any cash or property dividends (or any amount of additional Phantom LLC Units attributable to the value of such cash or property dividends) paid to holders of Company Units. Employee does not have any voting rights or any other rights of a member of the Company.  Employee has no pre-emptive rights to acquire any Company Units or to receive any additional Phantom LLC Units if the Company issues any further Company Units or Phantom LLC Units.

3

8.  **Form and Interpretation of Agreement.**

(a)  Headings.  The subject headings of the paragraphs and subparagraphs of this Agreement are included for convenience only, and shall not affect the construction or interpretation of any of its provisions.

(b)  Variations in Pronouns.  All pronouns include the masculine, feminine, neuter, singular or plural as the identification of persons, places, firms, corporations or entities and the context may require.

(c)  Entire Agreement.  This Agreement contains the entire agreement and understanding of the parties with respect to the subject matters hereof, and there are no representations, inducements, promises or agreements, oral or otherwise, not embodied herein.  Any and all prior discussions, negotiations, commitments and understandings relating to the subject matters hereof are merged herein.  There are no conditions precedent to the effectiveness of this Agreement other than as stated herein, and there are no related collateral agreements existing between the parties that are not referenced herein.

(d)  Modifications and Waiver.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

(e)  Interpretation and Fair Construction of Agreement.  This Agreement has been reviewed and approved by each of the parties.  If any provision of this Agreement is uncertain or ambiguous, the language in all parts hereof shall be construed as a whole according to its fair meaning and not strictly construed for or against any party.  The Board will interpret and construe this Agreement, and in the absence of bad faith its interpretations and determinations will be conclusive and binding on the parties hereto and any other person claiming an interest hereunder, with respect to any issue arising hereunder.  The Company is taxed as a corporation which has elected to be taxed as a Small Business Corporation under Section 1362 of the Internal Revenue Code, and this Agreement will be interpreted in all events in a manner to avoid Employee's rights hereunder from being deemed a second class of equity of the Company.

(f)  Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(g)  Applicable Law.  The laws of the State of Washington shall govern this Agreement.

9.  **Arbitration.**

(a)  Disputes.  "Dispute" means any claim, dispute or controversy arising with regard to this Agreement.

(b)  Arbitration.  Any dispute shall be resolved by arbitration by and pursuant to the rules and procedures of Judicial Dispute Resolution, LLC ("JDR") at its office located geographically

nearest to the Company's principal place of business, using a single arbitrator. The fact of and content of any arbitration proceeding (including any award thereon) shall be confidential and no party may disclose the same without the consent of all parties to the arbitration, except that judgment on the award may be filed as provided in JDR's rules or those of the courts of the State of Washington, and except as required by law, provided that any party receives a request to disclose the same under the terms of a subpoena or order issued by a court or governmental body, that party shall promptly notify the other parties of the circumstances surrounding such request so that they may challenge such request, and in any event, not disclose any more than is strictly required to avoid being held in contempt or subject to other penalty.

(c)     Costs. The prevailing party in any arbitration proceeding shall recover its reasonable attorneys' fees and all other costs incurred in that action or proceeding as well as any lawsuit instituted to enforce an arbitrator's award, in addition to any other relief to which it may be entitled, to include without limitation its share of the arbitrator's fees, JDR's administrative fees and any other amounts incurred in connection therewith.

(d)     Statute of Limitations. No demand for arbitration may be made after the date when institution of legal or equitable proceedings based on such dispute would be barred by the applicable statute of limitations.

(e)     Questions of Arbitrability. All questions relating to the arbitrability of any dispute shall be decided by arbitration in the same manner and with the same effect as all other controversies which may arise hereunder.

(f)     Exclusive Dispute Resolution Method. Arbitration is the exclusive dispute resolution method available under this Agreement. No suit at law or in equity based on a dispute may be instituted by any party except to enforce an arbitrator's award. Any party bringing a suit barred by this provision must pay all fees and costs incurred therein (or in any appeal, etc.) by all other parties to the suit, including without limitation, reasonable attorneys' fees and costs.

(g)     Alternate to JDR. If JDR is not available or willing to conduct any mediation hereunder, then the same shall be conducted by Washington Arbitration and Mediation Service.

**10.     Notice.** All notices, requests, demands or other communications which are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of delivery if personally delivered by hand, (ii) upon the third day after such notice is deposited in the Unites States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested, (iii) on the day after it is sent by a nationally recognized overnight express courier, or (iv) by facsimile upon written confirmation (other than the automatic confirmation that is received from the recipient's facsimile machine) of receipt by the recipient of the notice. For such purposes, the applicable address or facsimile number will be that set forth below a party's signature hereto, which address or number a party may change, from time to time, by means of a notice to the other party given in the manner provided in this Section 13.

**11.     Amendment.** The Company may from time to time amend this Agreement to the minimum extent necessary, on the advice of counsel or other advisors knowledgeable with respect to such matters, to comply with the intent to avoid any tax consequences to either party prior to the date

that a cash payment is made by the Company. This Agreement may not be otherwise changed, waived, discharged, amended, modified or terminated orally, or in any manner other than by a written instrument signed by both parties.

      **12.**    **Independent Counsel.** This Agreement has been prepared by the firm of Harlowe & Falk LLP on behalf of the Company. Employee acknowledges that she has been (or is hereby) advised by the Company to obtain independent legal and tax counsel and that he has had sufficient opportunity to do so before signing this Agreement.

      **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement effective the date first above written.

**COMPANY:**

INTEGRATIVE HEALTH INSTITUTE, PLLC

By: _____
Name: _____
Title: __President__ _____
Address: _____
         _____
Fax No.: _____

**EMPLOYEE:**

CHRISTINE SCHAFFNER

Signature: _____
Address: _____
         _____
Fax No.: _____

**EXHIBIT 7**

# INTEGRATIVE HEALTH INSTITUTE PLLC
# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement"), is made and entered into as of this ___ day of March, 2020 (the "Effective Date"), by and between Integrative Health Institute PLLC, a Washington professional limited liability company (the "Company") and Christine Schaffner (the "Employee").

## RECITALS

WHEREAS, the Company is a professional limited liability company with a medical office located in Woodinville, Washington.

WHEREAS, the Employee represents that she is a physician licensed to practice medicine in the city of Woodinville and the state of Washington.

WHEREAS, the Employee represents that she has been engaged in and has experience and training in the business as that provided by Company.

WHEREAS, the Employee will have access to the Company's Confidential Information (as hereinafter defined), and to obtain assurance that the Employee will protect the Company's Confidential Information, the Employee is willing to agree to these terms.

WHEREFORE, in consideration of the foregoing recitals and the mutual promises and covenants hereinafter set forth, the Company and the Employee agree as follows:

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the Company and the Employee (individually a "Party" and together the "Parties") hereby agree as follows:

1.  *Employment.* The Company hereby employs the Employee as a practicing physician, and the Employee hereby accepts employment from the Company upon terms and conditions set forth in this Agreement. The Employee shall perform duties as prescribed by the Company, including, but not limited to, those duties set forth in Section 4 herein, and other duties as are customarily performed by one providing such position in other, same, or similar businesses or enterprises such as that engaged in by the Company, including without limitation, preparation of reports, records and such forms as may be required by the Employee to fulfill her duties to the Company. Changes may be made from time to time by the Company in its sole discretion to the duties, reporting relationships and title of Employee. The Employee shall serve the Company faithfully, diligently, competently, and according to the best of her abilities. The Employee will devote full time and attention to achieving the purposes and discharging the responsibilities associated with this position, and will comply with all rules, policies and procedures of the Company as modified from time to time, including without limitation, rules and procedures set

forth in the Company's employee handbook, supervisor's manuals and/or operating manuals, if any.

2.      *Representations and Warranties.*  The Employee represents and warrants to the Company that Employee is not bound by any restrictive covenants and has no prior or other obligations or commitments of any kind that would in any way prevent, restrict, hinder or interfere with Employee's acceptance of continued employment or the performance of all duties and services to the fullest extent of the Employee's ability and knowledge.  The Employee agrees to indemnify and hold the Company harmless from any liability the Company may incur as the result of the existence of any such covenants, obligations or commitments.

3.      *Term of Employment.*  The Company will employ the Employee on an at-will basis, and the Employee accepts employment by the Company on the terms and conditions set forth below.

4.      *Duties and Functions.*

    4.1      *Professional Services.*  During the term of this Agreement, the Employee shall devote full time, substantially all of her professional time and efforts to and for the benefit of the Company. The Employee shall be committed to enhancement of the Company's practice and shall use her best efforts to further the goals of and to promote the medical practice of the Company.  The expenditure of reasonable amounts of time for teaching, personal, and charitable and professional activities shall not be deemed a breach of this Agreement provided such activities do not materially interfere with the services required to be rendered to the Company hereunder.

    4.2      *Standard of Practice.*  The employee shall be employed full-time and shall provide patient care at the Company's office no less than Two (2) days per week.  The Employee shall have on-call responsibilities, as determined by the Company.  Holiday assignments are to be rotated between the Employee and other physicians of the Company, as determined by the Company.  The Employee shall devote her utmost knowledge and best skill to the care of the Company's patients, which are entrusted to her and shall perform such other duties as may be assigned to her by the Company.  The Employee understands that all patients are accepted by the Company regardless of their race, color, national origin, handicap or age.  Dismissal of an established patient from continued care must be justified by a cause for dismissal due to patient noncompliance with physician directives or office procedures, and must be discharged in accordance with established legal protocols.

    4.3      *Ethical Conduct.*  The Employee shall engage in the practice of medicine in accordance with the Principles of Medical Ethics of the American Medical Association, and the customs and rules of ethical conduct prescribed by the Company.

    4.4      *License.*  The Employee shall maintain an un-restricted license to practice medicine in the city of Woodinville and the state of Washington.  Originals must be presented to the Company and photocopies of all required licenses shall be provided to the Company.

4.5     *Billing*.  The Employee agrees and acknowledges that the Company alone has the right to bill and receive payment from patients and third-party payors, including all government-sponsored programs, for physician services rendered by the Employee hereunder, and the Employee shall not bill any patient or third-party payor for such services.  Except as provided herein, all income or fees for physician services rendered by the Employee shall belong to, and be the property of, the Company.  The Company will use best efforts to bill for services no later than Five (5) working days after the Employee has provided information necessary to complete such billing and in the case of rebilling, Five (5) working days after negotiation of rejection of original billing information. This Section 4.5 shall survive termination of this Agreement.

4.6     *Surrender of Books and Records*.  The Employee acknowledges that all lists, books, records, and any other materials owned by the Company or used by it in connection with the conduct of its business, shall at all times remain the property of the Company, and that upon termination of employment hereunder, irrespective of the time, manner or cause of said termination, the Employee will surrender to the Company all such lists, books, records, and other materials. This Section 4.6 shall survive termination of this Agreement.

4.7     *Use of the Employee's Name*.  The Company shall have the right to use the Employee's name in connection with the Company's marketing and contracting activities, and in any oral or written communication with patients or third-party payors.

4.8     *Medical Records*.  The Employee shall prepare and maintain for the benefit of the Company medical records for patients in accordance with accepted standards of practice in the community, applicable laws regarding confidentiality of medical reports, the policies and procedures established by the Company and the terms of any third-party payor agreements.  The Employee acknowledges and agrees that all such medical records are the property of the Company.  To the extent permitted by law, the Employee shall cooperate and communicate freely with other health care providers who provide professional services to patients of the Company.

4.9     *Reimbursement Contracts*.  In the event that the Company elects to participate as a provider in an HMO, PPO, IPA or other care delivery system, then the Employee shall also be required to join.

4.10    *Support Services*.  The Company shall furnish to the Employee all of the necessary support services, including but not limited to, equipment, facilities, supplies, medical support employees, secretaries and other personnel reasonably needed by the Employee to perform the Employee's obligations created by this Agreement.  The cost of providing these support services shall be borne solely by the Company.

4.11    *The Company's Authority*.  The Company shall exercise direction over and give support to the Employee in regard to standards, policies, record keeping, treatment procedures, and fees to be charged; such direction and support shall not interfere with the normal physician-patient relationship nor be in violation of acceptable medical ethics.  The Company shall have the right to determine which staff person(s) will render support to the Employee and which physician employee will render services to a patient of the Company.  The Company shall have

final authority over acceptance or refusal of any patient.  It is understood and agreed, however, that the Company shall discuss the refusal of patients with the Employee.

5.      *Qualifications.*

        5.1     At all times during the term of this Agreement, the Employee shall maintain compliance with the following qualifications.  If the Employee at any time ceases to satisfy any one or more of the qualifications, the Employee shall immediately notify the Company, and the Employee's employment may be subject to immediate termination.  Failure to comply with the notice obligations of this Section 5 shall be grounds for immediate termination of this Agreement. The Employee shall:

        (a)     be a member in good standing of the Company's medical staff, and, as applicable, have appropriate and unrestricted clinical privileges at the Company's clinic and other hospitals in which the Employee provides medical services;

        (b)     have and maintain Washington State licensure in good standing as a physician and good standing with the Washington State Medical Quality Assurance Committee;

        (c)     have and maintain in good standing the right and ability to prescribe controlled substances, narcotics, and prescription drugs, including an unrestricted Drug Enforcement Administration number;

        (d)     have and maintain in good standing the right to receive reimbursement from Medicare, Medicaid, and other public and private health care programs, payors, and insurance companies as required by the Company from time to time;

        (e)     comply with any and all federal, state, or local agency law or regulation governing or applicable to the performance of professional services under this Agreement;

        (f)     comply with all continuing medical education requirements imposed by Washington State law; and

        (g)     comply with all ethical requirements of the American and Washington State Medical Associations; and American and Washington Psychiatry and Neurology Associations.

        5.2     The Employee hereby represents and warrants to the Company that the Employee:

        (a)     is not currently or ever been excluded, barred, or otherwise ineligible to participate in any federal or state health care program, including, but not limited to, Medicare, Medicaid, CHAMPUS/Tricare and the federal health care programs defined in 42 USC 1320a-7b(f) (the "Federal Health Care Programs");

(b)     has not been convicted of any criminal offense (i) related to the delivery or billing of health care services, (ii) related to the neglect or abuse of patients, (iii) involving moral turpitude or, in the sole opinion of the Company, may tend to injure the reputation of the Company, or (iv) for which she could be excluded, barred, or otherwise declared ineligible to participate in the Federal Health Care Programs;

(c)     has not been suspended, excluded, debarred, or sanctioned under any other federal health care program, including the Food and Drug Administration, the National Institutes of Health, the Department of Defense, or the Department of Veterans Affairs; and

(c)     is not currently under investigation or otherwise aware of any circumstance which may result in the Employee being excluded, barred, or otherwise declared ineligible to participate in the Federal Health Care Programs.

6.     *Third-Party Payor Agreements.*  The Employee hereby authorizes the Company, on the Employee's behalf, to enter into agreements with health plans, insurance companies, independent practice associations, preferred provider organizations, and other managed care entities, as the Company determines to be appropriate in connection with the provision of the Employee's services.  The Employee shall execute any additional agreements or documentation necessary to implement this provision and any agreement entered into by the Company.

7.     *Quality Assurance/Improvement.*

7.1     The Employee shall be responsible for procedures and care provided in the Company's clinic and shall ensure that the Employee's patients receive quality care in a compassionate manner and shall obtain a high degree of patient satisfaction.

7.2     The Employee shall maintain a collegial and cooperative relationship with all medical and facility staff employed by the Company.

7.3     The Employee shall be evaluated, at the Company's discretion, not less than annually.  The evaluation may include input from primary care physicians whose patients are served by the Employee.  Nothing contained in this Agreement, including this section, is intended to create enforceable rights on behalf of any person not a party to this Agreement, nor is it intended that any third-party beneficiary be created hereunder.

8.     *Patient Complaints.*  Upon request by the Company, the Employee shall make herself available to any patients who have made a complaint regarding the services provided by the Employee and shall make best efforts to resolve such complaints in as positive manner as is reasonably possible.

9.     *Collection.*  The Employee shall make all reasonable efforts to assist the Company in connection with the Company obtaining payment from any and all third party payor programs in which the Company may from time to time participate, including, but not limited to Blue Cross of Washington and Alaska, Regence Washington Blue Shield, and Medicare and Medicaid.

10.     *Medicare and Medicaid.*  The Employee agrees to provide physician services to Medicare and Medicaid recipients as well as low-income patients and uninsured patients in accordance with the policies of the Company, regardless of patient's ability to pay.

11.     *Records and Files.*

11.1     The Employee agrees to make or direct the making of proper and accurate reports, records, charts, claims and other documentation as may be required by regulatory bodies, whether private or public, and as may be required by the Company.

11.2     The Employee agrees comply with the Company's standards for timely completion of medical records, billing information, and such records as required by the Company to be completed by the Employee.

11.3     All such records, reports, files, and documentation shall remain the exclusive property of the Company.  The Employee shall be granted reasonable access to such records and files for legal and administrative purposes and subject to applicable legal requirements.

12.     *Compensation.*  The Employee shall be compensated for her services as set forth in Schedule A.

13.     *Term and Termination.*

13.1     *Term.*  This Agreement shall commence on the Effective Date and shall continue until terminated pursuant to this Agreement.

13.2     *Termination.*  This Agreement shall be terminated upon the happening of any of the following:

(a)     Whenever the Employee shall not be duly licensed or otherwise legally authorized to practice medicine in the city of Woodinville and/or the State of Washington.

(b)     The death of the Employee or the determination by either the Company or a court within the state of Washington, of the incompetence of the Employee.

(c)     The termination of the Company's medical group practice.

(d)     At any time when there is not medical malpractice insurance in full force and effect with respect to the Employee.

(e)     The suspension, expulsion or any other disciplinary action finally taken by the State of Washington, Washington State Department of Health, or equivalent regulatory body.

(f)     The Employee bills third party payors or accepts funds from either patients or third party payors for the Employee's own use.

(g)     The Employee's failure to rectify a material breach of any term of this Agreement which is not specifically enumerated in Section 3.2, within Thirty (30) days after written notice thereof from the Company.

(h)     Conviction of a felony crime.

(i)     Other actions determined by the Company to endanger the professional standing of the practice.

(j)     Notwithstanding any of the provisions of this Agreement, upon Sixty (60) days prior written notice by either the Employee or the Company to the other, for any reason.

14.    *Company Property/Confidential Information.*

14.1    All of the following shall be included within the definition of "Company Property": (1) all data and information in whatever form, relating to the business, operations, customers (including without limitation the identity of customers), clients, investors, borrowers, funding sources and employees of the Company, the Company's customers, or third party for which the Employee shall perform services on behalf of the Company; (2) all intellectual property in which the Company has an interest, and all copies and tangible embodiments thereof, in whatever form, including all copyrightable works and all copyrights; all trade secrets, and all computer software and documentation; and (3) accounting information system or management information system used or formerly used by the Company.  Any and all information or property supplied to the Employee by the Company or the Company's customers or third party for which the Employee shall perform services on behalf of the Company shall be used by the Employee for the performance of her duties under this Agreement, and for no other purpose whatsoever.  The Employee acknowledges and agrees that the Employee has no interest in any Company Property or in the property of the Company's customers or third party for which the Employee shall perform services on behalf of the Company, and all right, title and interest in such property is retained by the Company or the Company's customers or third party for which the Employee shall perform services.  By this Agreement the Company retains all rights of use of the work product generated by the Employee for the Company, including any and all work product generated prior to the date of this Agreement.  The Company retains all intellectual property rights associated with the work product, including any source code or blue prints.  For purposes of illustration and not limitation, the parties agree that the work performed for the Company under this Agreement, is "work for hire" as that term is used in United States patent, trademark and copyright law.  At the time such work is performed or created, and without necessity of further formality or designation by either party, all title, ownership and rights to and in such work and work product is and shall remain the sole property of the Company.  The Employee shall have no rights, reserved or otherwise, to or in such work or work product, or in its ultimate use, application or dissemination.

14.2    The Employee agrees that the Employee will take any and all reasonable actions necessary to ensure that the use and dissemination of the Company's Property shall conform to the requirements of this Agreement. The Employee shall not have the right to use any of the Company's Property, including, but not limited to, lists of Company's patients or any information derived therefrom, for any purpose other than fulfillment of the Employee's agreements herein. Notwithstanding the foregoing, Employee may use patient records and information that a patient lawfully obtains and provides to Employee. The provisions of this paragraph shall carry over and survive termination.

14.3    "Confidential Information" means (1) All data and information in whatever form, relating to the business, operations, data, materials, products, specifications, manuals, business plans, recipes, software, patient lists, marketing plans, financial information, prototypes, samples, technical data, services, inventions, processes, discoveries, formulations, architectures, concepts, ideas, designs, drawings, personnel, patients, markets, marketing plans, confidential information disclosed to the Company by third parties, and other information disclosed or submitted, orally, in writing, graphic or electronic form, or by any other media of the Company; and (2) All intellectual property in which the Company has an interest, and all copies and tangible embodiments thereof, in whatever form, including all copyrightable works and all copyrights; all trade secrets, and all computer software and documentation. However, Confidential Information shall not include information which, as the Employee can prove in written evidence, (i) is now or subsequently becomes generally known or available by publication, commercial use or otherwise, through no fault of the Employee, (ii) is known by the Employee at the time of disclosure, or (iii) is lawfully obtained by the Employee without violation of a confidentiality obligation.

14.4    "Person" means an individual, partnership, corporation, association, joint stock company, trust, joint venture, unincorporated organization or a governmental entity (or any department, agency or political subdivision thereof).

14.5    The Employee acknowledges that in connection with the Employee's employment by the Company, the Employee will obtain Confidential Information, and the Employee agrees that the Employee will not disclose to any Person any Confidential Information, except with the Company's express prior written consent. The Employee agrees that the Employee shall take any and all reasonable actions necessary to ensure that the use and dissemination of the Company's Confidential Information shall conform to the requirements of this Agreement, including, but not limited to, executing all instruments as the Company may require. The Employee further agrees that the Employee shall take reasonable measures to protect the secrecy of and avoid unauthorized disclosure and use of the Confidential Information of the Company. In the event the Employee is compelled to disclose the Company's Confidential Information by a valid subpoena, court or administrative order or as otherwise required by law, the Employee is entitled to comply with the Employee's legal obligation of disclosure but shall, prior to making any such compelled disclosure, promptly notify the Company of the compelled disclosure and cooperate with the Company in any legal efforts by the Company to protect against or limit the disclosure.

14.6    All documents and other materials containing Confidential Information and all copies thereof shall be returned to the Company promptly in the event the Company ceases to be employed by the Company, for any reason, or upon the written request by the Company.

14.7    Violation or breach of this Section 14 shall entitle the Company to preliminary and permanent injunctions with a bond waived, or other equitable relief in order to prevent or restrain any such breach by the Employee or her partners, agents, representatives, independent Employees, or any and all persons or entities directly or indirectly acting for or with the Employee. The rights and remedies of the Company under this section shall be in addition to, and not in limitation of, any of the rights, remedies or damages available at law or in equity.

15.    *HIPPA.*

15.1    The Employee and the Company hereby agree to comply with all applicable laws and regulations, including the provisions of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 USC 1320d, et seq. ("HIPPA"); federal privacy regulations contained in 45 CFR 160 and 164; federal security standards contained in 45 CFR 142; and federal standards for electronic transactions contained in 45 CFR 160 and 162, as may be amended (collectively referred to herein as the "HIPPA Requirements"), regarding the confidentiality of patient health care information.

15.2    The Employee and the Company agree not to use or disclose and Protected Heath Information, as defined in 45 CFR 164.501, or Individually Identifiable Health Information, as defined in 45 USC 1320d, other than as permitted by the HIPPA Requirements or pursuant to this Agreement.

15.3    To the extent required by the United States Secretary of Health and Human Services (the "Secretary") to confirm compliance with the HIPPA Requirements, the Employee and the Company agree to make their internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary.

15.4    The Employee and the Company agree to negotiate in good faith any additional agreements or amendments to this Agreement that may become necessary to ensure compliance with the HIPPA Requirements.

16.    *Professional Liability Insurance.*

16.1    *Coverage.* The Employee, at ehr sole cost and expense, shall obtain and maintain professional and general liability insurance coverage, with liability coverage in the amount of at least One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the annual aggregate. At the request of the Company, the Employee shall furnish satisfactory evidence of such liability coverage. The Employee shall notify the Company no less than Thirty (30) days prior to any material change or termination of such coverage.

16.2    *Insurability.* This Agreement is contingent upon the Employee's ability to secure and maintain professional liability insurance covering the Employee with an insurer during the

term of this Agreement. If for any reason the insurer cancels or denies insurance, the cancellation or denial will result in automatic and immediate termination of this Agreement, effective as of the date of cancellation or denial. The Employee shall promptly and accurately complete any application or other form of documentation required by the insurer in connection with the provision or any extension or renewal of such coverage.

17. *Non-Solicitation.*

17.1    The Employee agrees and acknowledges that, in connection with her employment with the Company, she will be provided with access to and become familiar with confidential and proprietary information and trade secrets belonging to the Company and/or the Company's subsidiaries or affiliates. Accordingly, in consideration of her employment with the Company pursuant to this Agreement and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Employee agrees that, while she is in the employ of the Company and for a Two (2) year period after the termination of her employment, for any reason, she shall not, either on her own behalf or on behalf of any third party, except on behalf of the Company, directly or indirectly, engage in any of the following activities:

(a)    Attempt in any manner to solicit from any client or patient of the Company or the Company's subsidiaries or affiliates at the time the Employee's termination, business of the type performed by the Company or the Company's subsidiaries or affiliates or to persuade any patient of the Company or the Company's subsidiaries or affiliates to cease to do business or to reduce the amount of business which any such patient has customarily done or actively contemplates doing with the Company or the Company's subsidiaries or affiliates; or

(b)    Recruit, solicit or induce, or attempt to induce, any employee or employees of the Company or its affiliates to terminate their employment with, or otherwise cease their relationship with the Company or its affiliates.

17.2    The parties acknowledge and agree that the restrictions placed upon the Employee herein are reasonable and necessary to protect the Company's legitimate interests. The Employee further acknowledges that, based upon her education, experience, and training, this non-solicitation provision will not prevent her from earning a livelihood and supporting herself and her family during the relevant time period.

17.3    If any restriction set forth in this Section 17 is found by any court of competent jurisdiction to be unenforceable as overbroad, it shall be reformed and interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

17.4    The provisions of this Section 17 shall survive termination or expiration of this Agreement.

18. *Remedies.* Notwithstanding other provisions of this Agreement regarding dispute resolution, the Employee agrees that the Employee's violation of any of Sections 14, 15, and 17

of this Agreement would cause the Company irreparable harm which would not be adequately compensated by monetary damages and that an injunction may be granted by any court or courts having jurisdiction, restraining the Employee from violation of the terms of this Agreement, upon any breach or threatened breach of the Employee of the obligations set forth in any of Sections 14, 15, or 17. The preceding sentence shall not be construed to limit the Company from any other relief or damages to which it may be entitled as a result of the Employee's breach of any provision of this Agreement, including Sections 14, 15, or 17. The Employee also agrees that a violation of any of Sections 14, 15, or 17 would entitle the Company, in addition to all other remedies available at law or equity, to recover from the Employee any and all funds, including, without limitation, wages and salary, which will be held by the Employee in constructive trust for the Company, received by the Employee in connection with such violation.

19.     *Dispute Resolution.* Any disputes arising out of this Agreement which require either party to commence litigation against the other shall be brought in and only in the Superior Court of Washington for King County or the United States District Court for the Western District of Washington, and Company and the Employee consent to jurisdiction and venue therein.

20.     *Fees.* If any litigation or other proceeding is brought under this Agreement, the prevailing party in such litigation or proceeding shall be entitled to receive its or his/her reasonable attorney fees and costs incurred in connection therewith.

21.     *Assignability.* During the Employee's employment by the Company, this Agreement may not be assigned by either party without the written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without the Employee's consent to a subsidiary or a successor by sale, merger or liquidation, if such successor carries on the business substantially in the form in which it is being conducted at the time of the sale, merger or liquidation. This Agreement is binding upon the Employee, the Employee's heirs, personal representatives and permitted assigns and on the Company, its successors and assigns.

22.     *Waiver.* No failure on the part of either party to exercise, and no delay in exercising, any right or remedy hereunder will operate as a waiver thereof; nor will any single or partial waiver of a breach of any provision of this Agreement operate or be construed as a waiver of any subsequent breach; nor will any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy granted hereby or by law.

23.     *Governing Law.* The validity, construction and performance of this Agreement shall be governed by the laws of the State of Washington, without regard to the conflict of law provisions of such laws. The parties hereto expressly recognize and agree that the implementation of this section is essential in light of the fact that the Employee will be working within the State of Washington, and there is a need for uniformity in the interpretation and enforcement of the employment agreements between the Company and its employees.

24.     *Entire Agreement.* This Agreement contains the entire agreement between the Company and the Employee with respect to the subject matter hereof and supersedes all prior agreements

and understandings between the parties and there are no other representations or agreements other than as stated in this Agreement related to the terms and conditions of the Employee's employment.  Amendment or modification of this Agreement must be in writing and signed by both parties.

25.     Indemnification.  Each party ("Indemnitor") shall indemnify and hold harmless the other party, its members, managers, officers, agents or employees, from and against any and all claims, demands, liabilities, losses, damages, costs and expenses (including reasonable attorney fees and costs) (collectively, "Claims"), resulting in any manner, directly or indirectly, from any acts or omissions of Indemnitor, its directors, officers, employees or agents.  Notwithstanding the foregoing, the Indemnitor shall not be liable under this section to the extent that a Claim is covered as a peril or loss insured against in its liability insurance policy then in force and effect, provided further, however, that this section shall not have any force or effect if the implementation of this section will, in any manner, negate, cancel or cause the loss of the insurance coverage otherwise available to any party under a liability insurance policy.

26.     *Severability*.  If any provision of this Agreement or compliance by any of the parties with any provision of this Agreement constitutes a violation of any law, or is or becomes unenforceable or void, then such provision, to the extent only that it is in violation of law, unenforceable or void, shall be deemed modified to the extent necessary so that it is no longer in violation of law, unenforceable or void, and such provision will be enforced to the fullest extent permitted by law.  If such modification is not possible, said provision, to the extent that it is in violation of law, unenforceable or void, shall be deemed severable from the remaining provisions of this Agreement, which provisions will remain binding on the parties.

27.     *Notices*.  All notices hereunder shall be in writing and shall be effective on the date that the same are personally delivered or deposited in the United States mail, postage prepaid, certified, and the return receipt thereof shall be evidence of same.  All notices shall be sent or delivered to the Company or the Employee at the addresses as shall, from time to time, be communicated from one to the other in writing.

28.     *Binding Effect*.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, personal representatives, successors and assigns.


          IN WITNESS WHEREOF, the parties have duly signed and delivered this Agreement as of the day and year first above written.


COMPANY:
INTEGRATIVE HEALTH INSTITUTE PLLC          EMPLOYEE:
BY:


_____          _____
[name], [title]                            Christine Schaffner

SCHEDULE A

Compensation

1.      *Incentive Compensation.*  As compensation for services to the Company, provided that the Employee remains employed by the Company, the Employee shall receive Forty Percent (40%) of collections from patients and third party payors generated from the Employee's professional fees (the "Compensation").  The Compensation shall be paid on a monthly basis, no later than the Twentieth (20th) day of each month, for all collections generated in the prior month.

All monies, including monthly capitation received by the Company for health maintenance organization (HMO) enrollees who have been assigned to the Employee or whose care has been exclusively managed by the Employee in any given month, shall be included in collections from third party payors generated by the Employee.

2.      *Stock Purchase.*  On December 31, 2019, the Company shall provide the Employee with the right to purchase shares of stock in the Company, representing Forty Nine Percent (49%) of all authorized stock of the Company, subject to the terms of an applicable stock subscription agreement and a shareholders agreement, upon the satisfaction of the following conditions:

2.1     The Employee has been continuously employed by the Company.

2.2     The Employee has maintained license and hospital privileges as required by this Agreement.

2.3     The Employee is found by the Company to be compatible with the Company's practice philosophy, in the sole discretion of the Company.

2.4     The Employee is not in breach of this Agreement.

3.      *Withholding.*  The Company may withhold from any amounts payable under this Agreement all applicable federal, state or local taxes, as required.

4.      *Benefits.*  The Company shall provide the Employee with the following benefits:

4.1     Three Hundred Dollars ($300.00) per month stipend for health insurance.

4.2     The Employee shall be entitled to the benefits generally available to the Company's employees pursuant to the Company's programs, which may now or, if not terminated, shall hereafter be in effect, or in any other benefit programs which may be established by the Company for which the Employee is eligible.  Nothing herein shall affect the Company's ability to modify, alter, terminate or otherwise change any benefit plan it has in effect, at any time, to the extent permitted by law.

5.      *Vacation/Holiday.*  For the duration of the Employee's employment hereunder, the Employee will be provided such vacation and paid holidays as the Company makes available to its similarly-situated employees generally.

6.      *Reimbursable Expenses.*  The Company shall reimburse the Employee for the necessary expenses as approved by the Company.  Payments shall be made to the Employee for reimbursable expenses upon submission of applicable bills, receipts or other documentation required by the Company and submitted in proper expense report format as set forth by the Company.  The Company shall make payments for reimbursable expenses by the next pay period following submission of the expense report.

7.      *Professional Liability Insurance.*  During the term of this Agreement, the Employee shall obtain and maintain the liability insurance for the practice of medicine by the Employee.  Such insurance shall be for the same amount as provided for all physician employees for the Company who are within the same specialty as the Employee.  The Company shall reimburse the Employee for all costs associated with such liability insurance.

8.      *Right of Set-off.*  By accepting this Agreement, the Employee consents to a deduction from any amounts the Company owes the Employee from time to time (including amounts owed to the Employee as wages or other compensation, fringe benefits, or vacation pay, as well as any other amounts owed to the Employee by the Company), to the extent of the amounts the Employee owes to the Company.

9.      *Section 409A Safe Harbor.*  Notwithstanding anything in this Agreement to the contrary, in no event shall the Company commence payment or distribution to the Employee of any amount that constitutes "nonqualified deferred compensation" within the meaning of Section 409A of the Code, earlier than the earliest permissible date under Section 409A of the Code that such amount could be paid or distributed without the imposition of additional taxes or interest under Section 409A of the Code.  If any payments or distributions are delayed pursuant to the immediately preceding sentence, the Company will accrue such amounts without interest during such period as the payment or distribution may be required to be deferred under Section 409A of the Code, and will become payable in a lump-sum payment on the first business day that such amount could be paid or distributed without additional taxes or interest being imposed under Section 409A.  The Company and the Employee agree that they will execute any and all amendments to this Agreement as they mutually agree in good faith may be necessary to ensure compliance with the distribution provisions of Section 409A of the Code or as otherwise needed to ensure that this Agreement complies with Code Section 409A.

# EXHIBIT 8



# marin naturopathic medicine

MARIN AND SACRAMENTO          CALIFORNIA          (415) 460-1968

HOME      DOCTORS      SERVICES      PATIENT PORTAL      SOPHIA NUTRITION STORE      CONTACT



**Marin Naturopathic Medicine** is a holistic clinic with two locations, in both Marin County and Sacramento, California. The clinic was started by Dr. Louisa Williams, author of *Radical Medicine: Profound Intervention in a Profoundly Toxic Age* (www.radicalmedicine.com). Dr. Williams has relocated to Austin, Texas and the clinic was taken over by Dr. Christine Schaffner. Dr. Schaffner is the Clinic Director at Sophia Health Institute (Dr. Dietrich Klinghardt's clinic in Woodinville, Washington) and has always felt the need to bring the medicine practiced at SHI to the Bay area. We are honored to continue the legacy of Dr. Williams' work in Marin and to combine it with the Sophia approach.

We are extremely passionate about and dedicated to bringing you the very best treatments and resources in Naturopathic and Biological Medicine. We look forward to helping you on your journey to vibrant health!

Learn More  →

## Subscribe

Sign up with your email address to receive news and updates.

First Name

Last Name

Email Address

SIGN UP

We respect your privacy.

---

**Marin Location:** 2144 Fourth Street, Ste B, San Rafael, CA 94901

**Sacramento Location:** 805 Wales Drive, Ste B, Folsom, CA, 95630

E:info@drchristineschaffner.com   P:(415) 460-1968   F:(415) 223-9890

*Information, products or services mentioned on this website are not intended to diagnose, treat, cure or prevent any disease. These statements or products have not been evaluated by the FDA or any government agency.*







MARIN AND SACRAMENTO          CALIFORNIA          (415) 460-1968

HOME   **DOCTORS**   SERVICES   PATIENT PORTAL
SOPHIA NUTRITION STORE   CONTACT

# Dr. Christine Schaffner

Dr. Christine Schaffner is a board certified Naturopathic Doctor who graduated from Bastyr University in Seattle, Washington. She completed her undergraduate studies in Pre-medicine and Psychology at the University of Virginia in Charlottesville, Virginia.

Dr. Schaffner's style of practice is strongly rooted in traditional Naturopathic principles. She believes in the importance of





establishing a strong health foundation in order to achieve optimal health. Dr. Schaffner combines both Naturopathic and Conventional therapies to develop individualized treatment plans that focus on addressing the underlying cause of complex chronic illness.

Dr. Schaffner listens to her patient's story and actively involves them in their health plan. She enjoys educating her patients so that they feel empowered in making decisions in their health journey.

Dr. Schaffner has trained extensively with Dietrich Klinghardt, MD, PhD. She has also completed Dr. Robert Rowen's Oxidation Therapy Course, Dr. Ritchie Shoemaker's Biotoxin Illness Course, Advanced Classes in Biotherapeutic Drainage, Methylation seminars with Dr. Paul Anderson and Dr. Ben Lynch, attended Medicine Week in Baden-Baden, Germany, and is a member of the Institute for Functional Medicine. She thoroughly enjoys staying current with the latest developments in chronic illness so she can better serve her patients.

*Dr. Christine Schaffner is not currently accepting new patients in California

---

**Marin Location:** 2144 Fourth Street, Ste B, San Rafael, CA 94901

**Sacramento Location:** 805 Wales Drive, Ste B, Folsom, CA, 95630

E:info@drchristineschaffner.com   P:(415) 460-1968   F:(415) 223-9890

*Information, products or services mentioned on this website are not intended to diagnose, treat, cure or prevent any disease. These statements or products have not been evaluated by the FDA or any government agency.*





# EXHIBIT 9



# vimeo



# Dr. Christine Schaffner

\+ · · ·

## Activity

| | |
|---|---|
| Showcases | 0 |
| Followers | 224 |
| Following | 0 |
| Collections | 0 |
| Membership plan | PRO |
| Member since | Aug 2016 |

## 77 videos



# vimeo



01:36

The Body Electric 2.0 - Join Us!



Throat Massage



vimeo



Day 10 Liver Flush



Tapping with Ellen

☰          **vimeo**          🔍

drk_judy_replay



Liver Flush Intro and Q&A with Dr. Christine Schaffner and Kim Todd







# vimeo



Benefits and Uses of HOCl



Dr. Klinghardt Tapping and Your Immunity






Dr. Christine Schaffner How to Apply HOCl





# EXHIBIT 10



offers.lumviskincare.com/shop/sophia-flow-plus/

Apps   L&D Ordering   My Daily Planner   sharepoint/Pages/d...   JDE   UltiPro   Navia Benefit Soluti...   Sophia Health Instit...   MasterControl Login   Int'l publication rou...

LUMVI
ENLIGHTENED SKINCARE.

SOPHIA FLOW +       MY ACCOUNT

LIMITED EDITION

# Sophia Flow + CBD Cream

The same **Microbiome Advanced Formula** in the renowned Sophia Flow Cream has been enhanced with the addition of Full Spectrum CBD extract.

### Quantities are limited.

BUY NOW →       LEARN MORE →



## What is Sophia Flow?

The results of over 30 years of research, Sophia Flow is crafted with a proprietary probiotic (Microbiome Advanced Formula) that generates a peptide macrophage-activating factor. This formula is extremely supportive for the immune system and promotes lymph node drainage in the neck, supporting neurological health and helping to prevent neurological illness down the road

## What are the benefits of adding CBD?

Our body has a naturally occurring endocannabinoid system with CB1 receptors and CB2 receptors:



### CB1 Receptors

Interact and communicate with the brain and central nervous system

### CB2 Receptors

Trigger immune response, lymph cells and important lymph organs including the spleen



CBD interacts with CB2 receptors and can have immunomodulatory and anti-inflammatory effects. By increasing immune modulation and decreasing inflammation, CBD helps further drainage of the lymph and eases pain.

From the help of a Molecular Biologist, Dr. Marco Ruggiero, and his expansive experience in research and formulating, we've added a full spectrum CBD extract to enhance the results of Sophia Flow. Dr. Ruggiero is a physician, researcher,

From the help of a Molecular Biologist, Dr. Marco Ruggiero, and his expansive experience in research and formulating, we've added a full spectrum CBD extract to enhance the results of Sophia Flow. Dr. Ruggiero is a physician, researcher, and formulator and holds a Ph.D. in Molecular Biology.  He has been a professor at the Department of Experimental and Clinical Biomedical Sciences at the University of Firenze, Italy for more than 20 years, and has also published more than 150 peer-reviewed scientific papers.

Quantities are limited.  Order your jar now.                BUY NOW →

## What is Full Spectrum CBD?

Think CBD but with an entourage to benefits go even further. Our Full Spectrum CBD added includes plant ingredient terpene and flavonoids that help to enhance the already beneficial effects of CBD. It also goes under the least amount of processing.

CBD to support lymph drainage (and
ease pain) with Dr. Marco Ruggiero



Full-spectrum CBD contains elements of healing properties like
protein, fiber, fatty acids, and rich essential vitamins. Full spectrum
CBD has also undergone the least amount of processing.

**It's Bountiful**
Full-spectrum CBD includes at least 113 known cannabinoids, all created inside a single hemp plant.

**It's Sustainable**
By combining various cannabinoids into a singled, bundled treatment, full-spectrum CBD's "team effect" lasts longer when used for different ailments, thus giving users more effective and sustainable treatment options.

**It's All Natural**
Full-spectrum CBD products are non-genetically modified, don't come with pesticides or chemicals, and are all organic.

Quantities are limited.  Get your jar now.    BUY NOW →

## Ingredients



All ingredients: Vegetable Oil, Phosphatidylcholine (From Sunflower), Chondroitin Sulfate (Not From Animal Source), Probiotic Blend (Bifidobacterium and Kefir Grains), Full Spectrum Cannabis Sativa Extract (CDB).

Directions for use: Using a clean utensil (wooden compressor, plastic spoon, or any clean household utensil) Use a very small amount (size of a pea,) apply to neck or any area that needs lymphatic drainage 1-2 times per day. Rub in thoroughly and massage along the lymph nodes until fully absorbed. It is important not to put your fingers directly into the as this could cause bacteria to form.



